**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 20 Cr. 165 (JEB) |
| v. | **REDACTED PUBLIC VERSION** |
| KEVIN CLINESMITH, | |
| Defendant. | |

**KEVIN CLINESMITH'S SENTENCING MEMORANDUM
IN SUPPORT OF A SENTENCE OF PROBATION**

December 3, 2020

Justin V. Shur
Emily K. Damrau
MOLOLAMKEN LLP
600 New Hampshire Ave., NW, Suite 500
Washington, DC  20037
Telephone:  (202) 556-2000
Facsimile:  (202) 556-2001

Megan Cunniff Church
Jordan Rice
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, Illinois 60654
Telephone:  (312) 450-6700
Facsimile:   (312) 450-6701

*Attorneys for Kevin Clinesmith*

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

I.     Kevin's Background ..................................................................................................... 3

      A.    Early Life and Education ................................................................................. 3

      B.    Public Service Career ..................................................................................... 5

      C.    Kevin's Family ............................................................................................... 7

II.    The Offense Conduct .................................................................................................. 8

      A.    The First FISA Application and the Initial Inquiry Regarding Individual #1's History with the OGA ................................................................. 10

      B.    The Final Application and Kevin's Inquiry as to Individual #1's History with the OGA ......................................................................... 12

III.   The Plea Agreement and Pre-Sentence Report ........................................................ 16

ARGUMENT ...................................................................................................................... 18

I.     Legal Standard ......................................................................................................... 18

II.    A Sentence of Probation Is Warranted ..................................................................... 18

      A.    Kevin's History and Characteristics Warrant a Sentence of Probation ................ 18

            1.    Kevin Has Displayed Admirable Resolve Throughout His Life .............. 19

            2.    Kevin Was a Dedicated Public Servant .................................................... 19

            3.    Kevin Is Devoted to Others ........................................................................ 21

      B.    The Nature and Circumstances of the Offense Warrant Probation ...................... 22

            1.    Kevin Was Under Tremendous Pressure ................................................... 22

            2.    Kevin Believed the Words He Added to the Email Were Accurate ......... 24

3.    Kevin Did Not Intend To Mislead Anyone About Individual #1's Relationship with the OGA...............................................................26

4.    Kevin Did Not Act for Personal Benefit.....................................................28

C.    A Sentence of Probation Reflects the Seriousness of the Offense........................30

D.    A Sentence of Probation Is Warranted Given the Significant Punishment Already Inflicted on Kevin ................................................................................34

E.    A Sentence of Probation Affords Adequate Deterrence, Promotes Respect for the Law, and Protects the Public from Further Crimes ...................................37

F.    Risks Posed by the COVID-19 Pandemic Also Weigh in Favor of a Non-Custodial Sentence...........................................................................................38

CONCLUSION...................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Banks v. Booth*,
459 F. Supp. 3d 143 (D.D.C. 2020) ..........................................................................38

*Gall v. United States*,
552 U.S. 38 (2007) ................................................................................................18, 31

*Koon v. United States*,
518 U.S. 81 (1996) ......................................................................................................18

*Nelson v. United States*,
555 U.S. 350 (2009) ....................................................................................................18

*Pepper v. United States*,
562 U.S. 476 (2011) ....................................................................................................18

*Rita v. United States*,
551 U.S. 338 (2007) ....................................................................................................19

*United States v. Dickinson*,
No. 1:12-cr-00197-BAH (D.D.C. 2012) .....................................................................31

*United States v. Gardellini*,
545 F.3d 1089 (D.C. Cir. 2008) .................................................................................36

*United States v. Giraldo-Serna*,
118 F. Supp. 3d 377 (D.D.C. 2015) ...........................................................................17

*United States v. Kaufman*,
791 F.3d 86 (D.C. Cir. 2015) .....................................................................................30

*United States v. Knights*,
534 U.S. 112 (2001) ....................................................................................................31

*United States v. Lieb*,
No. 1:10-cr-00144-RBW (D.D.C. 2010) .....................................................................31

*United States v Lookman*,
No. 1:19-cr-01439-WJ (D.N.M. 2020) ........................................................................32

*United States v. Mason*,
No. 17-cr-195 (TSC), 2020 WL 4199553 (D.D.C. July 10, 2020) ............................38

*United States v. Siemaszko*,
   No. 3:06-cr-00712-DAK-3 (N.D. Ohio 2009) .......................................................32

*United States v. Silva*,
   No. 1:16-cr-00069-TFH (D.D.C. 2017) .............................................................31

*United States v. Stadd*,
   No. 1:09-cr-00065-RMC (D.D.C. 2009) ............................................................31

## STATUTES AND RULES

18 U.S.C. § 1001 ...........................................................................................................37

18 U.S.C. § 1001(a)(3) ..................................................................................................16

18 U.S.C. § 3551 ...........................................................................................................32

18 U.S.C. § 3553 ...........................................................................................................19

18 U.S.C. § 3553(a) ..................................................................................................17, 18

18 U.S.C. § 3553(a)(1) ..................................................................................................18

18 U.S.C. § 3553(a)(2)(A) .......................................................................................18, 37

18 U.S.C. § 3553(a)(2)(B) .......................................................................................18, 37

18 U.S.C. § 3553(a)(2)(C) .................................................................................18, 37, 38

18 U.S.C. § 3553(a)(3) ..................................................................................................18

18 U.S.C.  § 3553(a)(6) .............................................................................................18, 31

18 U.S.C. § 3563(a)(2) ..................................................................................................32

18 U.S.C. § 3563(b)(12) ................................................................................................32

18 U.S.C. § 3663(a)(2) ..................................................................................................17

18 U.S.C. § 3663A .........................................................................................................17

18 U.S.C. § 3771(e)(2) ..................................................................................................17

5 C.F.R. § 731.202(b) ....................................................................................................34

CARES Act, Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 515-16 (2020) ........39

Pub. L. No. 98-473, § 239, 98 Stat. 1988, 2039 (1984) ................................................32

U.S.S.G. § 5E1.2(a) ....................................................................................................34

U.S.S.G. § 5E1.2(c)(3) ...............................................................................................34

U.S.S.G. § 5E1.2(d) ....................................................................................................35

U.S.S.G. § 5E1.2(e) ....................................................................................................35

### OTHER AUTHORITIES

*A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election* (June 2018), https://www.justice.gov/file/1071991/download ..................................................29

Att'y Gen. to Dir. Of Bureau of Prisons, Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020), *available at* https://www.justice.gov/ file/1262731/download ..................................................39

*Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources* (2006) ...............................................................................................14

Bureau of Justice Statistics, *Federal Criminal Case Processing Statistics*, https://www.bjs.gov/fjsrc/tsec.cfm ................................................................32

Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited Dec. 1, 2020) .......................................................................................39

Ctrs. for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19)*, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited Dec. 1, 2020) ...............................................................................39

Dep't of Justice, Off. of the Inspector Gen., *Audit of the Federal Bureau of Investigations Management of Its Confidential Human Source Validation Processes* (Nov. 2019), *available at* https://oig.justice.gov/reports/2019/a20009.pdf ......................................14

Dep't of Justice, Off. of the Inspector Gen., *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* (Dec. 8, 2019), https://www.justice.gov/storage/120919-examination.pdf .............................8

*Don't Believe the Left: This Anti-Trump FBI Lawyer's Abuse Was Outrageous*, N.Y. Post (Aug. 14, 2020) https://nypost.com/2020/08/14/dont-believe-the-left-this-anti-trump-fbi-lawyers-abuse-was-outrageous .......................................35

*FBI Confidential Human Source Policy Guide* §10.12 (Sept. 21, 2015) .....................25

Tim Haine, RealClearPolitics, *Nunes: Phase Two of Impeachment Circus Begins this Week* 6:20-6:23 (Dec. 1, 2019),
https://www.realclearpolitics.com/video/2019/
12/01/nunes_phase_two_of_impeachment_circus_begins_this_week.html ..........................35

Letter from Individual #1 to James Comey (Sept. 25, 2016), *available at*
https://tinyurl.com/yyhhdgow .....................................................................10

Charles Lipson, RealClearPolitics, *Will the Dam Break After Clinemsith's Plea?* (Aug. 18, 2020)
https://www.realclearpolitics.com/articles/2020/08/18/will_the_dam_break_af
ter_clinesmiths_plea_143983.html ...............................................35

Josh Rogin, *Trump's Russia Adviser Speaks Out, Calls Accusations 'Complete Garbage,'* Wash. Post (Sept. 26, 2016), https://tinyurl.com/y4y9lt5j ....................................10

Jop de Vrieze, Science, *More People Are Getting COVID-19 Twice, Suggesting Immunity Wanes Quickly in Some* (Nov. 18, 2020),
https://www.sciencemag.org/news/2020/11/more-people-are-getting-covid-
19-twice-suggesting-immunity-wanes-quickly-some ..............................................38

Univ. of Pittsburgh, *COVID-19 Reinfection and You* (Nov. 11, 2020),
https://www.pittwire.pitt.edu/news/covid-19-reinfection-and-you .........................................38

U.S. Census Bureau, *Quick Facts: United States*,
https://www.census.gov/quickfacts/fact/table/US/PST045219 ...............................................39

White House, *Remarks by President Trump* (Aug. 14, 2020),
https://www.whitehouse.gov/
briefings-statements/remarks-president-trump-press-briefing-august-14-2020/ ..............29, 35

## **INTRODUCTION**

Kevin Clinesmith made a grievous mistake.  By altering a colleague's email, he cut a corner in a job that required far better of him.  He failed to live up to the FBI's and his own high standards of conduct.   And he committed a crime.   Kevin pled guilty and accepts full responsibility.   He deeply regrets his conduct and apologizes to all those who have been affected—including his former colleagues, the FBI, the DOJ, the Court, the public, and his family.

The conduct that led to this case arose from an FBI investigation into whether the 2016 Trump presidential campaign had improperly coordinated with the Russian government.  As part of that investigation, the FBI and DOJ had obtained a FISA warrant for an advisor to the campaign, Individual #1.  On the third renewal of the warrant, an FBI agent who served as the affiant asked Kevin—an FBI lawyer assisting with the investigation—to inquire with another government agency as to whether Individual #1 had previously served as a "source" for that agency.

Kevin did as instructed, and subsequently reported to the agent what he believed to be true, albeit incorrectly: that Individual #1 had been a "subsource" and not a "source."  The agent asked Kevin whether the other agency had provided that information in writing.  Kevin thought it had, and told the agent he would forward him the email.  However, after reviewing the other agency's email, Kevin saw that it did not explicitly state whether Individual #1 had been a source.  Kevin then took a shortcut:  He added the words "and not a 'source'" to the email to reflect his understanding, and forwarded the altered email to the agent.

Kevin recognizes that his conduct was inexcusable.  He knew the original email did not contain those additional words.   And he knew that the agent would, upon receiving the

forwarded email, believe that it did.  Rather than altering the email, Kevin should have explained to the agent that while he understood that Individual #1 was not a source, the email from the other agency did not say so specifically.  Kevin deeply regrets not having done so.  And he recognizes the significance of his lapse in judgment; he understands how the altered email could have influenced the agent and, in turn, the renewal application.

Significantly, however, Kevin did not knowingly lie about the relationship between Individual #1 and the other government agency.  When Kevin informed the agent (and others) that Individual #1 was not a source, he genuinely believed he was conveying accurate information.

Moreover, Kevin's conduct, while serious, was an aberration in a life otherwise characterized by hard work, determination, and dedication to the service of others, as the more than 55 letters submitted to the Court attest.[1]  At every step in Kevin's life, his professionalism, integrity, humility, and kindness have been lauded.  Now, however, Kevin's reputation has been ruined, his professional career is in shambles, and he has been unable to support his family financially at a time when he and his wife are expecting their first child.  While he has nobody but himself to blame for those consequences, they are, in conjunction with a non-custodial sentence, a just punishment for Kevin's critical lapse in judgment.  For these reasons and the many others discussed below, we respectfully submit that, as advocated by the U.S. Probation Office, a within-Guidelines sentence of probation is warranted.

---

[1] These letters are provided in the accompanying Exhibits.  *See* Exs. 1-58, 64.

## BACKGROUND

I.   KEVIN'S BACKGROUND

A.   Early Life and Education

Kevin was raised in Kingston, Michigan, a village of just over 400 people.  He grew up on a small farm where his family raised dairy cows and primarily grew crops to use as animal feed.

During Kevin's early years, his father's temper led to verbal and, on occasion, physical abuse directed toward Kevin, his older siblings (Kevin was the youngest child by twelve years), and his mother.  Ultimately, that abuse resulted in Kevin's mother moving out with him when he was nine years old.  After that, Kevin saw his father only occasionally until they reconciled years later after his father addressed his anger issues.

Money was always tight for the Clinesmith family.  *See* Ex. 9 (Kevin's brother:  We "barely got by at times").  Kevin's father was almost entirely reliant on Social Security Disability Insurance due to injuries sustained in a farming accident.  Kevin's mother worked by starting her own day care service, but Kevin had to help make ends meet.  During high school, in addition to helping out with his mother's day care service, Kevin worked at Walmart and at a restaurant, occasionally missing class so he could take extra shifts.

In high school, Kevin was a decent student, but his grades suffered due to absences resulting from his need to help financially support his family.  His interest in education also lagged; high school didn't engage him.  But, with the encouragement of close friends, Kevin decided to enroll at Saginaw Valley State University, located in Saginaw, Michigan, rather than join his brothers at a job in the automotive industry.  The decision to enroll in college was not

without controversy in Kevin's family:  Kevin was expected to take the job his brother had lined up for him.  Kevin instead chose to pursue higher education.

Kevin flourished in college, where he expanded his horizons well beyond his small hometown.  *See* Ex. 33 (College professor:  Kevin "distinguished himself academically as an outstanding student" and was "in the top 5% out of thousands of students" that the professor had encountered over the last thirty years).  His political science courses awakened his intellectual curiosity and a dream to work in public service, specifically for the federal government.  After the terrorist attacks of 9/11, Kevin was determined to work in the national security field.  *See* Ex. 13 (Law school classmate:  Kevin's "dream for as long as I knew him" was to work for the federal government); Ex. 5 (Friend: working for the FBI was a "lifetime goal[ ]" for Kevin).  He doggedly pursued his goals, interning for a U.S. Senator; triple-majoring in political science, criminal justice, and public administration; writing an honors thesis on increasing young-voter turnout; and achieving a 3.85 GPA.  All the while, Kevin paid for college without financial support from his family, while still making time to help his mother with her day care service in Kingston whenever he could.  *See* Ex. 17.  Ultimately, Kevin graduated early, *summa cum laude*, and as a member of the Honors Program, becoming the first member of his family to earn a college degree.

Kevin's outstanding undergraduate record and strong test scores earned him a full scholarship to Michigan State University College of Law in East Lansing, Michigan.  If college had been a major change from life in Kingston, Michigan State University was another world altogether, with a student body more than 100 times larger than Kingston's entire population. There, Kevin continued to thrive, becoming "well-liked" and "well-respected amongst his peers" for his "excellent work ethic" and "positive and productive attitude."  Ex. 25; *see also* Ex. 13

4

(friend describing Kevin as "one of the driving forces of positivity in my life during law school").  Beyond Kevin's stellar academic work—he graduated *magna cum laude*—he served as a student notes editor of the school's flagship law review; and co-started a student organization that hosted leading figures in the law, including luminaries like Dean Erwin Chemerinsky.  Kevin also completed internships in the Michigan Attorney General's Office as well as the Michigan Governor's counsel's office.

**B.     Public Service Career**

Kevin had many opportunities following graduation.  He had so impressed his superiors at the Michigan Governor's counsel's office that they offered him a job.  Kevin turned it down, though, and moved to Washington, D.C. in 2007 to pursue his longtime dream by serving in the U.S. intelligence community.  He started as an Intelligence Analyst in the U.S. Department of Energy's Office of Intelligence and Counterintelligence.  In that role, he initially worked on counterintelligence initiatives that safeguarded the nation's nuclear arsenal, national laboratories, and energy infrastructure.  Over time, however, he switched his focus to foreign intelligence, specifically in global geopolitical and energy security issues, becoming an in-demand intelligence briefer and writer, authoring several Presidential Daily Briefs.  *See* Ex. 7.  In recognition of his aptitude, Kevin also was detailed to U.S. Africa Command in 2010 to undertake research missions and to meet with African officials to discuss energy security issues across the continent.

During the five years Kevin served at DOE, his work was outstanding.  According to his supervisor, Kevin "was the most gifted employee [he had] ever had the pleasure of supervising." Ex. 7.  Kevin was a "diligent[ ]" worker and the team's " 'rock' in a time of great need."  *Id.*; *see also* Ex. 23 (colleague recognizing Kevin's "willing[ness] to share in the burden").  And beyond his fine work, Kevin displayed "genuine warmth and care towards his peers," gaining a

reputation as "the nicest guy in the room." Ex. 7. In recognition of Kevin's outstanding contributions, he received excellent performance reviews as well as numerous awards, including the Secretary of Energy's Achievement Award for his team's work on the Arab Spring's impact in the Middle East and Africa.

While he worked at DOE, Kevin attended the Georgetown University Law Center at night to earn a Master of Laws in National Security Law, graduating in 2012 with distinction. His LLM helped pave the way for his eventual transition from Intelligence Analyst to an attorney role.

In April 2013, Kevin was detailed from DOE to serve as an Assistant General Counsel in the FBI's National Security and Cyber Law Branch of the Office of the General Counsel. His work focused primarily on complex counterintelligence investigations. Due to his prior experience as an Intelligence Analyst at DOE, Kevin also served as a particularly effective bridge between the FBI Intelligence Analysts and the FBI's Office of the General Counsel. In July 2015, due to his exceptional service as a detailee, Kevin was hired as an official FBI employee within the National Security and Cyber Law Branch.

Working for the FBI was Kevin's "dream job." *See* Ex. 22. His colleagues' dedication to protecting the American public inspired him, and each day of work was exciting and meaningful. His colleagues recognized his "legal talent" and his "abilities" and "ethics." Ex. 12. Within the National Security and Cyber Law Branch, Kevin was thought of as the "go-to person" for particularly difficult matters. Ex. 22. Beyond his legal abilities, Kevin's colleagues appreciated that he was "always eager to help out, even for matters outside of his job duties." Ex. 12; *see also* Ex. 19 (FBI OGC colleague: Kevin was "a dedicated civil servant" who was "willing[ ] to go above-and-beyond" to help colleagues).

While Kevin's work at the FBI was deeply rewarding, it was also taxing.  His job was incredibly demanding and high-stress.  Kevin frequently worked well beyond normal business hours and on weekends, sacrificing time with his family and friends, many of whom did not fully understand his responsibilities at work given its sensitive nature.  To meet the demands of his job, Kevin even delayed plans with his now-wife to marry and start a family.  Nevertheless, the daily challenges of working at the FBI did not diminish the fulfillment Kevin derived from his work.  Through hard work and dedication, Kevin had achieved his lifelong goal of a career in service of the public good and the country's national security—one that was unimaginable to him as a child growing up in Kingston.

C.     **Kevin's Family**

Kevin met his wife, Stephanie, in 2009.  She had recently returned from two years of Peace Corps service in Burkina Faso, and they quickly bonded over their mutual interest in Africa, which Kevin had developed while at DOE.  Stephanie and Kevin have encouraged and supported one another throughout their relationship, challenging each other to grow.  She urged him to pursue his career goals in the national security field, supporting him as he attended Georgetown for his LLM degree while working full time, and when he eventually transitioned into an attorney role within the FBI.  Likewise, Kevin supported Stephanie as she earned a Master's Degree in Public Health at Johns Hopkins University and pursued a career in health policy.  Their relationship is one of "true unconditional love" and partnership.  Ex. 58.  They have remained by one another's side throughout the investigation of Kevin's conduct and subsequent guilty plea.

Stephanie and Kevin are expecting their first child—a boy—due to be born in March 2021.  They are excited, even at this stressful time, to begin their family together.  Kevin has been devoted to Stephanie's and the baby's health, attending prenatal doctors' visits; reading

books about pregnancy, birth, and parenting; and catering to Stephanie's changing dietary needs. Ex. 58. While Stephanie is doing her best to focus on the present and minimize stress during her pregnancy, the uncertainty surrounding Kevin's future is a source of significant anxiety. As she wrote in her letter to the Court, "To lose [Kevin] for any amount of time, especially . . . on the precipice of becoming parents, would be heart-breaking." *Id.* She hopes, however, that Kevin will be by her side during the birth of their son and during his infancy. *Id.*

## II.    THE OFFENSE CONDUCT

In July 2016, the FBI opened an investigation, code named "Crossfire Hurricane," into whether certain individuals associated with the Donald J. Trump for President Campaign had coordinated with the Russian government's efforts to interfere in the 2016 U.S. presidential election.[2]   Statement of Offense, Dkt. 9 ¶4. In his role as Assistant General Counsel in the National Security and Cyber Law Branch of the FBI's Office of the General Counsel, Kevin was assigned to support the FBI agents working on the investigation. *Id.* ¶¶2-3, 5-6.

As part of the investigation, FBI Headquarters opened cases on several individuals who had been affiliated with the Trump campaign and had ties to the Russian government, including Individual #1. Dkt. 9 ¶4; OIG Report at ii. At the time, Individual #1 had already been the subject of an ongoing counterintelligence investigation by the FBI's New York Field Office. OIG Report at 2, 61-63. For several years, the New York Field Office had an interest in Individual #1 because of his relationships with certain Russian intelligence officers. *Id.* at 61-63.

---

[2] The information discussed in this Memorandum related to the Crossfire Hurricane investigation is public and is largely derived from the Department of Justice Office of the Inspector General's report on the investigation. *See* Dep't of Justice, Off. of the Inspector Gen., *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*, (Dec. 8, 2019), https://www.justice.gov/storage/120919-examination.pdf (hereinafter "OIG Report").

Based in part on those relationships, the Crossfire Hurricane investigative team sought approval for and conducted surveillance on Individual #1 under the Foreign Intelligence Surveillance Act.  OIG Report at 121-22.  As the Court is well aware, under FISA, the U.S. government can seek authorization from the Foreign Intelligence Surveillance Court to conduct electronic surveillance of a U.S. citizen for foreign intelligence purposes (*e.g.*, if it is able to establish probable cause that the individual is acting as an agent of a foreign power.).  *See generally id.* at 31-39.  As is standard practice, both the FBI and DOJ were involved in seeking a FISA warrant for Individual #1.  *See id.* at 39-42, 121, 249-51.

The FBI and DOJ prepared and submitted four FISA applications for Individual #1—the initiation application and three renewal applications.  Dkt. 9 ¶ 6.  Pursuant to FBI procedures, the FBI case agent—who was involved in the day-to-day activities of the investigation of Individual #1—was responsible for collecting and developing all material facts regarding Individual #1 so as to justify FISA authority or, in the case of renewals, continued FISA coverage.  The case agent then provided that information to the attorney assigned to prepare the FISA applications. As is customary, that attorney was not an FBI attorney such as Kevin, but rather an attorney in DOJ's National Security Division's Office of Intelligence.  *See, e.g.*, OIG Report at 39-40, 126. The DOJ attorney, working with the case agent, then drafted the FISA applications and submitted them to the FISC.  *See, e.g.*, *id.* at 39-42, 128, 155-56.

The four FISA applications for Individual #1 asserted that the Russian government was attempting to undermine and influence the 2016 U.S. presidential election and covertly influence U.S. foreign policy after the election.  OIG Report at vii.  The applications further asserted that the FBI believed Individual #1 was acting in conjunction with the Russian government in those efforts.  *Id.*  All four applications were granted.  *Id.* at 7.  While the specific conduct that led to

this case involved support that Kevin provided in connection with the fourth application, the events leading up to that application provide helpful context.

### A.     The First FISA Application and the Initial Inquiry Regarding Individual #1's History with the OGA

The FBI filed the initial FISA application regarding Individual #1 on October 21, 2016. OIG Report at vi.  Prior to the initial application, on September 25, 2016, Individual #1 sent a letter to the FBI Director in which he claimed, among other things, that he had "interacted with members of the U.S. intelligence community including the FBI and [another U.S. government agency] for many decades."  Letter from Individual #1 to James Comey (Sept. 25, 2016), *available at* https://tinyurl.com/yyhhdgow; *see* OIG Report at 145.  That letter was discussed and linked in a Washington Post opinion column dated September 26, 2016.  Josh Rogin, *Trump's Russia Adviser Speaks Out, Calls Accusations 'Complete Garbage*,*'* Wash. Post (Sept. 26, 2016), https://tinyurl.com/y4y9lt5j.

Subsequently, on September 29, 2016, the DOJ attorney assigned to draft the initial FISA application asked the FBI case agent:  "[D]o we know if there is any truth to [Individual #1's] claim that he has provided information to [the other U.S. government agency ("OGA")]—was he considered a source/asset/whatever?"  OIG Report at 131; *see also id.* at 157.  According to the DOJ lawyer, if Individual #1 had a relationship with the OGA, it would raise a question of whether his contacts with Russian intelligence officers—which were in part the basis for the FISA warrant—were "at the behest of the [OGA] or with the intent to assist the U.S. government."  *Id.* at 131, 157.  In response, the case agent stated:  "[Individual #1] did meet with [the OGA], however, it's dated and I would argue it was/is outside scope, I don't think we need it in [the FISA application]."  *Id.* at 157; *see also id.* at 131.  In preparing FISA applications, the DOJ attorney (really, the entire investigative team) rely heavily on the case agent for factual

matters related to probable cause.  *See id.* at 129.[3]  Thus, because the case agent concluded that Individual #1's meetings with the OGA were "outside scope," neither the initial FISA application, nor the first and second renewal, contained any information regarding Individual #1's prior relationship with the OGA.  *Id.* at 159.

According to the OIG Report, "the information [the case agent] provided to the [DOJ attorney] was incomplete, inaccurate, and in certain respects contrary to the information" in the FBI's possession at the time—most notably, a memorandum the FBI had received from the OGA on approximately August 17, 2016 (the "August 17 Memorandum").  OIG Report at 131; *see id.* at 157-58.  Contrary to the case agent's description, the August 17 Memorandum indicated that Individual #1 had been an OGA "operational contact"[4] during the period covering some (but not all) of the interactions between Individual #1 and Russian intelligence officers relied upon in the initial FISA application.  *Id.* at viii, 131, 158 & n.295.  The Memorandum further indicated that, during that time period, Individual #1 had provided information to the OGA concerning his prior contacts with certain Russian intelligence officers.[5]  Dkt. 9 ¶ 7; *see* OIG Report at 61 n.180, 149-50.

---

[3] *See also* OIG Report at 43 ("[I]t is the case agent's responsibility to ensure that statements contained in applications submitted to the FISC are 'scrupulously accurate.'"); *id.* at 376 (noting that the responsibility of raising issues for the DOJ attorney "fell squarely on the case agents who were most familiar with the case information").

[4] As the Court is aware, nearly all federal law enforcement and intelligence agencies cultivate relationships with individuals who are in a position to provide useful information.  Different agencies, however, use different terms to refer to those individuals.  The OGA, for example, uses the term "operational contact," while the FBI does not.  As explained further below, the use of different terms among agencies may have contributed to Kevin's misunderstanding concerning Individual #1's relationship with the OGA.

[5] In the OGA's parlance, the term "operational contact" refers to a person who provides information to the OGA "acquired through the normal course of [his] activities," but who cannot be "task[ed]" by the agency.  OIG Report at 6 n.8.  Accordingly, the August 17 Memorandum

Kevin was not aware of that information, however.  When he assisted the FBI's efforts to obtain the initial FISA warrant, Kevin knew of no prior relationship between Individual #1 and the OGA.  And he was not involved in any discussions—including the one discussed above between the case agent and DOJ attorney—concerning whether or not to include information about that relationship in the FISA application.  As was typical, the DOJ attorney worked primarily with the case agent to collect and develop information for the FISA application.  The first time Kevin was asked to inquire into whether, and to what extent, Individual #1 had a relationship with the OGA was in connection with the fourth and final application.

### B.     The Final Application and Kevin's Inquiry as to Individual #1's History with the OGA

In April and May 2017, Individual #1 asserted during interviews with media outlets that he had assisted U.S. intelligence agencies in the past.  Dkt. 9 ¶9; OIG Report at 248.  Similar to the DOJ attorney's inquiry in September 2016 as to whether there was "any truth" to Individual #1's claims, *see* pp.10-11 *supra*, an FBI Supervisory Special Agent ("SSA")—who was the FBI team lead for the various investigations related to the Russian government's election interference efforts and who served as the affiant on the second and third applications and would serve as the affiant for the fourth application,[6] *see* OIG Report at 66—sought to determine whether Individual #1 had a prior relationship with the OGA, *see id.* at 248.  According to the SSA, if Individual #1 "was being tasked by another agency, especially if he was being tasked to engage Russians" it would be "relevant for the [FISC] to know."  *Id.* at 249; *see id.* at 223.  To address this issue, the

---

indicated that the information Individual #1 had provided the OGA had been acquired in the ordinary course of his activities and not at the direction of the OGA.  *Id.*

[6] With FISA applications, it is standard practice for a supervisor, such as the SSA, to serve as the affiant as opposed to the case agent.  *See* OIG Report at 40-41.  The case agent, however, is still primarily responsible for collecting and developing information for the applications, and working with the DOJ attorney to prepare them.  *Id.* at 43-44.

SSA asked Kevin to inquire with the OGA as to whether Individual #1 had ever been a "source" for that agency.  *Id.*  The SSA instructed Kevin to resolve the issue by working with the case agent and his acting supervisor while the SSA would be on leave for the next several days.

Kevin did as requested.  As one of the Crossfire Hurricane team liaisons to the OGA, Kevin contacted the OGA to seek information about its relationship, if any, with Individual #1.  Specifically, in a June 15, 2017 email to an OGA employee, Kevin stated that there was an "indication that [Individual #1] may be a '[digraph]' source," and asked if (1) "[Individual #1 was] a source in any capacity," and (2) if so, "what is a '[digraph]' source (or whatever type of source he is)?"  *Id.* at 249-50.[7]

The OGA employee responded the same day, listing (but not attaching) reports previously prepared by the OGA and provided to the FBI, which mentioned Individual #1, and explaining:

> [The OGA uses] the [digraph] to show that the encrypted individual . . . is a [U.S. person].  We encrypt the [U.S. persons] when they provide reporting to us.  My recollection is that [Individual #1] was or is . . . [digraph] but the [reports] will explain the details.

Dkt. 9 ¶ 12.  While the email indicated that the OGA employee's "recollection" was that Individual #1 had some relationship with the OGA (*i.e.*, he provided "reporting" to the agency), it did not answer the question of whether Individual #1 had been a "source."[8]  *See* OIG Report at

---

[7] We understand the "digraph" refers to a two-letter designation used by the OGA to encrypt, or mask, the identity of certain U.S. Persons.  But as indicated in Kevin's email to the OGA, at the time, he did not know what the digraph meant.  While he had heard members of the investigative team refer to Individual #1 colloquially using the digraph and thus incorporated it into his inquiry, Kevin did not equate the digraph to being a source.

[8] The term "source" (formally known as a "Confidential Human Source") has a specialized meaning within the FBI.  It refers to "any individual who is believed to be providing useful and credible information to the FBI and whose identity, information, or relationship with the FBI

255 (the SSA later explained to the OIG that the unaltered email "doesn't really answer the question").  Instead, the email referred to a list of OGA reports that would "explain the details" of Individual #1's relationship with the OGA.

One of the reports listed in the OGA email was the August 17 Memorandum.  Kevin, however, does not recall reviewing the August 17 Memorandum or any of the other reports referenced in the OGA email.  OIG Report at 250; Dkt. 9 ¶ 14.  Those reports were not attached to the OGA email due to their sensitive nature, and Kevin did not have direct access to them (although they were available upon request in another location within FBI headquarters).  Dkt. 9 ¶¶ 12, 14.  Moreover, as with the DOJ attorney—who relied on the case agent's review of underlying documents when drafting the FISA applications—it was not typical for someone in Kevin's position to review those types of reports.  Kevin's and the OGC's role generally was to conduct legal reviews of the FISA applications, not to obtain, review, or evaluate the underlying documents related to the applications.  OIG Report at 41, 208.  That was the case agent's role. *See id.* at 43-44.

As such, the same day Kevin received the OGA's response, he forwarded it—including the list of reports that would "explain the details" of Individual #1's relationship with the OGA—to the case agent[9] and his acting supervisor.  OIG Report at 250.  Upon receiving the email, the case agent's supervisor messaged the case agent (copying Kevin) that she would "pull

---

warrants confidential handling."  Dep't of Justice, Off. of the Inspector Gen., *Audit of the Federal Bureau of Investigations Management of Its Confidential Human Source Validation Processes* (Nov. 2019), *available at* https://oig.justice.gov/reports/2019/a20009.pdf (citing *Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources* (2006)). However, unlike an "operational contact," as the term is used by the OGA, an FBI source ***may*** be "tasked" by the FBI.  *See, e.g.*, OIG Report at xvi.

[9] This was a different case agent from the one who worked on the initial FISA application, who had been replaced after receiving a promotion.  OIG Report at 210.

these [reports] for [the case agent] tomorrow and get [the case agent what he] need[s]." *Id.* The supervisor subsequently indicated in messages exchanged with the case agent (and Kevin) that the reports had in fact been pulled and reviewed by the case agent and his supervisor.

The following day, Kevin also forwarded the OGA's response to the DOJ attorney drafting the FISA renewal application.[10]  OIG Report at 251.  The DOJ attorney responded to Kevin, "thanks I think we are good and no need to carry it any further."[11]  *Id.*  Upon receiving that message from the DOJ attorney, and having previously provided the OGA email to the case agent and acting supervisor and those agents having read the OGA reports, Kevin believed the matter of Individual #1's status with the OGA had been addressed.

The next week, however, the SSA—who had just returned from leave—revisited the issue of Individual #1's status with Kevin.  OIG Report at 252-53.  In a series of instant messages, Kevin explained to the SSA his understanding that Individual #1 had been a "subsource" (and not a source) for the OGA—an honest but mistaken understanding as explained further below.  *Id.*  The SSA noted that he had "thought otherwise" based on the materials he reviewed (presumably his prior reading of the OGA reports), but that he would "re-read" them.  *Id.* at 253.  The SSA also asked if Kevin had it in writing from the OGA that Individual #1 was not a source.  *Id.*  Kevin thought he had, and indicated he would forward the email to the SSA.  *Id.*

---

[10] The DOJ attorney who drafted the final application was the same DOJ attorney who drafted the previous three applications.  OIG Report at 131, 157.

[11] At the time Kevin forwarded the email to the DOJ attorney, records show that Kevin and the DOJ attorney spoke by phone.  While neither remembers the specifics of the call, OIG Report at 251-52, in a subsequent instant message to the SSA, Kevin stated "in discussing [Individual #1's status] with [the DOJ attorney], he agreed we do not need to address it in the FISA," *id.* at 253.

Kevin, however, reviewed the OGA email and realized that it did not specifically address the issue of whether Individual #1 had been a source.  In a misguided attempt to save himself time and the embarrassment of having to backtrack on his assurance he had it in writing, Kevin forwarded the OGA's response to the SSA (including the list of OGA reports) immediately after telling the SSA he would do so, but Kevin added the phrase notated in bold to reflect his understanding of Individual #1's status:

> [The OGA uses] the [digraph] to show that the encrypted individual . . . is a [U.S. person].  We encrypt the [U.S. persons] when they provide reporting to us.   My recollection is that [Individual #1] was or is . . . [digraph] **and not a "source"** but the [documents] will explain the details.

OIG Report at 254-55.

After sending the email, Kevin had limited substantive involvement with the renewal application.  And he had no involvement in deciding whether to include Individual #1's status in the application (*i.e.*, as an OGA "subsource," as Kevin mistakenly understood it, or as an "operational contact" as described in the August 17 Memorandum).  Over the next 10 days, the DOJ attorney and the case agent worked on and finalized the application, and the SSA signed it.  OIG Report at 220, 224-27.  As with the previous applications, the fourth application did not include information about Individual #1's prior relationship with the OGA.  *Id.* at 8, 248.

## III.   THE PLEA AGREEMENT AND PRE-SENTENCE REPORT

Kevin has acknowledged that his alteration of the OGA email was a crime.  On August 19, 2020, he pleaded guilty to one count of making or using a false writing or document, in violation of 18 U.S.C. § 1001(a)(3).  Dkt. 8.  Specifically, his false statement was adding the phrase "and not a 'source' " to the OGA email when he knew the email originally did not contain those words.  Dkt. 9 ¶¶ 16-17.  That is, Kevin knowingly mispresented to the SSA that the

OGA's original email contained the words "and not a 'source.'"  But, as explained more fully below, Kevin genuinely believed that Individual #1, in fact, was not a source.

Pursuant to the Plea Agreement, the parties believe that the applicable Sentencing Guidelines range is 0-6 months' imprisonment.  Dkt. 8 at 3.  The U.S. Probation Office agreed. As described in the Pre-Sentence Report ("PSR"), the Probation Office determined that the applicable Guidelines range is 0-6 months' imprisonment based on a Base Offense level of six, a two-level enhancement for Abuse of Position of Trust,[12] a two-level reduction for Acceptance of Responsibility, and a Criminal History Category of I (based on no prior criminal conduct or arrests).  Dkt. 17 ¶ 96.[13]

The Probation Office further agreed that a non-custodial sentence is warranted here.  In considering the factors outlined in 18 U.S.C. § 3553(a), the Probation Office recommended a within-Guidelines sentence of 12 months of probation.  Dkt. 18 at 1.  In doing so, it highlighted Kevin's "commendable life," the unlikelihood that he "would ever again involve himself in a

---

[12] The Plea Agreement permitted Kevin to argue that the enhancement for Abuse of Position of Trust should not apply.  While there may be technical challenges to the application of that enhancement, Kevin chose not to object to it as the two-level enhancement has no effect on the ultimate Guidelines range of 0-6 months' imprisonment.  Moreover, whatever the technical meaning of "position of trust" is pursuant to the Guidelines, Kevin acknowledges that he held a position of trust with the FBI in the ordinary sense of the term and that his former colleagues, the Bureau, and the public deserved far better from him than the conduct that led to this case.

[13] The Probation Office found that restitution is "not applicable," Dkt. 18, and the government concluded "there is no identifiable victim in this case," Dkt. 17 ¶ 25.  Nevertheless, Individual #1 submitted a victim impact statement.  Dkt. 19.  Individual #1, however, is not a victim as defined under the relevant statutes, *see* 18 U.S.C. § 3663(a)(2) (defining "victim" as "a person directly and proximately harmed as a result of the commission of an offense"); 18 U.S.C. § 3663A (same); 18 U.S.C. § 3771(e)(2) (same), or this Court's precedent, *United States v. Giraldo-Serna*, 118 F. Supp. 3d 377, 382 (D.D.C. 2015).  Kevin's alteration of the email, while admittedly wrong, did not directly and proximately harm Individual #1.  For one thing, according to his own submission, Individual #1's alleged harm was the result of media coverage which began ***months before*** the offense conduct.  *See* Dkt. 19.  As Individual #1 is not a victim, he has no right to restitution or to speak at sentencing.

similar situation," and "his family obligations, specifically the impending birth of his child."
Dkt. 18 at 2.

## ARGUMENT

### I.    LEGAL STANDARD

In passing a sentence, courts must first calculate the applicable Guidelines range, which
serves as a "starting point and the initial benchmark" for a sentencing decision. *Gall v. United
States*, 552 U.S. 38, 49 (2007). Once the Guidelines range is calculated, courts must "consider
what sentence is appropriate for the individual defendant in light of the statutory sentencing
factors" set forth in 18 U.S.C. § 3553(a). *Nelson v. United States*, 555 U.S. 350, 351 (2009).
Those factors include "the history and characteristics of the defendant," § 3553(a)(1); the "nature
and circumstances of the offense," *id.*; the "need to avoid unwarranted sentence disparities,"
§ 3553(a)(6); the need to "reflect the seriousness of the offense," "provide just punishment,"
"protect the public" and provide "adequate deterrence," § 3553(a)(2)(A)-(C); "the kinds of
sentences available," § 3553(a)(3); and the need to "promote respect for the law,"
§ 3553(a)(2)(A). Weighing the § 3553(a) factors, we respectfully submit that a within-Guidelines
sentence of probation—combined with the punishments Kevin has already received—is
"sufficient, but not greater than necessary" to meet the goals of sentencing. *Pepper v. United
States*, 562 U.S. 476, 491 (2011) (quoting 18 U.S.C. § 3553(a)).

### II.    A SENTENCE OF PROBATION IS WARRANTED

#### A.    Kevin's History and Characteristics Warrant a Sentence of Probation

The Supreme Court has made clear that, in imposing a sentence, courts should take the
full measure of not just the offense but of the person convicted of the offense. *Koon v. United
States*, 518 U.S. 81, 113 (1996). The conduct that led to this case is "completely out of
character" for Kevin, Ex. 32, and is inconsistent with "who he is" and how he has lived his life,

Ex. 12.  The email incident was an anomalous and unfortunate departure from a life otherwise exemplified by hard work, determination, and his love for and loyalty to his country, his colleagues, his family, and his friends.  The many letters submitted to the Court on Kevin's behalf from individuals who represent different aspects of his life make clear that he is a good, kind, and supportive person who has made significant positive contributions, both personally and professionally.

1.     *Kevin Has Displayed Admirable Resolve Throughout His Life*

Kevin overcame difficult childhood circumstances.  He stepped up at an early age to care emotionally and financially for his family and to independently support himself.  He put himself through college, becoming the first in his family to graduate with a college degree.  He then earned a law degree and an LLM to pursue his aspiration of a career in the federal government as a national security lawyer.  As his sister recognized, Kevin's achievements are "[q]uite amazing for someone from our community."  Ex. 10.  And as his niece put it, "[h]e was and still is our proudest family achievement."  Ex. 48; *see* Ex. 9 (Kevin's older brother:  "Most kids look up to their older siblings.  But that is the opposite for us.  We all look up to Kevin for what he has accomplished.").  His unlikely trajectory from a small farming town to one of the world's preeminent law-enforcement agencies speaks to his determination to serve the public and his sense of purpose.  His grit and resolve weigh in favor of leniency.

2.     *Kevin Was a Dedicated Public Servant*

Kevin devoted himself to a career in public service, which also weighs in favor of a sentence of probation.  *See Rita v. United States*, 551 U.S. 338, 364-65 (2007) (Stevens, J., concurring) (public service may be considered under § 3553).  Since college, Kevin had one goal:  to work in the national security field and help secure the nation's safety.  With hard work in college and law school, he achieved that goal.

19

As an Intelligence Analyst in DOE's Office of Intelligence and Counterintelligence, Kevin compiled an exemplary record, earning excellent performance reviews and numerous awards, including special recognition from the Office of the Director of National Intelligence and the Secretary of Energy for his contributions and work during times of global crisis.  Kevin put in "many long nights and weekends" in "dedication to the team effort."  Ex. 23.  Indeed, he performed at such a high level that his supervisor stated, "I can say without hesitation that Kevin Clinesmith was the most gifted employee I have ever had the pleasure of supervising."  Ex. 7.

Those long nights, weekends, and personal sacrifices paid off when Kevin achieved his dream of working at the FBI.  He loved working for the FBI and was dedicated to its mission— so much so that he told colleagues that he "could not imagine being satisfied" in any other job anywhere else.  Ex. 22.  For him, government service was not a mere stepping stone to more lucrative opportunities in the private sector.  Rather, it was his passion, identity, and lifelong calling.

Kevin excelled at the FBI.  He worked harder than ever before.  His talent and willingness to go above and beyond, to help his co-workers, and to fulfill the FBI's mission made him stand out in a crowd of dedicated, talented public servants.  *See, e.g.*, Ex. 42 (FBI colleague: noting that Kevin's managers "selected him for some of [the FBI's] most difficult and sensitive cases" due to his "legal acumen" and willingness to "assist on a heavy lift").  Indeed, FBI agents and analysts "would specifically request to work solely with Kevin (over many other lawyers) due to his expertise, personable nature, and intellect."  Ex. 52.

███████████,[14] who worked with Kevin in the Office of the Special Counsel, took notice of Kevin's diligence, high-quality work, and reliability.  Ex. 64.

While acknowledging the seriousness of Kevin's conduct, many of his former FBI colleagues continue to support him—as evidenced by the over one dozen letters submitted by current and former FBI employees—recognizing that his "ethics and motivations were never in question" and that he "came to work every day to fulfill the FBI mission and to make the FBI better today than it was yesterday."  Ex. 12; Ex. 44 (OGC attorney:  "Kevin was the kind of colleague who everyone wants on his team: a public servant committed to getting our important work done pursuant to the rule of law while maintaining his generous spirit."); Ex. 43 (Assistant Special Agent in Charge:  "Kevin always displayed a high degree of integrity and a professional work ethic; it is my privilege to endorse his strong moral character.").

3.    *Kevin Is Devoted to Others*

Kevin is always there for others, whether through a kind word, a humane favor, or by lending his full and unselfish support.  His loyalty to his family is unsurpassed.  Kevin became the patriarch of his family when his father died in 2011.  He supported his nieces, emotionally and financially, after they tragically lost their father—Kevin's oldest brother—to a drug and alcohol overdose.  And, more recently, after Kevin's mother suffered a series of strokes resulting in paralysis, and was diagnosed with rapid-onset Alzheimer's Disease and dementia, Kevin managed his mother's care and helped to ensure that she received the best support and medical attention.

Kevin is equally devoted to his friends and colleagues.  As one friend put it, Kevin has a "tenacity for getting people to smile" and always seeks to "treat[ ] people like family, making

---

[14] The text highlighted in yellow is redacted from the publicly filed version of this memorandum.

everyone feel included."  Ex. 53.  In letter after letter to the Court, Kevin's friends, family, and colleagues describe specific instances of ways in which he supported those around him.  He is the type of person who, with no questions asked, "offers to pick up your groceries if you are ill," Ex. 32, and helps you "move no less than *four* times," Ex. 56 (emphasis added).  The type of person who helps clean up a local park, Ex. 58, or helps care for a friend's 90-year-old grandmother at a wedding, Ex. 50.  And his compassion and empathy apply to friends and strangers alike, as demonstrated by an instance where Kevin came to the defense of a woman— who he did not know—when she was being harassed.  Ex. 45.  In short, he is a man with "an extremely kind heart," who "thinks of others over himself," Ex. 56, and is "honest," "reliable," and "loyal," Ex. 25; Ex. 36.  Kevin's good character, public service, and dedication to others strongly weigh in favor of a sentence of probation.

### B.      The Nature and Circumstances of the Offense Warrant Probation

Kevin recognizes the seriousness of the offense to which he pled guilty and in no way intends to minimize it.  We ask, however, that the Court take into account the nature and circumstances of the underlying conduct, which we believe weigh in favor of a within-Guidelines sentence of probation.

#### 1.      *Kevin Was Under Tremendous Pressure*

Those who know Kevin have asked how he came to commit this offense.  *See, e.g.*, Ex. 12 (FBI colleague:  "One FBI agent called me after the news of [Kevin's] guilty plea, distraught with the news, wondering how such a good lawyer and a good person could make such a terrible mistake.").  While there is no satisfactory answer, any explanation must start with the considerable pressure he was under at the time—both at work and in his personal life.  While no mitigating factor can completely excuse Kevin's conduct, this context is important in understanding what led Kevin to make such a critical—and uncharacteristic—lapse in judgment.

At his job, Kevin was burning the candle at both ends. Working on the Crossfire Hurricane investigation—likely the FBI's most high-priority matter at the time—naturally imposed incredible demands on the members of the team. Kevin was no exception. He was working long hours and weekends to keep up with the demands of the investigation as well as his many other duties handling other law enforcement and national security matters. *See* Ex. 44 (FBI colleague: Kevin worked "long hours without complaint" on "sensitive and pressure-packed national security matters"); Ex. 51 (former FBI agent describing the "intense" nature of the work).

Moreover, the demands on Kevin's time increased when a Special Counsel was appointed in May 2017. Kevin assisted with the transition to the Special Counsel's Office. And because he was the only OGC attorney assigned to the Special Counsel's Office, Kevin found himself being pulled in different directions and responding daily to rapid-fire requests from multiple teams of prosecutors and investigators—all of which were high-priority and needed to be expedited. That the Crossfire Hurricane investigation was the target of intense interest and scrutiny—by the highest levels of the FBI, the media, and others—only compounded the stress of Kevin's long hours.

In addition to work-related stress, Kevin's personal life was especially difficult in the spring of 2017. His mother, who was back in Michigan but with whom Kevin still maintained a very close relationship, had suffered a series of strokes in late 2016 which resulted in paralysis and led to her requiring full-time care in a nursing home. Ex. 58. In late spring 2017, she also was diagnosed with rapid-onset Alzheimer's Disease and dementia. *Id.* Her health "rapidly deteriorated to a point where she could no longer recognize her family or communicate clearly." *Id.* While attempting to balance his workload, Kevin "travel[ed] back and forth from

Washington DC to Michigan, managing [his] mother's care."  Ex. 9; Ex. 8 (friend describing Kevin's mother's declining health and the stress it caused Kevin).

Among other things, Kevin managed the bureaucratic process to enroll his mother in the appropriate programs (*e.g.*, an enhanced medical benefits program under Michigan law) to help ensure she received high-quality care, and routinely communicated with her healthcare professionals to make certain her specific needs were attended to.  He also took on the financial burden for her care, managing (and paying for some of) her bills, doing his best to ensure that she received the best support and medical attention.  Ex. 46.

In short, when Kevin altered the email in June 2017, he was spread thin and exhausted at work and in his personal life.  That is no excuse.  But it does help explain how Kevin came to do something so out of character.

2.     *Kevin Believed the Words He Added to the Email Were Accurate*

Kevin added the words "and not a 'source'" to the OGA email and forwarded it to the SSA.  He deeply regrets having failed to tell the SSA that was his understanding, and not the OGA employee's own words.   But Kevin genuinely believed he was conveying accurate information about Individual #1.

Kevin believed that Individual #1 had been a subsource and thus was "not a 'source.'"  A "source," in FBI parlance, is an individual who has a direct relationship with a government agency (*e.g.*, the agency can directly task a source to collect specific information and then debrief the source about the information he collected).  A "subsource," on the other hand, has a direct relationship with the ***source***, **_not the agency_**, and **_cannot_** be tasked by the agency.  A subsource, for example, may share information with a source who, in turn, shares that information with the agency.  Thus, when Kevin altered the OGA email to add "and not a 'source'" he genuinely believed that was correct based on his understanding that Individual #1

had instead been a subsource and, unlike a source, was only indirectly providing information to the OGA.

Kevin's understanding that Individual #1 was a subsource, however, was mistaken.  The August 17 Memorandum indicated that Individual #1 was an "operational contact."  That term is distinguishable from an FBI "subsource" because an "operational contact," unlike a subsource, may provide information *directly* to the U.S. government.  *See* pp. 11-12, *supra*.  But, as discussed above, Kevin does not recall reviewing the August 17 Memorandum, which is consistent with OGC attorneys generally not reviewing primary source documents.  In fact, at the time, Kevin was not even familiar with the term "operational contact"—a term used by the OGA, not the FBI.

While Kevin cannot remember precisely how he arrived at his incorrect understanding that Individual #1 was a subsource, a number of factors may have contributed, including the OGA employee's use of OGA jargon; information obtained from other members of the Crossfire Hurricane team, oftentimes in phone calls without written follow up, *e.g.*, OIG Report at 249 n.393 (team member recalled Individual #1 being a "type of source");[15] discussion of other subsources in the FISA application, OIG Report at 133 (another source used "a network of sub-sources"); or a mix-up stemming from Kevin juggling many tasks while providing support to a complex, fast-paced investigation with various moving parts.   And once predisposed to

---

[15] Members of the Crossfire Hurricane team may have equated the OGA's inability to "task" Individual #1 with Individual #1 being a non-taskable "subsource."  As an "operational contact" under OGA parlance, Individual #1 could *not* be "tasked" by the agency.  *See* pp. 10-11, *supra*.  Unlike an "operational contact," however, an FBI "source" *is* taskable.  *See* p. 24, *supra*.  In contrast, an FBI "subsource," just like an "operational contact," *cannot* be tasked.  *FBI Confidential Human Source Policy Guide* § 10.12 (Sept. 21, 2015).  That morass of overlapping definitions and competing terminology used by different agencies may well have caused confusion among the investigative team and ultimately contributed to Kevin's misunderstanding.

understand that Individual #1 was a subsource, Kevin mistakenly understood the OGA employee's reference to Individual #1 "provid[ing] reporting to [the OGA]" in the past to mean that Individual #1 had provided reporting *indirectly* as a subsource.

Wherever his understanding came from, the record is clear that Kevin held this mistaken belief that Individual #1 was a subsource in good faith and believed, at the time, it was accurate. For example, the same day he received the OGA email (four days before altering and forwarding it to the SSA), Kevin sent a message to his supervisor in the FBI's Office of the General Counsel expressing his belief that Individual #1 was a "U.S. *subsource* of a source."  OIG Report at 250 (emphasis added).  And, just before forwarding the altered email, Kevin reiterated that same understanding to the SSA.  *Id.* at 252-53 ("[T]he real . . . source was using [Individual #1] as a . . . subsource.").  Indeed, Kevin maintained that understanding throughout his time on the Crossfire Hurricane investigation.  It was not until over two years later—during a voluntary interview with the OIG—that he learned the August 17 Memorandum described Individual #1 as an "operational contact."  *See* OIG Report at 250.

### 3. *Kevin Did Not Intend To Mislead Anyone About Individual #1's Relationship with the OGA*

When Kevin altered the email, he did not intend to deceive the SSA, the FISC, or anyone else as to Individual #1's status.  Within hours of receiving the OGA email, Kevin forwarded it—*unaltered and in its entirety*—to the case agent, who was intimately involved in preparing the FISA application, and his supervisor.  OIG Report at 250.  If Kevin had known of and wished to conceal Individual #1's true relationship with the OGA, Kevin would have never done that, especially considering the OGA email stated that the August 17 Memorandum (along with the other OGA reports) would "explain the details" of Individual #1's history with the agency.  *Id.* Nor would Kevin have remained silent when the case agent's supervisor said that she would

"pull the[ ] [OGA] documents" for the case agent which Kevin had every expectation the case agent would read.  *Id.*  The case agent's supervisor in fact indicated she and the case agent **had** reviewed them.[16]  If Kevin's intent were to mislead his colleagues about Individual #1's status, he would have actively discouraged them from reviewing the OGA reports or, at least, downplayed their significance.

Kevin did just the opposite.  The next day, on his own initiative and without instruction from the investigative team, Kevin forwarded the entire list of OGA reports, along with the OGA employee's unaltered response, to the DOJ attorney who was responsible for drafting the FISA application.  OIG Report at 251.  And three days later, in the altered email, Kevin again sent the full list of OGA reports that would "explain the details" to the SSA, who indicated he would "re-read" them.  *Id.* at 253-55.  Again, if Kevin's goal had been to obscure Individual #1's history with the OGA, he would never have done those things.

Kevin's description of Individual #1 as a subsource also shows he never intended to hide that Individual #1 had some prior relationship with the OGA.  As the DOJ attorney responsible for drafting the application later told the OIG, if Individual #1 was a subsource, it would have been a "flag" requiring further inquiry.  OIG Report at 254 ("[T]hat means he was being handled by somebody.  That means that there was . . . something more; let's dig more into it.").  Thus, by repeatedly describing Individual #1 as a subsource and by providing the full list of OGA reports, Kevin invited additional scrutiny from his colleagues as to the precise nature of Individual #1's

---

[16] It would have also been reasonable for Kevin to assume that the case agent would identify any pertinent facts in the OGA reports about Individual #1's history—particularly if they were inconsistent with what Kevin reported—and bring them to the attention of the DOJ attorney drafting the application, in accordance with routine FISA drafting procedures.

history with the OGA, something he would have never done if his intent was to hide the relationship.[17]

Kevin made the ill-advised decision to alter the email to reflect his honest, but incorrect, understanding of Individual #1's prior relationship with the OGA.  That was a crime, as Kevin has acknowledged.  But it was not the product of malicious intent.  Rather, it was the result of a performance failure during a time of tremendous stress.

### 4.    *Kevin Did Not Act for Personal Benefit*

At the heart of most false statement prosecutions is a motive to obtain a personal benefit by, for example, procuring a financial or commercial advantage or concealing misconduct or a mishap which, if discovered, would embarrass or cast a negative light on the offender.  Neither was the case here.

Not only did Kevin not intend to conceal Individual #1's status in the final application, *see* pp. 26-27, *supra*, he had no motive to do so.  As the SSA explained to the OIG, if Individual #1's relationship with the OGA had been disclosed in the final application, such disclosure would have raised questions as to how they "just now come to determine that [Individual #1] was an asset of the [OGA]."  OIG Report at 253.  But Kevin would not have been the focus of such inquiry or taken the brunt of any resulting criticism.  Any ramifications would have fallen on the case agent and the DOJ attorney who had discussed Individual #1's prior relationship with the

---

[17] It is also worth noting that had Kevin sought to conceal from the FISC that Individual #1 had a relationship with the OGA, he would have never described him to colleagues as a subsource. That description could very well have triggered disclosure of Individual #1's relationship with the OGA because even Individual #1's status as a subsource could have been relevant to the FISC's evaluation of probable cause.

OGA in connection with the initial FISA application, but did not include it.[18]  *See* pp. 10-11, *supra*.

To be clear, by altering the OGA email, Kevin committed a crime and made a critical mistake—one which inadvertently contributed to the continued non-disclosure of Individual #1's status.  But it was not because he sought to personally benefit or hide anything.

Nor did Kevin have a personal axe to grind.  Throughout the Crossfire Hurricane investigation, President Trump and others have attacked the FBI as a partisan agency and accused Kevin and others at the Bureau of targeting the President for political reasons.  *See* The White House, *Remarks by President Trump* (Aug. 14, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-briefing-august-14-2020/.  Such allegations are baseless.  For one thing, after conducting an exhaustive investigation—including reviewing more than a million documents and conducting over 100 witness interviews—the OIG concluded that there was no evidence that political bias or improper motivation influenced how the FBI, including Kevin, conducted itself.[19]  OIG Report at 359; *see also id.* at 251-55.

---

[18]  Indeed, the OIG concluded that the case agent was "primarily responsible" for the "most significant errors and omissions in the FISA applications," including providing inaccurate information about Individual #1's relationship with the OGA.  OIG Report at 377.  To be fair, the case agent's errors and omissions were part of a series of failings.  *Id.* at 413-14 (identifying "17 significant inaccuracies and omissions" and expressing concern "that so many basic and fundamental errors were made by three separate, hand-picked investigative teams" and that failures were made "not just by those who prepared the FISA applications, but also by the managers and supervisors in the Crossfire Hurricane chain of command").

[19]  As discussed in a separate 2018 OIG report, Kevin and four other FBI employees had expressed personal political views in messages to friends and colleagues using the FBI's messaging system.  *See* Dept. of Justice, Off. of the Inspector Gen., *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election* iii (June 2018) (hereinafter "2016 Election OIG Report"), https://www.justice.gov/file/1071991/download; OIG Report at 256 n.400.  While Kevin deeply regrets having done so and recognizes the appearance of bias it could create, the OIG found no

Moreover, Kevin's conduct during the Crossfire Hurricane investigation is inconsistent with the suggestion that he acted out of political zeal to harm President Trump, his campaign, or his administration.   For example, Kevin—along with others at OGC—initially *declined* a proposed FISA application for Individual #1, because he believed there was insufficient information to establish probable cause.  OIG Report at 4, 122.  Later, after additional evidence to establish probable cause was obtained, Kevin urged members of the investigative team to send all *exculpatory* statements made by Individual #1 to the DOJ attorney drafting the application. *Id.* at 170.  On another occasion, Kevin *rejected* the prospect of a FISA application to surveil another advisor to the Trump campaign because he believed there was inadequate basis to do so. *Id.* at 128.  And he was *opposed* to the idea of inserting an FBI source into the Trump campaign. *Id.* at 404.  Had Kevin been personally motivated to harm President Trump, he would never have done any of those things.

### C.      A Sentence of Probation Reflects the Seriousness of the Offense

The U.S. Sentencing Guidelines recognize that a sentence of probation may adequately reflect the seriousness of Kevin's conduct as probation falls within the Guidelines range calculated in the PSR and by the government (*i.e.*, 0-6 months' imprisonment).  A sentence of probation is thus presumptively reasonable as a matter of law.  *See United States v. Kaufman*, 791 F.3d 86, 89-90 (D.C. Cir. 2015); Dkt. 17 ¶¶97, 106 (recognizing a sentence of probation is authorized in this case).

Moreover, the severity of a probationary sentence should not be underestimated.  As the Supreme Court recognized, " '[p]robation is not granted out of a spirit of leniency,' " but instead

---

evidence that Kevin—or others at the FBI—allowed his personal political views reflected in those messages to affect his work or the investigation.  *See* 2016 Election OIG Report at 420.

involves "substantial[] restrict[ions]" on liberty.  *Gall*, 552 U.S. at 48 & n.4; *see also United States v. Knights,* 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'").   A probationary sentence would also carry both the Court's and the public's condemnation of Kevin's conduct.

Further, a sentence of probation in this case would not create a sentencing disparity.  18 U.S.C. § 3553(a)(6) (recognizing the "need to avoid unwarranted sentence disparities among defendants . . . who have been found guilty of similar conduct").   Courts in this district—and around the country—have frequently imposed a sentence of probation in false statement cases:[20]

- *United States v. Silva*, No. 1:16-cr-00069-TFH (D.D.C. 2017), Dkts. 1-1, 33, 35, 51 (DEA Special Agent in charge of field office in Monterrey, Mexico who provided false information causing two Mexican citizens to have their visas revoked in exchange for post-retirement employment, and who submitted false financial disclosure reports was sentenced to 2 years of probation and 100 hours of community service)

- *United States v. Dickinson*, No. 1:12-cr-00197-BAH, Dkts. 1, 18 (D.D.C. 2012) (FERC employee elected Treasurer of Local 421 of the American Federation of Government Employees who embezzled $21,713 of federal-employee union funds and filed false reports with the Department of Labor to cover it up was sentenced to 5 years of probation and 40 hours of community service)

- *United States v. Lieb*, No. 1:10-cr-00144-RBW, Dkts. 8, 9, 18 (D.D.C. 2010) (DOD employee who failed to disclose on his financial disclosure form gifts—including a ticket to the Super Bowl, lodging on a cruise ship, and meals and drinks—from a company that had secured DOD contracts worth hundreds of millions of dollars was sentenced to 2 years of probation with 200 hours of community service)

- *United States v. Stadd*, No. 1:09-cr-00065-RMC, Dkts. 1, 32 (D.D.C. 2009) (former NASA Chief of Staff who steered millions of dollars of earmarked funds for NASA initiative to benefit university with which defendant had a consulting agreement, thereafter increasing his own consulting fees as a result, was sentenced to 3 years of probation with 100 hours of community service)

---

[20] Additional case citations and summaries are attached hereto as Exhibit 63.

- *United States v Lookman*, No. 1:19-cr-01439-WJ (D.N.M. 2020), Dkts. 31, 61 (former scientist from Los Alamos National Laboratory who made false statements regarding his involvement with a Chinese government technology program—stating he had not been recruited by the Chinese program when he in fact had—was sentenced to 5 years of probation)

- *United States v. Siemaszko*, No. 3:06-cr-00712-DAK-3 (N.D. Ohio 2009), Dkts. 359, 364 (employee of nuclear power station who made false statements to the Nuclear Regulatory Commission regarding the condition and maintenance of equipment at the power plant was sentenced to 3 years of probation)

Indeed, the Bureau of Justice Statistics indicates that for the three most recent years for which data is available, a clear majority of those convicted of § 1001 offenses have received non-custodial sentences. *See* Bureau of Justice Statistics, *Federal Criminal Case Processing Statistics*, https://www.bjs.gov/fjsrc/tsec.cfm.[21]  A within-Guidelines sentence of probation here would be well within the norm.

A probationary sentence would also serve "the interests of society as a whole" as Kevin committed a non-violent offense.  Pub. L. No. 98-473, § 239, 98 Stat. 1988, 2039 (1984) (set forth at note to 18 U.S.C. § 3551).  Congress has noted that "prison resources" should be "reserved for those violent and serious criminal offenders who pose the most dangerous threat to society." *Id.*  Kevin is not such an offender.  Incarcerating Kevin thus will not benefit society; rather, it would only be costly and unnecessary.

A sentence of probation, on the other hand, would allow Kevin to contribute his considerable talents to the community while adequately serving the purposes of sentencing.  As the Probation Office recognizes, Dkt. 17 ¶ 106, a condition of community service is appropriate if the Court sentences Kevin to probation.  18 U.S.C. § 3563(a)(2), (b)(12).  And Kevin is highly

---

[21] For the years 2014-2016, fewer than 36% percent of all § 1001 convictions have resulted in a custodial sentence.  Moreover, that smaller group notably includes cases with aggravating factors not present here, such as convictions for multiple offenses, no acceptance of responsibility, and/or a financial loss or gain.

motivated and committed to helping those in his community.  One potential organization for which Kevin may perform community service is Street Sense Media, a non-profit organization that serves and raises awareness for the homeless community in Washington, D.C.  Ex. 59.  After interviewing Kevin, Street Sense believes he would be an asset as a volunteer, particularly with respect to assisting with the production of the bi-weekly newspaper Street Sense publishes.  *Id.* It is "happy to partner with [Kevin]" so he can "be as productive as possible as he serves his sentence."  *Id.*

Another potential organization for which Kevin could perform community service is the American Foundation for Suicide Prevention ("AFSP")—a national organization "dedicated to saving lives and bringing hope to those affected by suicide."  Ex. 60.  AFSP interviewed Kevin and determined that it could use his help in the following areas: "development (recruitment and stewardship of community support), communications (marketing and public relations), and public policy (advocating for essential government policy changes that will save lives)."  *Id.* Between Street Sense and AFSP, as well as any other organization the Court finds appropriate, Kevin is well positioned to be able to complete meaningful community service as a component of his sentence.

A sentence of probation would also allow Kevin to care for his wife in the final stages of her pregnancy and assist with childcare obligations once their son is born, decreasing the collateral effects of Kevin's sentence on innocent parties.  Those effects are considerably heightened in light of the COVID-19 pandemic, where childcare opportunities are more limited due to the risk of spreading or contracting the virus.

D.     **A Sentence of Probation Is Warranted Given the Significant Punishment Already Inflicted on Kevin**

A within-Guidelines sentence of probation is particularly appropriate in light of the significant collateral consequences that Kevin has faced and will continue to face.  Since the inception of the government's investigation, Kevin has been devastated personally and professionally.  And the financial and emotional costs of this ordeal have had a profound impact on him and his family.

As a result of his conduct, Kevin has lost his career and professional identity.  He no longer works for the FBI and his conviction likely precludes him from ever working for the federal government again, let alone in his chosen field of law enforcement and intelligence, which was his true passion since college.  *See* 5 C.F.R. § 731.202(b) (noting factors that may render an individual unsuitable for federal employment, including criminal conduct).

Moreover, Kevin has lost his livelihood.  He self-reported his conduct and his guilty plea to the authorities where he is licensed as an attorney.  And he has voluntarily offered to stop practicing law until those disciplinary authorities complete their review of Kevin's conduct.

His non-attorney job prospects are also bleak.  For one thing, he will likely be unable to qualify for a security clearance, which will significantly hinder his ability to obtain a private-sector role relating to national security, where his skills and competencies lie.  Indeed, since leaving the FBI, despite his best efforts Kevin has been unable to find work.  As a result, he and his family have and will continue to suffer financially, as evidenced by their negative monthly cash flow as calculated in the PSR.[22]

---

[22] The Sentencing Guidelines provide for a fine between $1,000 and $9,500—unless Kevin "is unable to pay."  U.S.S.G. § 5E1.2(a), (c)(3).  Further, in determining the amount of a fine, the Court must consider the defendant's ability to pay and the burden the fine places on the

It is not surprising that Kevin has struggled to chart a path forward given he has been lambasted on the national stage. While the President has broadly and repeatedly targeted members of the law enforcement and intelligence community whom he has perceived to be his political enemies, he has lavished special attention on Kevin. Indeed, before the Information and Plea Agreement were even filed, President Trump held a press conference at the White House where he called Kevin "a corrupt FBI attorney who falsified FISA warrants in James Comey's very corrupt FBI." The White House, *Remarks by President Trump*, p. 29, *supra*. And a U.S. Congressman, who was one of President Trump's most vocal supporters, suggested that Kevin should be "strung up." Tim Haine, RealClearPolitics, *Nunes: Phase Two of Impeachment Circus Begins this Week* 6:20-6:23 (Dec. 1, 2019), https://www.realclearpolitics.com/video/2019/12/01/nunes_phase_two_of_impeachment_circus_begins_this_week.html (linking to broadcast interview of congressman on Fox News).

Echoing these inflammatory remarks, Kevin has been publicly and falsely portrayed as the face of a purported vast "deep state" conspiracy to topple the Trump administration. *See, e.g.*, *Don't Believe the Left: This Anti-Trump FBI Lawyer's Abuse Was Outrageous*, N.Y. Post (Aug. 14, 2020), https://nypost.com/2020/08/14/dont-believe-the-left-this-anti-trump-fbi-lawyers-abuse-was-outrageous; Charles Lipson, RealClearPolitics, *Will the Dam Break After Clinesmith's Plea?* (Aug. 18, 2020), https://www.realclearpolitics.com/articles/2020/08/18/will_the_dam_break_after_clinesmiths_plea_143983.html. And Kevin has been the subject of threats and vicious attacks on social media and elsewhere. *See, e.g.*, Ex. 61 at 1 (Kevin "should be executed"); *id.* at 2 ("Hang the FBI Lawyer Kevin Clinesmith in public on gallows erected at

---

defendant and his dependents. *Id.* § 5E1.2(d). Kevin has been unemployed for over a year and is barely getting by financially. We thus respectfully ask the Court to waive the fine and instead order community service. § 5E1.2(e).

the base of the United States Capital"); *id.* at 3 ("Hang him high!"); *id.* at 4 (email to counsel: Kevin should be "shot in front of a Military firing squad for the treasonous lying piece of filth he is!!"); *id.* at 5 (email to counsel:  "In a different time and place your client Clinesmith's carcass would be swinging from a lamp post.").  His family members, including his nieces, received harassment as well.



We recognize collateral consequences are a feature of any criminal conviction.  But, given the unique circumstances of this case, Kevin has received non-judicial punishment well beyond the average defendant.  There is no just reason to impose a custodial sentence on top of it.  *See, e.g.*, *United States v. Gardellini*, 545 F.3d 1089, 1091 (D.C. Cir. 2008) (affirming probationary sentence, instead of Guidelines' 10 to 16 months range, where defendant had "already 'suffered substantially' due to his prosecution" and was being treated for depression).

E.      **A Sentence of Probation Affords Adequate Deterrence, Promotes Respect for the Law, and Protects the Public from Further Crimes**

The Court must impose a sentence that "afford[s] adequate deterrence to criminal conduct," "promote[s] respect for the law," and "protect[s] the public from further crimes of the defendant."   18 U.S.C. § 3553(a)(2)(A), (B) & (C).   A probationary sentence achieves those goals.

For a sentence to accomplish general deterrence, it must send a message to the entire community of potential violators.   This case has garnered substantial media attention, ensuring that potential offenders know that if they engage in this type of conduct they will be prosecuted and punished.   Moreover, a reasonable person observing the fallout of this case would understand the significant cost, independent of any possible prison term, of making a false statement in violation of § 1001.   Aside from the enormous stress this case has visited on Kevin and his family, he has lost his career and his livelihood.   This delivers a clear message that similar conduct risks devastating, life-changing results.   Sending Kevin to prison is unnecessary to promote general deterrence.   *See* Dkt. 18 at 2 (recognizing "a sentence of probation will provide general deterrence" (emphasis omitted)).

Specific deterrence would also be accomplished through a non-custodial sentence, particularly in light of the substantial punishments Kevin has already faced.   In addition to the consequences discussed above, Kevin will have to live with his actions and the attendant shame for the rest of his life.   *See* Dkt. 18 at 2 (acknowledging Kevin's "lack of good judgment for a brief period" has "forever altered his future").   Moreover, there is absolutely no risk of recidivism here.   Kevin is a first-time offender and his conduct was an isolated incident in an otherwise upstanding and law- abiding life.   Thus a custodial sentence is not needed to achieve specific deterrence or to "protect the public from further crimes of the defendant."

§ 3553(a)(2)(C); Dkt. 18 at 1-2 (concluding that "rehabilitation is not of specific concern" here as "the instant offense represents [Kevin's] only involvement with the criminal justice system").

A custodial sentence is also unnecessary to promote respect for the law—both in the public at large and in Kevin.  There can be no question that Kevin understands the seriousness of the offense.  He pleaded guilty, acknowledged his criminal conduct, and has taken responsibility for his actions and their consequences.  He has also worked steadily toward atonement by, among other things, participating in the FBI's ongoing administrative review of FISA matters, cooperating with ongoing disciplinary proceedings, and seeking out opportunities to perform community service.

## F.   Risks Posed by the COVID-19 Pandemic Also Weigh in Favor of a Non-Custodial Sentence

While a custodial sentence would be unduly punitive in ordinary times, these are not ordinary times.  "[T]he danger [COVID-19] poses is particularly acute in carceral settings." *United States v. Mason*, No. 17-cr-195 (TSC), 2020 WL 4199553, at *1 (D.D.C. July 10, 2020); *see also Banks v. Booth*, 459 F. Supp. 3d 143, 151 (D.D.C. 2020) (recognizing that "[d]ue to the unique posture of jails and prisons," reducing the inmate population reduces the risk of the spread of COVID-19).[23]

---

[23] Kevin believes he may have contracted the coronavirus last spring and later tested positive for coronavirus antibodies.  While there is not yet a clear scientific consensus on the topic, it is possible to be re-infected with COVID-19 after previously recovering from the virus.  Jop de Vrieze, Science, *More People Are Getting COVID-19 Twice, Suggesting Immunity Wanes Quickly in Some* (Nov. 18, 2020), https://www.sciencemag.org/news/2020/11/more-people-are-getting-covid-19-twice-suggesting-immunity-wanes-quickly-some.  An even "bigger concern" is contracting the virus a second time, "be[ing] asymptomatic the second time around, and still carry[ing] [the virus] and transmit[ting] it to other more vulnerable people."  Univ. of Pittsburgh, *COVID-19 Reinfection and You* (Nov. 11, 2020), https://www.pittwire.pitt.edu/news/covid-19-reinfection-and-you.  Accordingly, COVID-19 continues to present a risk to Kevin and others he comes in contact with even if he previously had the virus.

While the number of cases changes daily and can increase exponentially if not properly controlled, as of November 30, 2020, 4677 federal inmates and 1422 BOP staff currently have COVID-19 (out of about 139,000 total inmates and 36,000 staff).  Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited Dec. 1, 2020).  More than 20,500 inmates and 1,900 staff have recovered from the virus, and 145 inmates and 2 BOP staff have died.  *Id.* That means that approximately 18% of all federal inmates have or had confirmed cases of COVID-19, while about 4% of the U.S. population has been infected.  *See* Ctrs. for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19)*, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited Dec. 1, 2020) (13,447,627 total U.S. cases since January 21, 2020); U.S. Census Bureau, *Quick Facts: United States*, https://www.census.gov/quickfacts/fact/table/US/PST045219 (U.S. population estimated at about 328 million).

A sentence that includes incarceration is therefore unnecessarily harsh because it would expose Kevin to a greater risk of severe illness caused by COVID-19.  On the other hand, a sentence of probation—which would be the most appropriate sentence even if there were no pandemic—would limit the risks that COVID-19 presents to Kevin as well as prison inmates and staff.[24]

---

[24] Should the Court find that a within-Guidelines sentence of probation is insufficient, we respectfully request that the Court order a sentence of home confinement.  As Congress and the Justice Department have recognized, such a sentence limits the risks that COVID-19 presents. *See* CARES Act, Pub. L. No. 116-136, §12003(b)(2), 134 Stat. 281, 515-16 (2020) (expanding authority to reduce the federal prison population by releasing inmates to home detention); Att'y Gen. to Dir. of Bureau of Prisons, *Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), *available at* https://www.justice.gov/file/1262731/download (recognizing that home confinement can help contain the spread of the virus and directing BOP to identify at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement).

## CONCLUSION

We respectfully urge the Court to impose a within-Guidelines sentence of probation with community service.  Such a sentence is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.

Dated:    December 3, 2020

Respectfully submitted,

/s/ Justin V. Shur
Justin V. Shur
Emily K. Damrau
MOLOLAMKEN LLP
600 New Hampshire Ave., NW, Suite 500
Washington, DC  20037
Telephone: (202) 556-2000
Facsimile:  (202) 556-2001

Megan Cunniff Church
Jordan Rice
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, Illinois 60654
Telephone:  (312) 450-6700
Facsimile:  (312) 450-6701

*Attorneys for Kevin Clinesmith*

**CERTIFICATE OF SERVICE**

I certify that today, December 3, 2020, I electronically filed the foregoing Sentencing Memorandum of Defendant Kevin Clinesmith with the Clerk of the Court for the U.S. District Court for the District of Columbia using the CM/ECF system.  All participants in this case who are registered CM/ECF users will be served by the CM/ECF system.


December 3, 2020                        /s/ Justin V. Shur