UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | :   Crim. No. 20-cr-165 (JEB) |
| | : |
| KEVIN CLINESMITH, | : |
| | : |
| Defendant. | : |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America (the "government") respectfully submits this memorandum in aid of sentencing of defendant Kevin Clinesmith ("Clinesmith"). On August 19, 2020, Clinesmith pleaded guilty to one count of making false statements in violation of 18 U.S.C. § 1001(a)(3). The government respectfully submits that a sentence of incarceration that is at least between the middle and upper end of the applicable Sentencing Guidelines range is appropriate and warranted.

**I.**    **Offense Conduct and Other Relevant Facts[1]**

On July 31, 2016, the Federal Bureau of Investigation ("FBI") opened an investigation, known as "Crossfire Hurricane," into whether individuals associated with the Donald J. Trump for President Campaign were coordinating activities with the Russian government. *See* Statement of Offense ¶ 4. By August 16, 2016, the FBI had opened investigations under the Crossfire Hurricane umbrella on four individuals, including an individual identified in this case as "Individual #1."[2] *Id.*

---

[1] The facts described herein are drawn primarily from the Statement of Offense filed in this case on August 19, 2020, (Doc. 9) ("Statement of Offense"), which has been incorporated into the Pre-Sentence Report ("PSR"), and the Department of Justice Office of Inspector General's ("OIG") *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* (Dec. 9. 2019) ("OIG Report").

[2] At the time, the FBI's New York field office had a pre-existing counterintelligence investigation on Individual #1, which was opened a few months earlier on April 6, 2016. However, there had been limited investigative activity, and on August 10, the investigation was transferred to the Crossfire Hurricane team. *See* OIG Report at 63.

The defendant—an FBI attorney in the Office of General Counsel—was the principal line attorney assigned to provide legal support to the Crossfire Hurricane team. *Id.* ¶¶ 1-2, 5; OIG Report at 81-83. Among other things, he worked on applications to the United States Foreign Intelligence Surveillance Court ("FISC") to conduct surveillance on Individual #1 pursuant to the Foreign Intelligence Surveillance Act ("FISA"). *Id.* ¶ 6. There were a total of four court-approved FISA applications targeting Individual #1, which allowed the FBI to conduct surveillance on Individual #1 for nearly a year, from October 2016 to September 2017. *See id.* Each of the FISA applications described Individual #1's prior contacts with Russian intelligence officers and alleged there was probable cause that Individual #1 was a knowing agent of a foreign power, specifically Russia. *See id.* The final application was approved on June 29, 2017 and expired on September 22, 2017. Statement of Offense ¶ 6.

On August 17, 2016, prior to the approval of the first FISA application, another U.S. government agency ("OGA") provided the Crossfire Hurricane team with a memorandum ("August 17 Memorandum") indicating that Individual #1 had been approved as an "operational contact" for the OGA from 2008 to 2013—overlapping in time with his interactions with known Russian intelligence officers described in the FISA applications—and detailing information that Individual #1 had provided to the OGA concerning Individual #1's prior contacts with certain Russian intelligence officers (at least one of whom was discussed in the FISA applications). *Id.* ¶ 7; *see* OIG Report at 158. The OGA had assessed that Individual #1 was candid in describing his contacts to the OGA. *See id*. None of this information was included in the first three FISA applications. *See* Statement of Offense *id.* ¶ 8; *see* OIG Report at viii, xi, 157-169.

In early June 2017, prior to the submission of the final application, and after Individual #1 stated publicly that he/she had assisted the U.S. government in the past, the FBI Supervisory

2

Special Agent ("SSA"), who was going to be the affiant on the final application, asked the defendant to inquire with the OGA as to whether Individual #1 had ever been a "source" for the OGA.[3] *Id.* ¶ 9. The SSA was on leave for two days from June 15 to June 16. Prior to going on leave, he informed the defendant that another supervisory special agent ("SSA-2") and the case agent on the investigation ("Case Agent") would be available to discuss the issue in his absence.[4]

On Thursday, June 15, 2017, the defendant sent an email to a liaison at the OGA ("OGA Liaison") seeking clarification as to whether Individual #1 was an OGA source and stating "[t]here is an indication that [Individual #1] may be a '[digraph]' source. This is a fact we would need to disclose in our next FISA renewal. . . To that end, can we get two items from you? 1) Source Check/Is [Individual #1] a source in any capacity? 2) If he is, what is a [digraph] source (or whatever type of source he is)?"[5] *Id.* ¶ 11.

The OGA Liaison responded by email later that same day. *Id.* ¶ 12. Specifically, the OGA Liaison provided the defendant with a list of documents, including the August 17 Memorandum, that the OGA had previously provided the FBI. *Id.* The OGA Liaison also wrote that the OGA uses

> the [digraph] to show that the encrypted individual . . . is a [U.S. person]. We encrypt the [U.S. persons] when they provide reporting to us. My recollection is that [Individual #1] was or is . . . [digraph] but the [documents] will explain the details. If you need a formal definition for the FISA, please let me know and we'll work up some language and get it cleared for use.

---

[3] The SSA was the affiant on the second, third, and fourth applications, but not the first application.

[4] SSA-2 was part of the Crossfire Hurricane team, but he/she was not assigned to the investigation of Individual #1. He/she was assigned to the investigation of another individual and was only covering for the SSA while he was on leave for two days.

[5] The OGA uses a specific two-letter designation, or digraph, to describe a U.S. person who has been approved by the OGA for "operational contact."

*Id.* The defendant replied to the OGA Liaison later that same day with "[t]hanks so much for that information. We're digging into the [documents] now, but I think the definition of the [digraph] answers our questions." *Id.* ¶ 13. The defendant also forwarded the OGA Liaison's email to the Case Agent and SSA-2, but removed the initial email that he sent to the OGA Liaison inquiring about Individual #1's status as a source. *See* OIG Report at 250. SSA-2 responded by email to the defendant and the Case Agent, telling the Case Agent that he/she would "pull these [documents] for you tomorrow[.]" *Id.* In a subsequent reply, SSA-2 suggested that the Case Agent may have heard the information before.

However, that evening—before SSA-2 pulled the documents for the Case Agent— the defendant sent an email to his supervisor in the FBI's General Counsel's Office stating that Individual #1 was not a source, but rather a "U.S. subsource of a source." *See id.* Also that evening, the defendant sent an email to the attorney in the Department of Justice's National Security Division ("NSD"), Office of Intelligence who was working on the FISA application ("OI Attorney") and requested a time to talk the next day. *See id.* at 251.

Early the next day, on Friday, June 16, 2017, SSA-2 had informed the Case Agent he/she now had the OGA documents listed in the OGA Liaison's June 15 email, and SSA-2 and the Case Agent agreed to discuss them on Monday, June 19. Also that morning, the defendant and the OI Attorney spoke for approximately 28 minutes, until 11:46 a.m. *Id.* At approximately the same time, 11:46 a.m., the defendant forwarded to the OI Attorney the OGA Liaison's email. *Id.* Again, he omitted the initial email that he sent to the OGA Liaison inquiring about Individual #1's status as a source. *See id.*

Although the OI Attorney does not remember the telephone call or what the defendant told him on the phone, the OI Attorney replied to the email a few minutes after the call, telling the

4

defendant "thanks I think we are good and no need to carry it any further." *See id.* The defendant replied, "Music to my ears" and copied the Case Agent. *Id.* There is no indication that the Case Agent went back to look at the OGA documents after the Case Agent received the email with the OI Attorney's guidance on the issue.

On Monday, June 19, 2017, the SSA returned from leave and asked the defendant for an update on his prior request for information on Individual #1's past relationship with the OGA. *See* Statement of Offense ¶ 15. They engaged in the following conversation via instant messaging:

| | | |
|---|---|---|
| SSA: | Do we have any update on the [OGA] CHS request? Also, [Case Agent] said [OI Attorney] is not so optimistic.[6] | |
| Defendant: | [OGA] CHS: You are referring to [Individual #1]? | |
| SSA: | Yes. | |
| Defendant: | He is cleared. | |
| SSA: | Cleared to fly? | |
| Defendant: | [digraph]=Masked USPER.[7] | |
| SSA: | So he was and the relationship officially ended? | |
| Defendant: | So, essentially, the real . . . source was using [Individual #1] as a [Steele]-like subsource.[8] | |
| Defendant: | [Individual #1] was never a source. | |
| SSA: | You mean the [OGA] officer? | |
| Defendant: | Right. Whomever generated the reporting from the [documents]. | |

---

[6] The term "CHS" is short for "Confidential Human Source."

[7] "USPER" is short for "U.S. Person."

[8] Steele is a reference to Christopher Steele, who prepared certain reports, based on information from subsources. The FISA applications on Individual #1 relied on information from those reports.

5

| | |
|---|---|
| Defendant: | It was just liaison with [Individual #1] which resulted in reporting, eventually they closed it out as unhelpful. |
| Defendant: | So, in discussing with [the OI Attorney], he agreed we do not need to address it in the FISA. |
| Defendant: | [The OI Attorney] is always Eeyore in drafting these special FISA applications. |
| SSA: | So [Individual #1] was a [digraph] or [Individual #1] was a subsource of the [digraph]. |
| Defendant: | It's [sic] sounds like a subsource of the [digraph]. |
| Defendant: | And yes, [the OGA] confirmed explicitly he was never a source. |
| SSA: | Interesting. |
| Defendant: | But like, interesting good, right? |
| Defendant: | I mean, at least we don't have to have a terrible footnote. |
| SSA: | Sure. Just interesting they say not a source. We thought otherwise based on the writing . . . I will re-read. |
| Defendant: | At most, it's [another person] being the CHS, and you talking to [the other person]. |
| SSA: | Got it. Thank you. Do we have that in writing. |
| Defendant: | On TS. I'll forward/[9] |

OIG Report at 252-253.

    As reflected in the above conversation, the defendant told the SSA that Individual #1 "was never a source" and that "[the OGA] confirmed explicitly he was never a source." When the SSA asked if the defendant had that in writing, the defendant responded he did and that he would forward the email that the OGA had provided.

---

[9] "TS" is short for "Top Secret."

6

Immediately following the above conversation, the defendant forwarded to the SSA the OGA Liaison's June 15, 2017 email, which he had altered. *See* Statement of Offense ¶ 16. The altered email read as follows:

> My recollection is that [Individual #1] was or is "[digraph]" **and not a "source"** but the [documents] will explain the details. If you need a formal definition for the FISA, please let me know and we'll work up some language and get it cleared for use.

*Id.* (emphasis added). The defendant had altered the email by adding the words "and not a source," thus making it appear that the OGA Liaison had written that Individual #1 was "not a source" for the OGA. *Id.* In doing so, the defendant made and used a false writing or document because he knew the original email did not contain the words "not a source." *See id.* ¶ 17.

Not only was the altered email itself a false document, the statement the defendant made in the altered email and in the instant messages to the SSA—that Individual #1 was not a source— was also false. In fact, Individual #1 had been a source for the OGA and had provided direct reporting to the OGA in the past. *See* OIG Report at 251. When interviewed by the OIG, the OGA Liaison described Individual #1 as a "source" under the FBI's terminology and said that the reason she offered, in her email, to assist in providing language for the FISA application was because she was telling the OGC Attorney that, using the FBI's terminology, Individual #1 had been a source for the OGA. *See id.* As the OGA Liaison told the OIG, it was incorrect to describe Individual #1 as a subsource. *See id.* at 251, 254-256. The OGA Liaison also stated that she saw no basis for the OGC Attorney to have concluded, based on their communications and the August 17 Memorandum, that Individual #1 never had a direct relationship with the other agency. *See id.* at 251. In addition, the OGA Liaison said that she did not recall having any telephone discussions with the OGC Attorney on this issue. *See id.*

7

The alteration also was material. Statement of Offense ¶ 17. As several people involved in the application process explained, Individual #1's status as a source should have been disclosed to the FISC because it bears on whether there was probable cause to believe that Individual #1 was acting as a knowing agent of a foreign power. The OI Attorney stated that it would have been a significant fact if Individual #1 had a relationship with the OGA that overlapped in time with his interactions with known Russian intelligence officers described in the FISA applications, as was the case here, because it would raise the issue of whether Individual #1 had those interactions with the intent to assist the U.S. government. *See* OIG Report at 156. NSD's Deputy Assistant Attorney General at the time indicated that a FISA target's relationship with another U.S. government agency is typically included in a FISA application, *see id.*, and he believed the information about Individual #1's prior relationship with the OGA should have been disclosed because it "goes to the question of where the person's loyalties lie[,]" *id.* at 159.

Indeed, the defendant himself knew that if Individual #1 had been a source with the OGA, that information would need to be disclosed in the FISA application. Statement of Offense ¶ 10. He acknowledged as much in his original email to OGA Liaison, stating "This is a fact we would need to disclose in our next FISA renewal." *Id.* ¶ 11. Later, when interviewed by the OIG, the defendant stated there was "a big, big concern from both [the NSD's Office of Intelligence] and from the FBI that we had been targeting a source, because that should never happen without us knowing about it." *Id.* ¶ 10. The defendant added that if it were true, they would "need to provide [the information] to the court" because such information would "drastically change[] the way that we would handle . . . [the] FISA application." *Id.*

The SSA also described the importance of knowing Individual #1's prior relationship with the OGA. According to the SSA, "if [Individual #1] was being tasked by another agency, especially

if he was being tasked to engage Russians, then it would absolutely be relevant for the Court to know ... [and] could also seriously impact the predication of our entire investigation which focused on [Individual #1's] close and continuous contact with Russian/Russia-linked individuals." OIG Report at 249.

The defendant was the person that the SSA relied on to resolve the issue of whether Individual #1 had been a source for the OGA in the past. *Id.* at 255. The defendant's statement to the SSA that the OGA had said "explicitly" that Individual #1 had never been a source was "the confirmation that [he] need[ed]." *Id.* at 253. According to the SSA, the language that the defendant inserted into the OGA Liaison's email—that Individual #1 was "not a source"—was the most important part of the email for him. *Id.* at 255. He stated, "if they say [Individual #1 is] not a source, then you know we're good." *Id*. The SSA further stated that if the email from the OGA Liaison had not contained the words "not a source" then, for him, the issue would have remained unresolved, and he would have had to seek further clarification. As he told the OIG, "If you take out 'and not a source,' . . . it doesn't really answer the question." *Id*. He also said that something lesser, such as a verbal statement from the OGA Liaison, would not have resolved the issue for him. *Id.*

After receiving the altered email, the SSA asked the defendant if the SSA could send the email to other members of the team. *Id*. The defendant responded he "already did on Friday when [the OI Attorney] said we're good to go. Sorry for not cc'ing you." *Id*. Relying on the altered email, and after receiving the guidance that they were "good to go" on this issue, the SSA signed and submitted the final FISA application to the FISC on June 29, 2017. *See* Statement of Offense ¶ 16.

9

The OIG subsequently conducted a review of the four FISA applications targeting Individual #1. *See* OIG Report. The OIG discovered the defendant's conduct in altering the email. When confronted with the altered email by the OIG, the defendant initially stated that he was not certain how the alteration occurred, but then subsequently acknowledged that he made the change. *See id.* at 255.

After being informed of the OIG's findings, the Department of Justice provided the FISC with notice of the defendant's conduct and the failure to disclose Individual #1's prior relationship with the OGA. The Department of Justice also provided the FISC with notice of numerous other misstatements and omissions that the OIG discovered in its review of the four FISA applications. The Department of Justice later acknowledged that with respect to the final two FISA applications, there was "insufficient predication to establish probable cause to believe that [Individual #1] was acting as an agent of a foreign power." *See* Order Regarding Handling and Disposition of Information, Docket Nos. 16-1182, 17-52, 17-375, 17-679 (FISA Ct. Jan. 7, 2020).

## II.   Discussion of Sentencing Factors

There is no dispute that the defendant's total offense level under the Sentencing Guidelines is six, and his Criminal History Category is I, resulting in a Sentencing Guidelines range of zero to six months of incarceration.[10] The government respectfully submits that a sentence of incarceration that is at least between the middle and upper end of the applicable Sentencing Guidelines range is appropriate and warranted. As detailed more fully below, this case is outside the heartland of typical cases under 18 U.S.C. § 1001, and such a sentence would reflect the

---

[10] The Guidelines calculation in the PSR includes a 2-level enhancement under U.S.S.G. § 3B1.3 for abuse of a position of trust. In the plea agreement, the defendant reserved his right to argue against the application of this enhancement. However, in an email dated November 17, 2020, the defendant's counsel informed the government and the Court that it was not objecting to this enhancement.

seriousness of the offense, promote respect for the law, and provide just punishment for the offense, while also affording adequate general deterrence to future criminal conduct. *See* 18 U.S.C. 3553(a).

In this case, the defendant's offense was a very serious one with significant repercussions. The defendant altered an email that misled an FBI supervisory special agent and caused the supervisory special agent to sign a FISA application that failed to disclose that Individual #1 had been a source of another government agency—a fact that bore on whether the individual was acting as a knowing agent of a foreign power. By inserting the words "not a source" into the OGA Liaison's email, the defendant fabricated support for the false notion that Individual # 1 had not acted as a source for the OGA. The defendant also essentially used the OGA Liaison's identity—without his/her permission—and falsely attributed words to the OGA Liaison, which gave credibility to his alteration and made the SSA believe that Individual #1 was not a source. The resulting failure to disclose Individual #1's relationship with the OGA, combined with other material misstatements and omissions that the OIG found in the FISA applications, allowed the FBI to conduct surveillance on a U.S. citizen based on a FISA application that the Department of Justice later acknowledged lacked probable cause.

The defendant's conduct also undermined the integrity of the FISA process and struck at the very core of what the FISC fundamentally relies on in reviewing FISA applications: the government's duty of candor. The FISC serves as a "check on executive branch decisions to conduct surveillance in order to protect the fourth amendment rights of U.S. persons[,]" but it can "serve those purposes effectively only if the applicant agency fully and accurately provides information in its possession that is material to whether probable cases exists." Order, *In Re Accuracy Concerns Regarding FBI Matters Submitted to the FISC*, Docket No. Misc. 19-02, at 2

(FISA Ct. Dec. 17, 2019) (internal quotations and citations omitted). Accordingly, and particularly because FISA applications involve *ex parte* proceedings with no adverse party on the other side to challenge the facts, the government "has a heightened duty of candor to the [FISC]." *Id.* (internal quotations and citations omitted). In other words, "[c]andor is fundamental to [the FISC's] effective operation[.]" *Id.* (citation omitted).

As a licensed attorney and an officer of the Court, the defendant took an oath, was bound by professional and ethical obligations, and should have been well-aware of this duty of candor. He was an experienced attorney with the FBI's Office of General Counsel and was assigned to some of the FBI's most significant and high-profile investigations.

Although the defendant did not personally sign any FISA application, his deceptive conduct nonetheless was antithetical to the duty of candor and eroded the FISC's confidence in the accuracy of all previous FISA applications worked on by the defendant. *See id.* (stating that the defendant's conduct "gave rise to serious concerns about the accuracy and completeness of the information provided to the FISC in any matter in which [the defendant] was involved."). As a consequence, the FISC ordered the government to identify all prior matters before the FISC in which the defendant participated and verify that the government's submissions in those matters were complete and truthful—a time-consuming and costly endeavor that has diverted and continues to divert the FBI's resources from other matters. His conduct also fueled public distrust of the FBI and of the entire FISA program itself.

Thus, there is a need for just punishment that includes a term of imprisonment to reflect the seriousness of the offense. The Court's sentence must also promote respect for the law and deter others from committing similar crimes. The Court's sentence should send a message that people like the defendant—an attorney in a position of trust who others relied upon—will face

serious consequences if they commit crimes that result in material misstatements or omissions to a court. This Court's sentence can have a powerful deterrent effect because, unlike the majority of cases, this case has received and will continue to receive substantial publicity and coverage by the news media. This Court's sentence should be designed, in part, to send a powerful message to the community that this type of conduct—falsifying information to hide facts from a court—will not be tolerated.

The government expects that the defendant will claim that although he altered the email and created a false document, he did not intend to mislead anyone and was either confused or truly believed that Individual #1 had not been a source for the OGA. By his own words, however, it appears that the defendant falsified the email in order to conceal Individual #1's former status as a source and to avoid making an embarrassing disclosure to the FISC. Such a disclosure would have likely drawn a strong and hostile response from the FISC for not disclosing it sooner since the FBI had the information in its possession before the first FISA application was filed. Indeed, in the June 19, 2017 instant message conversation with the SSA, the defendant wrote "at least we don't have to have a terrible footnote" explaining that Individual #1 was a source. OIG Report at 253. While the defendant told OIG he was referring to how "laborious" it would be to draft a footnote explaining that Individual #1 had been an OGA source, *see id.*, that reading is self-serving and absurd. Moreover, as a practical matter, how laborious would it have been to draft a single footnote to explain to the FISC that Individual #1 had been a source for the OGA. The SSA involved in the application understood the defendant to be referring to the terrible optic of just now, in the fourth application, disclosing to the Court that Individual #1 had been a source for another agency after failing to do so in all of the prior applications. *See id.* Such a disclosure would

13

have undermined the probable cause in the FISA application and the overall investigation of Individual #1, which the defendant was able to avoid by altering the email.

The public record also reflects that political or personal bias may have motivated or contributed to his offense conduct. As noted in the OIG Report and PSR, the defendant was previously investigated, and ultimately suspended, for sending improper political messages to other FBI employees. *See* OIG Report at 256 n.400. For example, on the day after the 2016 presidential election, the defendant wrote "I am so stressed about what I could have done differently." *Id.* When another FBI colleague asked the defendant "[i]s it making you rethink your commitment to the Trump administration[,]" the defendant replied, "Hell no," and then added "Viva le resistance." *Id.* The defendant was referred to the Office of Professional Responsibility for investigation for these and other related messages, and in July 2018 he was suspended, without pay, for 14 days. The defendant's prior disciplinary infraction for expressing his political views in a work setting is a relevant aspect of his background. Indeed, it is plausible that his strong political views and/or personal dislike of the current President made him more willing to engage in the fraudulent and unethical conduct to which he has pled guilty. While it is impossible to know with certainty how those views may have affected his offense conduct, the defendant plainly has shown that he did not discharge his important responsibilities at the FBI with the professionalism, integrity, and objectivity required of such a sensitive job position.

Any claim that the defendant altered the email because he truly believed Individual #1 was not a source, but rather a subsource, is not supported by the evidence. First, in response to the defendant's inquiry on whether Individual #1 was a source in any capacity, the OGA Liaison's June 15 email made clear that Individual #1 was an individual who "provide[s] reporting to us." It said nothing about subsources, and in subsequent interviews, the OGA Liaison explicitly denied

telling the defendant that Individual #1 was a subsource. In fact, the government has not located any evidence that anyone ever told the defendant that Individual #1 was a subsource of a source rather than a source. Second, when the defendant forwarded the OGA Liaison's email to the OI Attorney, the defendant removed the portion of the email chain containing the question he originally sent the OGA Liaison about Individual #1's status as a "source." The only plausible reason to remove the original question is because the defendant did not want the OI Attorney to see he was asking about Individual #1's status as a source. Third, he saw no reason to alter the email when he forwarded it to the OI Attorney. If he thought the email itself supported his belief that Individual #1 was not a source, then there was no reason to alter the email when he sent it to the SSA. Lastly, when first confronted by the OIG, he said he was not certain how the alteration occurred. In short, his actions are wholly inconsistent with someone who would have believed the accuracy of the language he inserted. Furthermore, rather than simply explaining his belief about Individual #1's status in his own email, he altered the OGA Liaison's original email to give the information credibility and believability.

      The defendant also may claim that he did not read the OGA documents, and regardless of his own conduct, the supervisory agents and case agents had access to the August 17 Memorandum and other OGA documents that disclosed Individual #1 prior relationship with the OGA. It is true that some of the instant messages and emails suggest others, such as the SSA and Case Agent may have read those OGA documents in the past. For example, in the instant messages with the SSA where the defendant indicated that Individual #1 was not a source, the SSA responded "interesting they say not a source. We thought otherwise based on the writing . . . I will re-read." However, the SSA made clear that he wanted clarification and a definitive answer, and he was relying on the defendant to get that answer from the OGA. The words "not a source," coupled with the

15

appearance that the email was authored by the OGA Liaison, were the most important pieces of information to him, and if the OGA Liaison's email to the defendant did not contain the words "not a source," it would not have resolved the issue and he would have asked for further clarification. Moreover, after the defendant altered the email and sent it to the SSA, he asked if he could forward it to other members of the team. The defendant quickly squashed that idea and informed the SSA that he had already done so when the OI Attorney said they were good to go. He also forwarded to the Case Agent the OI Attorney's email indicating that nothing more needed to be done on the issue. Thus, neither of them had any reason to go back and independently review the OGA documents.

In any event, regardless of who else read the documents, the fact remains that he altered an email and falsely attributed the words "not a source" to the OGA Liaison, which misled the SSA into believing that the OGA Liaison had expressly confirmed, in writing, that Individual #1 was not a source, when the defendant well knew that the OGA Liaison had not written those words in the email. The defendant's conduct is particularly troublesome because he was an attorney who was supposed to adhere to certain professional and ethical obligations, which he disregarded here. An attorney—particularly an attorney in the FBI's Office of General Counsel—is the last person that FBI agents or this Court should expect to create a false document.

The government recognizes that the defendant accepted responsibility and pleaded guilty without consuming government and judicial resources. He agreed to plead guilty to an information, forgoing the traditional criminal process and the need to obtain an indictment. Additionally, as part of his plea agreement, the government required the defendant to speak with the FBI's Inspection Division about all FISA applications he worked on, as part of the FBI's review of FISA matters

for the FISC, and he in fact did so. The Court should consider these circumstances in fashioning its sentence, but they do not negate the need for a sentence of imprisonment.

To the extent the defendant asks the Court for no jail time, based on, among other things, his lack of criminal history, his family circumstances, and the impact this offense has already had on his career, none of these considerations warrant a non-incarceratory sentence. First, the defendant's lack of criminal history is already accounted for in the Guidelines range calculation, which contemplates up to six months of imprisonment for a first-time offender like the defendant.

Second, while the defendant and his wife would like the defendant to avoid jail so he can be at home to help his wife through her pregnancy and help with future childcare after the upcoming birth of their child in March, the defendant's family circumstances are not so unusual as to warrant special consideration. Section 5H1.6 of the Sentencing Guidelines states that family ties and responsibilities are ordinarily not relevant in determining whether a sentence should be outside the applicable guideline range. Thus, it is only in the extraordinary case that a defendant's family circumstances will warrant consideration. This Court routinely sentences defendants who have children, significant others, and family, to periods of incarceration, and the defendant's situation is not unique or extraordinary.

To be sure, the government recognizes the impact incarceration will have on the defendant's wife, who may have to care for their child alone for a period of time, depending on the sentence the Court imposes. However, this hardship is a result of the defendant's own decision to commit the crime for which he is being sentenced and is no different than any other defendant this Court sentences to a term of imprisonment.

Finally, to the extent the defendant argues that he has already been punished due to loss of employment and his possible disbarment due to this felony conviction, these circumstances should

not mitigate his sentence. Again, these collateral consequences are entirely the result of his own wrongdoing. Moreover, loss of a job and the impact of a conviction on one's career are consequences experienced by most white-collar defendants and do not merit any special treatment or consideration here. Society expects and requires better from attorneys and officers of the Court, who take the oath to uphold the law and comply with their professional and ethical obligations. These consequences do not negate the need for a sentence of imprisonment to reflect the seriousness of his offense, to promote respect for the law, and to provide adequate general deterrence.

**III.     Conclusion**

For the reasons stated above, the government respectfully asks the Court to impose a sentence of imprisonment that is at least between the middle and upper end of the applicable Guidelines range.

                                                Respectfully submitted,

                                                JOHN H. DURHAM
                                                Special Counsel
                                                The Special Counsel's Office

Dated: December 3, 2020        By:        /s/
                                                Anthony Scarpelli
                                                Assistant United States Attorney
                                                for the District of Columbia
                                                555 Fourth Street, NW
                                                Washington, DC 20530
                                                Tel: (202) 252-7707
                                                Email: anthony.scarpelli@usdoj.gov

                                                Neeraj N. Patel
                                                Special Assistant United States Attorney
                                                for the District of Columbia
                                                U.S. Attorney's Office
                                                157 Church Street, 25th Floor
                                                New Haven, CT 06510
                                                Tel: 203-821-3700
                                                Email: neeraj.patel@usdoj.gov

CERTIFICATE OF SERVICE

    I hereby certify that on December 3, 2020, a copy of the foregoing Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                      /s/
                                 Anthony Scarpelli
                                 Assistant United States Attorney