UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 20-cr-165-JEB |
| | ) | |
| | ) | |
| KEVIN CLINESMITH, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

MOTION FOR RELIEF UNDER THE CRIME VICTIMS' RIGHTS ACT

COMES NOW, Carter Page ("Dr. Page"), as a victim of defendant's offense, to assert his rights under the Crime Victims' Rights Act, 18 U.S.C. § 3771, and pursuant to § 3771(d)(1) moves this Honorable Court for relief.  Dr. Page has the right to be heard at sentencing pursuant to § 3771(a)(4), and the right to restitution pursuant to § 3771(a)(6) and 18 U.S.C. § 3663.  Dr. Page therefore respectfully moves the Court to issue an order confirming his status as a statutory victim and for the other relief described herein.[1]

---

[1] On today's date, undersigned counsel provided a draft version of this motion to the representatives of the United States in this matter, at the government's request, in order to ascertain the government's position on the relief requested herein.  The United States has authorized counsel to advise the court that it is reviewing the motion and will file a response with the Court setting forth its position.

## STATEMENT OF FACTS

### A.    Defendant Clinesmith's Offense

The defendant, Kevin Clinesmith, is a lawyer who was employed by the Federal Bureau of Investigation ("FBI") from July 12, 2015 to September 21, 2019. He worked in FBI's Office of General Counsel as an Assistant General Counsel in the National Security and Cyber Law Branch.  The defendant assisted with applications prepared by the FBI and the National Security Division ("NSD") of the United States Department of Justice ("DOJ") to conduct surveillance under the Foreign Intelligence Surveillance Act ("FISA").

On July 31, 2016, the FBI opened the "Crossfire Hurricane" investigation and, as part of it, shortly thereafter opened an investigation into Dr. Page.  Among other things, the defendant provided support to FBI agents who prepared applications to obtain FISA warrants from the United States Foreign Intelligence Surveillance Court ("FISC") to conduct surveillance on Dr. Page.  The FISC approved four FISA warrants targeting Dr. Page.

To obtain those warrants, the FBI had to persuade the FISC that Dr. Page was an agent of the Russian government – which he was not.  Prior to seeking the first FISA warrant, in August 2016, the FBI Crossfire Hurricane team was provided with a memorandum and other materials from a U.S. intelligence agency which showed that Dr. Page, far from being a Russian agent, was instead an approved "operational contact" for that intelligence agency from at least 2008 to 2013.  The first three FISA warrant applications failed to provide this crucial information to the FISC.

2

In April 2017, FBI employees and other government officials leaked to the media that a FISA warrant and renewals had been issued targeting Dr. Page as an alleged Russian agent.  Dr. Page received a tremendous amount of adverse publicity as a result of the leak about the FISA warrants' mere existence.  Prior to the submission of the 4th application for a FISA warrant in June 2017, Dr. Page had publicly denied that he was a Russian agent and disclosed his status as a person working with U.S. government intelligence agencies.

After Dr. Page's public statements, a FBI Supervisory Special Agent ("SSA")—who would be the affiant on 4th warrant application—asked defendant Clinesmith to inquire of the U.S. intelligence agency whether Dr. Page was ever a "source" for it as he claimed.[2]  Clinesmith knew that Dr. Page's status as a U.S. intelligence source was a material fact requiring disclosure in the FISA application submitted to the FISC.  Indeed, Clinesmith acknowledged that there was "a big, big concern from both [the NSD's Office of Intelligence] and from the FBI that we had been targeting a source, because that should never happen without us knowing about it." *See* U.S. Dep't of Justice Office of Inspector General, 20-012, *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* (December 2019) at p. 249 ("Horowitz Report").  And Clinesmith knew that if Dr. Page's public statement was true, they would "need to provide [the

---

[2] The SSA had also been the affiant on the 2nd and 3rd warrant applications, but in light of Dr Page's media interviews since their submission indicating that Dr. Page had a relationship with the intelligence community, the SSA wanted a "definitive answer as to whether Page had a prior relationship with the [intelligence community] before SSA 2 signed the last renewal application."  Horowitz Report at 248.

information] to the court" because such information would "drastically change[] the way that we would handle ...[the] FISA application." *Id.*

At the SSA's insistence for confirmation on the question whether Dr. Page was a CIA operational contact, Clinesmith sent an email on June 15, 2017, to the U.S. intelligence agency liaison stating: "We need some clarification on [Dr. Page]. There is an indication that he may be [your] source. This is a fact we would need to disclose in our next FISA renewal... To that end, can we get two items from you? 1) Source Check/Is [Dr. Page] a source in any capacity? 2) If he is, what is a [certain type of] source (or whatever type of source he is)?"   Horowitz Report at 249-50; Statement of Offense in Support of Guilty Plea p. 5-6.

In response, the U.S. intelligence agency liaison sent an email to Clinesmith that same day confirming that Dr. Page had been an agency source, using the lexicon "operational contact."   The liaison referenced a list of documents previously provided to the Crossfire Hurricane team in August 2016, including the memorandum that confirmed Dr. Page had been a source for the U.S. intelligence agency.  These documents were accessible to the Crossfire Hurricane team and had been all along.  Clinesmith claims in his sentencing memorandum that it was not his responsibility to read those documents, which were physically maintained with the investigatory team. But he fails to explain why he would not have reviewed those documents given that he was *specifically asked to determine Dr. Page's status* with the other agency, and that agency referred him to these documents in order to do so.  *Cf* Defense Sentencing Memorandum at 14, *with* Defense Sentencing Memorandum at 12-13.

Moreover, the agency liaison offered Clinesmith further help, saying: "If you need a formal definition for the FISA, please let me know and we'll work up some language and get it cleared for use." Horowitz Report at p. 250. Plainly she would not have made this offer to provide a formal definition of Dr. Page's status if there was nothing to tell the FISC. Unsurprisingly, Clinesmith never took the liaison up on this offer because he was not interested in elucidating for the FISC the exact nature of Dr. Page's relationship with the intelligence agency.

Rather, in communications with the SSA on June 19, 2017, Clinesmith stated that Dr. Page "was never a source."[3] In response, the SSA asked: "Do we have that in writing." Horowitz Report at 252-53; Statement of Offense in Support of Guilty Plea p. 6. Clinesmith stated they did and said he would forward it to the SSA. That same day, Clinesmith altered the email from the U.S. intelligence agency liaison to falsely state that Dr. Page was not a source, and then forwarded it to the SSA.

Consequently, Dr. Page's true status as a U.S. government source was not disclosed to the FISC in the 4th application and the 4th FISA warrant was approved. As a result, Dr. Page's communications were surreptitiously surveilled for another three months. The DOJ has subsequently conceded to the FISC that, in reality,

---

[3]When confronted about this later by the OIG, Clinesmith stated that he believed his conclusion that Dr. Page was not a source was based in part on a telephone conversation with the liaison from the other agency. The liaison, however, recalled no telephone conversation with Clinesmith at all, and stated that she would not have conveyed that conclusion over the telephone because she would not have had the relevant documents in front of her. She also told the OIG that Clinesmith's interpretation of her email was exactly the opposite of what it conveys. She pointed out that she offered to provide clarifying language precisely because she was telling Clinesmith that Dr. Page was a source. Horowitz Report at p. 251.

there was insufficient evidence to support the issuance of either the 3d or the 4th

FISA warrants (and the DOJ has declined to defend the legality of the first two

warrants). That is, the DOJ admits that there was, in fact, no probable cause to

believe Dr. Page was the agent of Russia.

### B.   The Harms to Dr. Page

The issuance of the 4th FISA warrant harmed Dr. Page in multiple ways. He

suffered the intangible harm of being unlawfully spied upon for three months of his

life. "The evil of an unreasonable search or seizure is that it invades privacy ….."

*Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999). "The intangible harm

[caused by an unlawful search] can be severe: victims of such searches can feel

'violated' in the same sense, and to the same degree, as do victims of burglaries …."

William J. Stuntz, *Warrants and Fourth Amendment Remedies*, 77 Va.L.Rev. 881,

901 (1991).

Further, Dr. Page suffered tangible harm *as a result of the 4th FISA Warrant.*

It was specifically cited in federal government documents as evidence that Dr. Page

is a suspect person and that the surveillance of him was warranted.

For example, on January 29, 2018, members of the House Permanent Select

Committee on Intelligence circulated to all members of the House of Representative

an advocacy document entitled "Correcting the Record – The Russia Investigation."

(A copy is attached as Exhibit A). Assuming the legitimacy of the FISA warrants,

this document argued that the FBI and DOJ did not abuse the FISA process. It

said that the FBI and DOJ "would have been remiss in their duty to protect the

country had they not sought a FISA warrant and repeated renewals to conduct

temporary surveillance of Carter Page, someone the FBI assessed to be an agent of

the Russian government."  The document asserted in bold type that the "FISA

application and three subsequent renewals carefully outlined for the Court a multi-

pronged rationale for surveilling Page."  It further asserted that "[t]he initial

warrant application and subsequent renewals received independent scrutiny and

approval by four different federal judges."  And it added that "[t]he Court approved

three renewals – in early January 2017, early April 2017, and late June 2017 –

which authorized the FBI to maintain surveillance on Page until late September

2017."  In sum, the document used the imprimatur of the FISC—which had been

misled by Clinesmith and the FBI *in the 4th warrant application*—to continue

falsely painting Dr. Page as a traitor to his country, a depiction that was, and is,

opposite of  the truth.

  Professor Jonathan Turley has aptly summarized what happened to Dr. Page

as a result of being wrongly targeted by the FISA warrants:

> [Page was portrayed] in endless media segments [as] a shady character
> who was at worst a Russian spy and at best a Russian stooge. Page
> became the face and focus for the justification of the Russia collusion
> investigation. His manifest guilt and sinister work in Moscow had to
> be accepted in order to combat those questioning the allegations of
> Trump campaign collusion with the Russians. In other words, his guilt
> had to be indisputable in order for the Russia collusion investigation to
> be, so to speak, unimpeachable.

Turley, Jonathan, *An Apology to Carter Page*, The Hill (December 14, 2019),

https://thehill.com/opinion/judiciary/474570-an-apology-to-carter-page.  As Professor

Turley noted, "Page served his purpose and the trashing of his reputation was a cost

of doing business with the federal government for many members of Congress and the media." *Id.*

Dr. Page has suffered significant reputational, emotional, and financial harm as a result of the unlawful warrant process in which Defendant Clinesmith was a full participant. No legitimate, rational person or company would associate or do business with a "documented" Russian spy. At least three banks or financial services companies have declined to do business with Dr. Page's companies as a result of his unsought notoriety. He also received death threats that caused him to repeatedly relocate. Former friends, associates, and colleagues shunned him due to their mistaken belief in the accuracy of the FISA process that labelled Dr. Page, a former Naval officer and patriotic American, as a turncoat engaged in treason.

The harm inflicted on Dr. Page remains unredressed and unacknowledged to this day. Defendant Clinesmith apologizes, through counsel, to "all those who have been affected," including his family, his colleagues, the Court, and the public, but notably not to Dr. Page. Defense Sentencing Memo at p. 1. Astonishingly, Clinesmith laments the consequences that have befallen him as a result of his own unlawful actions, while arguing that Dr. Page is not a victim of his crime. *Id.* at 34; and at 17 fn. 13.

## ARGUMENT

### A.    Dr. Page Is a Victim of the Instant Offense

Dr. Page is a victim of defendant Clinesmith's offense. Under the Crime Victims' Rights Act ("CVRA"), a "crime victim" is "a person directly and proximately

harmed as a result of the commission of a Federal offense or an offense in the

District of Columbia." 18 U.S.C. § 3771(e)(2)(A).  "The requirement that the victim

be 'directly and proximately harmed' encompasses the traditional 'but for'

and proximate cause analyses." *United States v. Giraldo-Serna*, 118 F. Supp. 3d

377, 383 (D.D.C. 2015) (citing *In re Rendon Galvis*, 564 F.3d 170, 175 (2d Cir.

2009)).  "The CVRA 'instructs the district court to look at the offense itself only to

determine the harmful effects the offense has on parties.  Under the plain language

of the statute, a party may qualify as a victim, even though it may not have been

the target of the crime, as long as it suffers harm as a result of the crime's

commission.'" *In re McNulty*, 597 F.3d 344, 351 (6th Cir. 2010) (quoting *In re

Stewart*, 552 F.3d 1285, 1289 (11th Cir. 2008)).

In this case, Dr. Page was the target of the crime.  He was the target of the

FISA warrant surveillance.   Clinesmith lied to the SSA and provided an altered

document to him to mislead the agent into believing that obtaining a FISA warrant

against Dr. Page was legitimate, when in fact, it was not.  Dr. Page suffered the

direct and proximate harms discussed above because the 4th FISA warrant was

issued in reliance on Clinesmith's false statement. *See United States v. Contreras,*

16-00740 HG-01, 2017 WL 2563222 (D. Haw. June 13, 2017) (a correctional officer's

false statements that concealed his inappropriate relationship with an inmate from

DOJ officials directly and proximately harmed the inmate); *United States v.

Williams*, 811 Fed. Appx. 690 (2d Cir. 2020) (upholding the finding that a bank was

the victim of false statement where loss to the bank was the foreseeable result.)

The fact that Dr. Page had already been harmed by the prior FISA warrants before the 4th warrant issued does not mean that he is not a victim of Clinesmith's false statement.  Nor does the fact that the application for the 4th FISA warrant contained other misstatements and omissions sever the causal link between the offense at issue here and the harm that Dr. Page suffered.   "That there could be a multiplicity of possible 'but-for' causes does not mean that [one of them] fails to qualify as a 'but-for' cause." *In re de Henriquez*, 2015 WL 10692637, at *1 (D.C. Cir. 2015).

Likewise, while the FISC was certainly a victim of the offense conduct, that does not alter the conclusion that Dr. Page was a victim for purposes of the CVRA and the restitution statute.

## B.  Dr. Page Has a Right to Be Heard at the Sentencing

Dr. Page has the right to be heard at sentencing pursuant to the CVRA, 18 U.S.C. § 3771(a)(4).  Dr. Page and undersigned counsel plan to attend the sentencing, and Dr. Page wishes to be heard by the court.  He will not seek imposition of a particular sentence but wants to underscore that Clinesmith's offense was malicious and intentional: Clinesmith altered the email in order to hide the truth  about whether Dr. Page had been a source for the intelligence agency, and that the information had previously been withheld from the FISC.

Clinesmith's assertion during his plea colloquy that he believed that Dr. Page had not been a source for the agency, and that he altered the email to "correct" it, is preposterous.  Had he believed the email was mistaken or unclear, he could have

easily asked the intelligence agency to correct or clarify it.  And he would not have

lied to the SSA about what the intelligence agency had advised the FBI.

Furthermore, Dr. Page was not simply an abstract FISA target for

Clinesmith.  Dr. Page had interacted directly with Clinesmith several months

before Clinesmith altered the email at issue.  In March 2017, during the 2nd FISA

warrant surveillance period and while the 3rd application was being prepared,

Dr. Page was interviewed on five occasions, for a total of about ten hours, by two

FBI agents who – unbeknownst to Dr. Page – were part of the Crossfire Hurricane

team.

In the course of these interviews, Dr. Page advised the agents that he was not

a Russian agent and, to the contrary, that he had previously assisted the FBI and

the U.S. intelligence agency in their counter-intelligence missions.  He also advised

the agents that he had received death threats as a result of the false accusation that

he was a Russian agent.  These interviews led to contact with Clinesmith after an

attorney named Adam Burke began helping Dr. Page.

Mr. Burke was concerned about why the FBI had interviewed Dr. Page so

often and what FBI's legal interest was in Dr. Page.  When Dr. Page advised the

agents he had been speaking to that he had counsel, the agents placed Dr. Page and

Mr. Burke in touch with Clinesmith.[4]  Mr. Burke had conversations with

Clinesmith in which Mr. Burke inquired about obtaining a "proffer letter" for

---

[4] This was not a coincidence, but a result of Clinesmith's standing role as a legal
advisor on the Crossfire Hurricane team.

Dr Page, and advised Clinesmith about the threats that Dr. Page had been receiving because of the false allegation that he was a Russian agent.

Mr. Burke and Clinesmith also discussed a prior FBI case in which Dr. Page had played a role assisting FBI. This was the case of Evgeny Buryakov, a Russian spy posing as a New York banker. Dr. Page cooperated with the FBI's investigation of Buryakov, who was prosecuted and sent to prison. In March 2017—upon Buryakov's scheduled release from prison, media interest was anticipated in the case and Dr. Page was expected to be contacted for comment. Clinesmith told Mr. Burke that he would prefer that Dr. Page not comment or hold off comment.

Clinesmith could not have had any legitimate reason for discouraging Dr. Page from speaking to the media. It appears to be a blatant attempt to discourage Dr. Page from accurately and publicly portraying himself in a favorable way which was at cross purposes with the smear campaign the Crossfire Hurricane team was pursuing as it falsely targeted Dr. Page.

Nonetheless, Dr. Page did make some comments to the media, which were reported on April 5, 2017. That same day, Mr. Burke wrote an email to Clinesmith (with a copy to Dr. Page) stating:

> As a follow up, I wanted to expand on Mr. Page's reasons for addressing the latest controversy directly with the media.
>
> In addition to being maligned by certain media outlets, he has received some thinly veiled death threats including blog post comments (see e.g., attached) and a voicemail message. For this reason, Mr. Page felt compelled to respond. He has addressed the voicemail threat with the agents who advised they were looking into it.
>
> . . .

The following morning, April 6, 2017, Dr. Page responded to this email, both

to Mr. Burke and Clinesmith, but he addressed his comments directly to

Clinesmith, saying, in part:

> Dear Kevin:
>
> Thanks very much for your help in advancing this important process of
> belatedly restoring justice in America, after the vicious campaign lies
> and civil rights violations that led to our discussions.
>
> …
>
> As alluded to by Adam [Burke], I have been quite overwhelmed with
> constant, round-the-clock media inquiries and the damage control
> following the belated revelations of my "idiot"-branding from the
> January 2015 filing, adding new fuel to the highly misleading
> narrative that has drastically defamed not just me but members of my
> family from here to the West coast, etc.  Thanks for your consideration.
> I look forward to resolving this situation.

Copies of both of these emails are attached as Exhibit B.

For reasons that are now clear, Clinesmith never contacted Mr. Burke—

much less Dr. Page—to help remedy the devastating fallout from the false portrayal

of Dr. Page as a Russian agent.  Unbeknownst to Dr. Page and Mr. Burke, the

application for the 3rd FISA warrant was submitted and approved the very next

day, April 7, 2017.

Thus, in early April 2017 Dr. Page directly appealed to Clinesmith for

assistance in dispelling the false allegation that he was a Russian agent.

Clinesmith did nothing to help Dr. Page and stood by while the FBI obtained the 3rd

FISA warrant against Dr. Page (while actively discouraging Dr. Page from publicly

denying that he was a Russian agent).

Then, a mere two months later, Clinesmith committed the instant offense by providing an altered document to the SSA who was tasked to verify the 4th FISA warrant application.  Clinesmith knew —because he had to—that *if* he advised the SSA that Dr. Page had been a source for a U.S. intelligence agency, the application for the 4th warrant likely would not be submitted by DOJ or else might be denied by the FISC.  Either way, disclosing this exculpatory fact would expose the material omission of this critical information from the prior three FISA warrants.  This might require a corrective disclosure to the FISC, pursuant to FISC Rule 13a, with respect to the three prior warrants.  Faced with this choice, Clinesmith chose to lie.

While Clinesmith claims in his sentencing memorandum that he did not intend to mislead anyone by inserting the words "not a source" into the email, this argument is not credible.  In the June 2017 conversation in which Clinesmith told the affiant SSA that Dr. Page was not a source, he expressed relief that: "I mean, at least we don't have to have a terrible footnote."

When the DOJ OIG interviewed him about this comment, Clinesmith tried to explain it away as follows:

> "[Clinesmith] told us that he was referring to how "laborious" it would be to draft such a footnote for the FISA application, not that such a footnote might undermine or conflict with the overall narrative presented in the FISA applications."

Horowitz Report at p. 253. However, the SSA gave a far more realistic assessment of it to the OIG investigators:

> [H]e understood [Clinesmith's] comment about not having to draft a 'terrible footnote' to mean that the team could avoid having to explain in Renewal Application No. 3 that they had 'just now come to determine that [Page] was an asset of the [other agency] and probably

14

> being tasked to engage ... [with] Russians which is ... why we opened a
> case on him.'  The SSA 2 said that he understood [Clinesmith] to be
> saying that 'the optic...would be terrible' if the prior FISA applications
> were 'dubious' in light of a relationship between Page and the other
> agency, and the FBI was only becoming aware of that relationship in
> the third renewal application and after Page's public statements.

Horowitz Report at p. 254. This interpretation hits closer to the truth.  What

Clinesmith was actually relieved about was that he had hit upon a flimsy excuse to

avoid making this disclosure to the FISC at all.

In sum, the relevant facts show that Clinesmith's conduct was not

inadvertent or mistaken.  Nor was it made in good faith.  It was deliberate conduct

to avoid revealing to the FISC that the earlier warrant applications contained a

major omission.  It constituted a doubling down by again failing to advise the FISC

that Dr. Page was an operational contact for the other intelligence agency.


### C.      Dr. Page Has a Right to Restitution

Dr. Page also has the right to "full and timely restitution as provided in law."

18 U.S.C. § 3771(a)(6).  As the victim of a criminal false statement, Dr. Page is

entitled to permissive restitution under 18 U.S.C. § 3663, although he is not entitled

to mandatory restitution under 18 U.S.C. § 3663A.  *See United States v. Dorcely,*

454 F.3d 366, 377 (D.C. Cir. 2006).  Accordingly, Dr. Page submitted to the

Probation Officer in this matter a Declaration of Loss and a Victim's Impact

Statement.

As the FISC recognized in its order of June 25, 2020, Dr. Page also has the

right to seek civil redress under the FISA for injury from the unlawful surveillance

against him.  Opinion and Order Regarding Use and Disclosure of Information at

13, 16-1182,17-52, 17-375, 17-679 (FISA Ct. Jun. 25, 2020) at p. 13.  In this regard,

Dr. Page filed a civil action on November 27, 2020 in this Court against the United

States, the DOJ, the FBI, and eight named individuals, including defendant

Clinesmith, covering his conduct seeking $75 million in damages for their violations

of Dr. Page's rights under FISA, the Federal Torts Claims Act, the Privacy Act, and

the Constitution.  *Page v. James Comey, et al.*, No. 1:20-cv-3460 (KBJ) (D.D.C. filed

Nov. 27, 2020).[5]  In addition, Dr. Page has a claim for the FISA violations against

the United States under the Patriot Act, 18 U.S.C. § 2712, which is pending as an

administrative claim, awaiting determination.  Should the Government deny that

claim, it will issue a "right to sue" letter and that claim will be added to the existing

civil litigation.

Dr. Page pursuing his civil remedies against the United States and other

defendants, including Clinesmith, does not preclude a restitution order in this case.

As the FISC's June 25, 2020 order explains:  "Interpreting FISA 's criminal

prohibitions to hinder pursuit of its complementary civil remedies would violate the

principle that"[ s ]tatutes should be interpreted as a symmetrical and coherent

regulatory scheme." Mellouli v. Lynch, 575 U.S. 798, 135 S. Ct. 1980, 1989 (2015)

(quoting FDA v. Brown & Williamson Tobacco Com., 529 U.S. 120, 133 (2000))." *Id.*

---

[5]Counsel would draw the Court's attention to the Complaint filed in the civil case, which contains additional information regarding Dr. Page's biography, credentials, and service to the United States.

Nevertheless, the existence of a parallel, complex, multi-defendant civil case which includes the Defendant in this matter and the United States as a defendant as well, is clearly a complicating factor in this proceeding.  In this regard, the restitution statute empowers the Court to decline to enter a restitution order if it determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution outweighs the need to provide restitution.  *See* 18 U.S.C. § 3663(a)(1)(B)(ii).

As part of restitution, Dr. Page has additionally requested reimbursement for his expenses in attending the sentencing of this matter, pursuant to 18 U.S.C. § 3663(b)(4).  This claim is described in the Declaration of Loss.

**REQUEST FOR RELIEF**

WHEREFORE, Dr. Page respectfully requests that the Court:

1. Confirm his status as a victim of the offense in this case under 18 U.S.C. § 3771 and 18 U.S.C. § 3663 and to the rights contained therein;

2. Permit Dr. Page to be heard at the sentencing; and

3. Award Dr. Page restitution as determined by the Court at the sentencing hearing.

Respectfully submitted,


_____/s/_____
Leslie McAdoo Gordon
DC BAR #456781
McAdoo Gordon & Associates, P.C.
1140 19th Street, NW, Suite 602
Washington, DC 20036
(202) 293-0534 telephone
(202) 478-2095 facsimile
leslie.mcadoo@mcadoolaw.com


_____/s/_____
K. Lawson Pedigo
Bar ID: TX0186
MILLER KEFFER & PEDIGO PLLC
3400 Carlisle Street, Suite 550
Dallas, Texas 75204
Telephone: (214) 696-2050
klpedigo@mkp-law.net


*Attorneys for Carter Page*

18

## CERTIFICATE OF SERVICE

I hereby certify that, on December 3, 2020, a copy of the foregoing Motion for

Relief Under the Crime Victims' Rights Act was served electronically on:

> Justin Shur
> Emily Kathryn Damrau
> Megan Cunniff Church
> Jordan Rice
> MOLOLAMKEN LLP
> 600 New Hampshire Avenue, NW
> Suite 660
> Washington, DC 20037
> (202) 556-2005
> Email: jshur@mololamken.com
>
> Anthony F. Scarpelli
> U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
> 555 Fourth Street, NW
> Washington, DC 20530
> (202) 252-7707
> Fax: (202) 514-8707
> Email: anthony.scarpelli@usdoj.gov
>
> Neeraj Patel
> Special Assistant United States Attorney
> 157 Church Street
> 25th Floor
> New Haven, CT 06510
> 203-821-3700
> Email: neeraj.patel@usdoj.gov

_____/s/_____
Leslie McAdoo Gordon
DC BAR #456781
McAdoo Gordon & Associates, P.C.
1140 19th Street, NW, Suite 602
Washington, DC 20036
(202) 293-0534 telephone
(202) 478-2095 facsimile
Leslie.mcadoo@mcadoolaw.com

19