UNCLASSIFIED

TOP SECRET//NOFORN

**TO:** All Members of the House of Representatives
**FROM:** HPSCI Minority
**DATE:** January 29, 2018
**RE: Correcting the Record – The Russia Investigations**

---

The HPSCI Majority's move to release to the House of Representatives its allegations against the Federal Bureau of Investigation (FBI) and the Department of Justice (DOJ) is a transparent effort to undermine those agencies, the Special Counsel, and Congress' investigations. It also risks public exposure of sensitive sources and methods for no legitimate purpose.

FBI and DOJ officials did not "abuse" the Foreign Intelligence Surveillance Act (FISA) process, omit material information, or subvert this vital tool to spy on the Trump campaign.

In fact, DOJ and the FBI would have been remiss in their duty to protect the country had they not sought a FISA warrant and repeated renewals to conduct temporary surveillance of Carter Page, someone the FBI assessed to be an agent of the Russian government. DOJ met the rigor, transparency, and evidentiary basis needed to meet FISA's probable cause requirement, by demonstrating:

- contemporaneous evidence of Russia's election interference;
- concerning Russian links and outreach to Trump campaign officials;
- Page's history with Russian intelligence; and
- [REDACTED] Page's suspicious activities in 2016, including in Moscow.

The Committee's Minority has therefore prepared this memorandum to correct the record:

- **Christopher Steele's raw intelligence reporting did not inform the FBI's decision to initiate its counterintelligence investigation in late July 2016.** In fact, the FBI's closely-held investigative team only received Steele's reporting in mid-September – more than seven weeks later. The FBI – and, subsequently, the Special Counsel's – investigation into links between the Russian government and Trump campaign associates has been based on troubling law enforcement and intelligence information unrelated to the "dossier."

- **DOJ's October 21, 2016 FISA application and three subsequent renewals carefully outlined for the Court a multi-pronged rationale for surveilling Page,** who, at the time of the first application, was no longer with the Trump campaign. DOJ detailed Page's past relationships with Russian spies and interaction with Russian officials during the 2016 campaign, [REDACTED]. DOJ cited multiple sources to support the case for surveilling Page — but made only narrow use of information from Steele's sources about Page's specific activities in 2016, chiefly his suspected July 2016 meetings in Moscow with Russian officials. [REDACTED]. In fact, the FBI interviewed Page in March 2016 about his contact with Russian intelligence, the very month candidate Donald Trump named him a foreign policy advisor.

  As DOJ informed the Court in subsequent renewals, [REDACTED] **Steele's reporting about Page's Moscow meetings** [REDACTED]. DOJ's applications did not otherwise rely on Steele's reporting, including any "salacious" allegations



TOP SECRET//NOFORN



UNCLASSIFIED



about Trump, and the FBI never paid Steele for this reporting. While explaining why the FBI viewed Steele's reporting and sources as reliable and credible, DOJ also disclosed:

- Steele's prior relationship with the FBI;
- the fact of and reason for his termination as a source; and
- the assessed political motivation of those who hired him.

- **The Committee Majority's memorandum, which draws selectively on highly sensitive classified information, includes other distortions and misrepresentations** that are contradicted by the underlying classified documents, which the vast majority of Members of the Committee and the House have not had the opportunity to review – and which Chairman Nunes chose not to read himself.[1]

**Background**

On January 18, 2018, the Committee Majority, during an unrelated business meeting, forced a surprise vote to release to the full House a profoundly misleading memorandum alleging serious abuses by the FBI and DOJ. Majority staff drafted the document in secret on behalf of Chairman Devin Nunes (and reportedly with guidance and input from Rep. Trey Gowdy), and then rushed a party-line vote without prior notice.

This was by design. The overwhelming majority of Committee Members never received DOJ authorization to access the underlying classified information, and therefore could not judge the veracity of Chairman Nunes' claims. Due to sensitive sources and methods, DOJ provided access only to the Committee's Chair and Ranking Member (or respective designees), and limited staff, to facilitate the Committee's investigation into Russia's covert campaign to influence the 2016 U.S. elections.[2] As DOJ has confirmed publicly, it did not authorize the broader release of this information within Congress or to the public, and Chairman Nunes refused to allow DOJ and the FBI to review his document until he permitted the FBI Director to see it for the first time in HPSCI's secure spaces late on Sunday, January 28 – 10 days after disclosure to the House.[3]

**FBI's Counterintelligence Investigation**

In its October 2016 FISA application and subsequent renewals, DOJ accurately informed the Court that the FBI initiated its counterintelligence investigation on July 31, 2016, after receiving information [redacted]. George Papadopoulos revealed [redacted] that individuals linked to Russia, who took interest in Papadopoulos as a Trump campaign foreign policy adviser, informed him in late April 2016 that Russia [redacted].[4] Papadopoulos's disclosure, moreover, occurred against **the backdrop of Russia's aggressive covert campaign to influence our elections, which the FBI was already monitoring.** We would later learn in Papadopoulos's plea that that the information the Russians could assist by anonymously releasing were thousands of Hillary Clinton's emails.[5]

DOJ told the Court the truth. Its representation was consistent with the FBI's underlying investigative record, which current and former senior officials later corroborated in extensive







UNCLASSIFIED



Committee testimony. Christopher Steele's reporting, which he began to share with an FBI agent [redacted] through the end of October 2016, **played no role** in launching the FBI's counterintelligence investigation into Russian interference and links to the Trump campaign. In fact, Steele's reporting did not reach the counterintelligence team investigating Russia at FBI headquarters until mid-September 2016, more than seven weeks after the FBI opened its investigation, because the probe's existence was so closely held within the FBI.[6] By then, the FBI had already opened sub-inquiries into [redacted] individuals linked to the Trump campaign: [redacted] and former campaign foreign policy advisor **Carter Page.**

As Committee testimony bears out, the FBI would have continued its investigation, including against [redacted] individuals, even if it had never received information from Steele, never applied for a FISA warrant against Page, or if the FISC had rejected the application.[7]

**DOJ's FISA Application and Renewals**

The initial warrant application and subsequent renewals received independent scrutiny and approval by four different federal judges, ~~three~~ 2 of whom were appointed by President George W. Bush and one by President Ronald Reagan. DOJ first applied to the FISC on October 21, 2016 for a warrant to permit the FBI to initiate electronic surveillance and physical search of Page for 90 days, consistent with FISA requirements. The Court approved three renewals – in early January 2017, early April 2017, and late June 2017 – which authorized the FBI to maintain surveillance on Page until late September 2017. Senior DOJ and FBI officials appointed by the Obama and Trump Administrations, including acting Attorney General Dana Boente and Deputy Attorney General Rod Rosenstein, certified the applications with the Court.

one by George H.W Bush

**FISA was not used to spy on Trump or his campaign.** As the Trump campaign and Page have acknowledged, Page ended his formal affiliation with the campaign months before DOJ applied for a warrant. DOJ, moreover, submitted the initial application less than three weeks before the election, even though the FBI's investigation had been ongoing since the end of July 2016.

DOJ's warrant request was based on compelling evidence and probable cause to believe Page was knowingly assisting clandestine Russian intelligence activities in the U.S.:

- **Page's Connections to Russian Government and Intelligence Officials:** The FBI had an independent basis for investigating Page's motivations and actions during the campaign, transition, and following the inauguration. As DOJ described in detail to the Court, Page had an extensive record as [redacted][8] prior to joining the Trump campaign. He resided in Moscow from 2004-2007 and pursued business deals with Russia's state-owned energy company Gazprom— [redacted][9] As early as [redacted], a Russian intelligence officer [redacted] targeted Page for recruitment. Page showed [redacted].







UNCLASSIFIED



**Page remained on the radar of Russian intelligence and the FBI.** In 2013, prosecutors indicted three other Russian spies, two of whom targeted Page for recruitment. The FBI also interviewed Page multiple times about his Russian intelligence contacts, including in March 2016.[10] The FBI's concern about and knowledge of Page's activities therefore long predate the FBI's receipt of Steele's information.

- **Page's Suspicious Activity During the 2016 Campaign:** The FISA applications also detail Page's suspicious activity after joining the Trump campaign in March 2016. [REDACTED] Page traveled to Moscow in July 2016, during which he gave a university commencement address – an honor usually reserved for well-known luminaries.
  - **It is in this specific sub-section of the applications that DOJ refers to Steele's reporting on Page and his alleged coordination with Russian officials.** Steele's information about Page was consistent with the FBI's assessment of Russian intelligence efforts to recruit him and his connections to Russian persons of interest.
  - In particular, Steele's sources reported that Page met separately while in Russia with Igor Sechin, a close associate of Vladimir Putin and executive chairman of Rosneft, Russia's state-owned oil company, and Igor Divyekin, a senior Kremlin official. Sechin allegedly discussed the prospect of future U.S.-Russia energy cooperation and "an associated move to lift Ukraine-related western sanctions against Russia." Divyekin allegedly disclosed to Page that the Kremlin possessed compromising information on Clinton ("kompromat") and noted "the possibility of its being released to Candidate #1's campaign."[11] [*Note*: "Candidate #1" refers to candidate Trump.] This closely tracks what other Russian contacts were informing another Trump foreign policy advisor, George Papadopoulos.

- In subsequent FISA renewals, **DOJ provided additional information obtained through multiple independent sources that corroborated Steele's reporting.**
  - [REDACTED][12]
  - [REDACTED]
  - Page's [REDACTED] in Moscow with [REDACTED] senior Russian officials [REDACTED] as well as meetings with Russian officials [REDACTED][13]

This information contradicts Page's November 2, 2017 testimony to the Committee, in which he initially denied any such meetings and then was forced to admit speaking with







UNCLASSIFIED

UNCLASSIFIED



Dvorkovich and meeting with Rosneft's Sechin-tied investor relations chief, Andrey Baranov.

- **The Court-approved surveillance of Page allowed FBI to collect valuable intelligence.** The FISA renewals demonstrate that the FBI collected important investigative information and leads by conducting Court-approved surveillance. For instance, [REDACTED]

  DOJ also documented evidence that Page [REDACTED], anticipated [REDACTED] and repeatedly contacted [REDACTED] in an effort to present himself as [REDACTED][15] [REDACTED][16] Page's efforts to [REDACTED] also contradict his sworn testimony to our Committee.

<u>**DOJ's Transparency about Christopher Steele**</u>

**Far from "omitting" material facts about Steele, as the Majority claims,[17] DOJ repeatedly informed the Court about Steele's background, credibility, and potential bias.** DOJ explained in detail Steele's prior relationship with and compensation from the FBI; his credibility, reporting history, and source network; the fact of and reason for his termination as a source in late October 2016; and the likely political motivations of those who hired Steele.

- **DOJ was transparent with Court about Steele's sourcing:** The Committee Majority, which had earlier accused Obama Administration officials of improper "unmasking," faults DOJ for not revealing the names of specific U.S. persons and entities in the FISA application and subsequent renewals. In fact, DOJ appropriately upheld its longstanding practice of protecting U.S. citizen information by purposefully not "unmasking" U.S. person and entity names, unless they were themselves the subject of a counterintelligence investigation. DOJ instead used generic identifiers that provided the Court with more than sufficient information to understand the political context of Steele's research. In an extensive explanation to the Court, DOJ discloses that Steele

  > *"was approached by an identified U.S. Person,[18] who indicated to Source #1[Steele][19] that a U.S.-based law firm[20] had hired the identified U.S. Person to conduct research regarding Candidate #1's[21] ties to Russia. (The identified U.S. Person and Source #1 have a long-standing business relationship.) The identified U.S. person hired Source #1 to conduct this research. The identified U.S. Person never advised Source #1 as to the motivation behind the research into Candidate #1's ties to Russia. <u>The FBI speculates that the identified U.S. Person was likely looking for information that could be used to discredit Candidate #1's campaign.</u>"*[22]

  Contrary to the Majority's assertion that DOJ fails to mention that Steele's research was commissioned by "political actors" to "obtain derogatory information on Donald Trump's ties to Russia,"[23] **DOJ in fact informed the Court accurately that Steele was hired by**







UNCLASSIFIED

TOP SECRET//NOFORN

**politically-motivated U.S. persons and entities and that his research appeared intended for use "to discredit" Trump's campaign.**

- **DOJ explained the FBI's reasonable basis for finding Steele credible:** The applications correctly described Steele as [redacted] . The applications also reviewed Steele's multi-year history of credible reporting on Russia and other matters, including information DOJ used in criminal proceedings.[24] Senior FBI and DOJ officials have repeatedly affirmed to the Committee the reliability and credibility of Steele's reporting, an assessment also reflected in the FBI's underlying source documents.[25] The FBI has undertaken a rigorous process to vet allegations from Steele's reporting, including with regard to Page.[26]

- **The FBI properly notified the FISC after it terminated Steele as a source for making unauthorized disclosures to the media.** The Majority cites no evidence that the FBI, prior to filing its initial October 21, 2016 application, actually knew or should have known of any allegedly inappropriate media contacts by Steele. Nor do they cite evidence that Steele disclosed to *Yahoo!* details included in the FISA warrant, since the British Court filings to which they refer do not address what Steele may have said to *Yahoo!*.

  DOJ informed the Court in its renewals that the FBI acted promptly to terminate Steele after learning from him (after DOJ filed the first warrant application) that he had discussed his work with a media outlet in late October. The January 2018 renewal further explained to the Court that Steele told the FBI that he made his unauthorized media disclosure because of his frustration at Director Comey's public announcement shortly before the election that the FBI reopened its investigation into candidate Clinton's email use.

- **DOJ never paid Steele for the "dossier":** The Majority asserts that the FBI had "separately authorized payment" to Steele for his research on Trump but neglects to mention that payment was cancelled and never made. As the FBI's records and Committee testimony confirms, although the FBI initially considered compensation [redacted], **Steele ultimately never received payment from the FBI for any "dossier"-related information.**[27] DOJ accurately informed the Court that Steele had been an FBI confidential human source since [redacted], for which he was "compensated [redacted] by the FBI" – payment for previously-shared information of value unrelated to the FBI's Russia investigation.[28]

__Additional Omissions, Errors, and Distortions in the Majority's Memorandum__

- **DOJ appropriately provided the Court with a comprehensive explanation of Russia's election interference, including evidence that Russia courted another Trump campaign advisor, Papadopoulos, and that Russian agents previewed their hack and dissemination of stolen emails.** In claiming that there is "no evidence of any cooperation or conspiracy between Page and Papadopoulos,"[29] the Majority misstates the reason why DOJ specifically explained Russia's courting of Papadopoulos. Papadopoulos's interaction with Russian agents, coupled with real-time evidence of Russian election interference, provided the Court with a broader context in which to evaluate Russia's clandestine activities and Page's history and alleged contact with Russian officials. Moreover, since only Page [redacted]








UNCLASSIFIED



[REDACTED], no evidence of a separate conspiracy between him and Papadopoulos was required. **DOJ would have been negligent in omitting vital information about Papadopoulos and Russia's concerted efforts.**

- **In its Court filings, DOJ made proper use of news coverage.** The Majority falsely claims that the FISA materials "relied heavily" on a September 23, 2016 *Yahoo!* News article by Michael Isikoff and that this article "does not corroborate the Steele Dossier because it is derived from information leaked by Steele himself." [30] In fact, DOJ referenced Isikoff's article, alongside another article the Majority fails to mention, not to provide separate corroboration for Steele's reporting, but instead to inform the Court of Page's public denial of his suspected meetings in Moscow, which Page also echoed in a September 25, 2016 letter to FBI Director Comey. [REDACTED] [31]

- **The Majority's reference to Bruce Ohr is misleading.** The Majority mischaracterizes Bruce Ohr's role, overstates the significance of his interactions with Steele, and misleads about the timeframe of Ohr's communication with the FBI. In late November 2016, Ohr informed the FBI of his prior professional relationship with Steele and information that Steele shared with him (including Steele's concern about Trump being compromised by Russia). He also described his wife's contract work with Fusion GPS, the firm that hired Steele separately. This occurred weeks after the election and more than a month after the Court approved the initial FISA application. The Majority describes Bruce Ohr as a senior DOJ official who "worked closely with the Deputy Attorney General, Yates and later Rosenstein," in order to imply that Ohr was somehow involved in the FISA process, but there is no indication this is the case.

  Bruce Ohr is a well-respected career professional whose portfolio is drugs and organized crime, not counterintelligence. There is no evidence that he would have known about the Page FISA applications and their contents. The Majority's assertions, moreover, are irrelevant in determining the veracity of Steele's reporting. By the time Ohr debriefs with the FBI, it had already terminated Steele as a source and was independently corroborating Steele's reporting about Page's activities. Bruce Ohr took the initiative to inform the FBI of what he knew, and the Majority does him a grave disservice by suggesting he is part of some malign conspiracy.

- **Finally, Peter Strzok and Lisa Page's text messages are irrelevant to the FISA application.** The Majority gratuitously includes reference to Strzok and Page at the end of their memorandum, in an effort to imply that political bias infected the FBI's investigation and DOJ's FISA applications. In fact, neither Strzok nor Page served as affiants on the applications, which were the product of extensive and senior DOJ and FBI review.[32] In demonizing both career professionals, the Majority accuses them of "orchestrating leaks to the media" – a serious charge; omits inconvenient text messages, in which they critiqued a wide range of other officials and candidates from both parties; does not disclose that FBI Deputy Director McCabe testified to the Committee that he had no idea what Page and Strzok were referring to in their "insurance policy" texts;[33] and ignores Strzok's acknowledged role in preparing a public declaration, by then Director Comey, about former Secretary Clinton's "extreme carelessness" in handling classified information—which greatly damaged Clinton's public reputation in the days just prior to the presidential election.







UNCLASSIFIED



[1] Letter to HPSCI Chairman Devin Nunes, Assistant Attorney General Stephen Boyd, Department of Justice, January 24, 2018.

[2] Letter to HPSCI Chairman Devin Nunes, Assistant Attorney General Stephen Boyd, Department of Justice, January 24, 2018. DOJ also confirmed in writing to Minority Staff DOJ and FBI's terms of review:

> the Department has accommodated HPSCI's oversight request by allowing repeated in camera reviews of the material in an appropriate secure facility under the general stipulations that (1) **the Chair (or his delegate) and the Ranking Member (or his delegate) and two staff each, with appropriate security clearances, be allowed to review on behalf of the Committee,** (2) that the review take place in a reading room set up at the Department, and (3) that the documents not leave the physical control of the Department, and (5) that the review opportunities be bipartisan in nature. Though we originally requested that no notes be taken, in acknowledgment of a request by the Committee and recognizing that the volume of documents had increased with time, the Department eventually allowed notes to be taken to facilitate HPSCI's review. Also, initial reviews of the material include [sic] short briefings by Department officials to put the material in context and to provide some additional information.

Email from Stephen Boyd to HPSCI Minority Staff, January 18, 2018 (emphasis supplied).

[3] Letter to HPSCI Chairman Devin Nunes, Assistant Attorney General Stephen Boyd, Department of Justice, January 24, 2018.

[4] 

[5] Papadopoulos's October 5, 2017 guilty plea adds further texture to this initial tip, by clarifying that a Russian agent told Papadopoulos that "They [the Russians] have dirt on her"; "the Russians had emails of Clinton"; "they have thousands of emails." *U.S. v. George Papadopoulos* (1:17-cr-182, District of Columbia), p. 7.

[6] 

[7] Under the Special Counsel's direction, Flynn and Papadopoulos have both pleaded guilty to lying to federal investigators and are cooperating with the Special Counsel's investigation, while Manafort and his long-time aide, former Trump deputy campaign manager Rick Gates, have been indicted on multiple counts and are awaiting trial. See *U.S. v. Michael T. Flynn* (1:17-cr-232, District of Columbia); *U.S. v. Paul J. Manafort, Jr., and Richard W. Gates III* (1:17-cr-201, District of Columbia); *U.S. v. George Papadopoulos* (1:17-cr-182, District of Columbia).



[8]

[9]

[10] See also, *U.S. v. Evgeny Buryakov, a/k/a "Zhenya," Igor Sporyshev, and Victor Podobnyy*, U.S. Southern District of New York, January 23, 2015.

[11] Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, p.18. Repeated in subsequent renewal applications

[12] Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, pp. 20-21.





UNCLASSIFIED



[13] [redacted]

[14] [redacted] the FBI and broader Intelligence Community's high confidence assessment that the Russian government was engaged in a covert interference campaign to influence the 2016 election, including that Russian intelligence actors "compromised the DNC" and WikiLeaks subsequently leaked in July 2016 "a trove" of DNC emails. Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, pp. 6-7. Repeated and updated with new information in subsequent renewal applications. Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, pp. 20-21.

[15] Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, pp. 36, 46, 48.

[16] Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, p. 56.

[17] HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation*, January 18, 2018, pp. 2-3 (enumerating "omissions" of fact, regarding Steele and his activities, from the Page FISA applications).

[18] Glenn Simpson.

[19] Christopher Steele.

[20] Perkins Coie LLP.

[21] Donald Trump.

[22] Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, pp. 15-16, n. 8. Repeated in subsequent renewal applications.

[23] HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation*, January 18, 2018, p. 2.

[24] Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, p. 15, footnote 8. Repeated in subsequent renewal applications.

[25] Interview of Andrew McCabe (FBI Deputy Director), House Permanent Select Committee on Intelligence, December 19, 2017, p. 46, 100; Interview of Sally Yates (former Deputy Attorney General), House Permanent Select Committee on Intelligence, November 3, 2017, p. 16; Interview with John Carlin (former Assistant Attorney General for National Security), House Permanent Select Committee on Intelligence, July, 2017, p. 35.

[26] Interview of Andrew McCabe (FBI Deputy Director), House Permanent Select Committee on Intelligence, December 19, 2017, p. 100-101, 115.

[27] Interview of FBI Agent, House Permanent Select Committee on Intelligence, December 20, 2017, p. 112.

[28] Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, pp. 15-16, n. 8. Repeated in subsequent renewal applications.

[29] HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation*, January 18, 2018, p. 4 ("The Page FISA application also mentions information regarding fellow Trump campaign advisor George Papadopoulos, but there is no evidence of any cooperation or conspiracy between Page and Papadopoulos.")

[30] HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation*, January 18, 2018, p. 2. Neither Isikoff nor *Yahoo!* are specifically identified in the FISA Materials, in keeping with the FBI's general practice of not identifying U.S. persons.

[31] Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, p. 25; Department of Justice, Foreign Intelligence Surveillance Court Application, January 12. 2017, p. 31; Carter Page, Letter to FBI Director James Comey, September 25, 2016.







UNCLASSIFIED



[32] [redacted].

[33] Interview of Andrew McCabe (FBI Deputy Director), House Permanent Select Committee on Intelligence, December 19, 2017, p. 157.



UNCLASSIFIED