## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KEVIN CLINESMITH,<br><br>        Defendant. | No. 20 Cr. 165 (JEB) |

### OPPOSITION TO CARTER PAGE'S
### MOTION FOR RELIEF UNDER
### THE CRIME VICTIMS' RIGHTS ACT

Kevin Clinesmith, by and through undersigned counsel, respectfully submits this Opposition to Carter Page's Motion for Relief Under the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771. Put simply, Page is not a "crime victim" under the CVRA and thus has no right to speak at sentencing. He also has failed to establish any entitlement to restitution.

Page has not proved, as required under the CVRA, that Clinesmith's offense was the "but-for" cause of his claimed harms. About nine months *before* Clinesmith's offense, the news media reported that Page had improper ties with Russian operatives. And eight months *before* Clinesmith's offense, the FBI obtained authorization to surveil Page. While Page asserts that such surveillance and publicity led to his claimed harm, Clinesmith caused neither.

The only conceivable harm alleged by Page that in any way relates to Clinesmith's offense is the continued surveillance arising from the third FISA renewal warrant. But, to establish that Clinesmith's offense was the but-for cause of continued surveillance, Page must show that (1) the FBI and DOJ would have included his prior status as an OGA "operational contact" in the final renewal application absent Clinesmith's offense, and (2) the FISC would have denied the application if it had known of Page's status. Page's motion does neither.

Page also fails to prove that his claimed harms were "proximately caused" by Clinesmith's offense. In particular, Page does not—and cannot—establish that his harm was proximately caused by Clinesmith's offense rather than sixteen other errors identified by the Inspector General, including the FBI's heavy reliance on reporting from a confidential human source, Christopher Steele, to establish probable cause for all four FISA applications.

Finally, even if Page were a crime victim, he is not entitled to restitution. For one, he does not actually seek any restitution. Instead, he asks for an advisory opinion that he is entitled to some undetermined amount of restitution, but simultaneously requests that the Court use its authority under 18 U.S.C. § 3663(a)(1)(B)(ii) to "decline to make" an order of restitution. Putting aside that Page does not present a live controversy regarding restitution, his eye-popping claim for $75 million is unsubstantiated by any evidence, his claimed pecuniary losses were not caused by Clinesmith's offense, and his claimed speculative losses are not compensable under the applicable statutory provisions.

For these reasons and those discussed below, the Court should deny Page's motion in its entirety.[1]

## BACKGROUND[2]

I.    **The FBI's Investigation of Russian Interference in the 2016 Election and the Initial FISA Warrant Targeting Page**

In July 2016, the FBI opened the "Crossfire Hurricane" investigation into whether individuals associated with the Donald Trump presidential campaign had coordinated with the

---

[1] Clinesmith addresses the issue of restitution in light of Page's supplemental filing on that issue, Dkt. 35.

[2] Clinesmith describes the relevant facts in detail in his sentencing memorandum. *See* Dkt. 21 at 10-16, 22-30. The most salient facts are summarized again here, however, to facilitate the Court's resolution of the instant motion. The abbreviations used in Clinesmith's sentencing memorandum retain their meaning here.

Russian government's efforts to interfere in the 2016 U.S. presidential election.  Dkt. 9 at ¶4.  At the time, Page was already the subject of an ongoing counterintelligence investigation by the FBI's New York Field Office due to his relationships with certain Russian intelligence officers. OIG Report at 2, 61.  Based in part on those relationships and his connection to the Trump campaign as an advisor, the Crossfire Hurricane team opened an investigation into Page.  *Id.* at 59.  The investigative team then considered seeking a FISA warrant to surveil Page, but Clinesmith and his colleagues in the FBI's Office of the General Counsel determined there was an insufficient basis for probable cause.  *Id.* at 3-4.

Two months later, on September 19, 2016, the Crossfire Hurricane team received reports from an FBI confidential human source, Christopher Steele, containing allegations that Page had met with individuals associated with the Russian government in connection with Russia's efforts to interfere in the 2016 election.  OIG Report at vi-vii.  The information provided by Steele altered the course of the investigation into Page.  Almost immediately, the investigative team began the process to apply for a FISA warrant targeting him.  The "FISA request form drew almost entirely from Steele's reporting in describing the factual basis to establish probable cause to believe that [Page] was an agent of a foreign power," *id.* at 126, and the FBI's eventual warrant application "relied entirely on information from Steele" to support allegations concerning Page's alleged coordination with the Russian government, *id.* at 130.

In September 2016, in response to information in media reports and a letter Page sent to FBI Director James Comey, the DOJ attorney who was responsible for drafting the initial FISA application asked the case agent assigned to the investigation what Page's relationship had been with the OGA.  Dkt. 21 at 10.  The case agent, explicitly referencing the August 17 Memorandum that the OGA provided to the FBI explaining that Page had been an OGA

"operational contact"[3] between 2008 and 2013, responded that he did not think there was a need to disclose Page's prior status in the application. *Id.* at 10-11; OIG Report at 157-58. In his view, Page's operational-contact status was "dated" and "outside [the] scope." OIG Report at 157. Based on the case agent's response, the initial FISA application prepared by the DOJ attorney did not disclose Page's prior relationship with the OGA. *Id.* at 159. The Inspector General later faulted the FBI for that omission because the 2008-2013 period covered some (but not all) of the interactions between Page and Russian intelligence officers relied upon in the initial application. *Id.* at viii, 131, 158 & n.295.

## II.     The FISA Renewal Applications and Clinesmith's Inquiry as to Page's Status with the OGA

The FISC granted the initial FISA warrant on October 21, 2016. OIG Report at v. The FBI later applied for and received three renewal warrants. Dkt. 9 at ¶6. Clinesmith's offense relates only to the final renewal application. *See generally* Dkt. 9.

Prior to the final application, Page asserted during interviews with media outlets that he had assisted U.S. intelligence agencies in the past, including the OGA. Dkt. 9 at ¶9; OIG Report at 248; *see, e.g.*, MSNBC, *Carter Page: I Regularly Briefed CIA, FBI* (May 11, 2017), https://tinyurl.com/y5wqmrgo. That caught the attention of the SSA who would serve as affiant for the final renewal. In his view, if Page "was being tasked by another agency, especially if he was being tasked to engage Russians," it would be "relevant for the [FISC] to know." OIG Report at 249. Accordingly, the SSA asked Clinesmith to inquire with the OGA about Page's status. *Id.*

---

[3] An "operational contact" is, in OGA parlance, a person who provides information to the OGA "acquired through the normal course of [his] activities," but who cannot be "task[ed]" by the agency. OIG Report at 6 n.8.

On June 15, 2017, Clinesmith did as instructed and asked an OGA liaison about Page's status with the agency.  OIG Report at 249-50.  The OGA employee responded the same day, listing (but not attaching due to their sensitive nature) reports previously prepared by the OGA and provided to the FBI, and explaining:

> [The OGA uses] the [digraph] to show that the encrypted individual . . . is a [U.S. person].  We encrypt the [U.S. persons] when they provide reporting to us.  My recollection is that Page was or is . . . [digraph] but the [reports] will explain the details.  If you need a formal definition for the FISA, please let me know and we'll work up some language and get it cleared for use.

Dkt. 9 at ¶12.[4]  One of the reports listed in the OGA email was the August 17 Memorandum.  As explained in his sentencing memorandum, Clinesmith does not recall reviewing that document or any of the other reports referenced in the OGA email.  Dkt. 21 at 13-14; *see* OIG Report at 250; Dkt. 9 at ¶14.

The same day Clinesmith received the OGA email, he forwarded it—including the list of reports that would "explain the details" of Page's relationship with the OGA—to the case agent assigned to the investigation and his acting supervisor.  OIG Report at 250.  The supervisor responded to the case agent (copying Clinesmith) that she would "pull these [reports] for [the case agent] tomorrow and get [the case agent what he] need[s]."  *Id.*  The supervisor subsequently indicated in messages exchanged with the case agent and Clinesmith that the reports had been reviewed by the case agent and his supervisor.

---

[4] Page incorrectly alleges in his motion that the OGA email "confirm[ed] that Dr. Page had been an agency source, using the lexicon 'operational contact.'"  Dkt. 23-2 at 4.  While the OGA email indicates that Page "provide[d] reporting to" the agency, it makes no direct reference to Page being a "source" or "operational contact."  Rather, the August 17 Memorandum listed in the email describes Page as an "operational contact."

The following day, Clinesmith forwarded the OGA's response to the DOJ attorney responsible for drafting the renewal application[5] (the DOJ attorney who drafted the final application was the same attorney who drafted the previous three applications, OIG Report at 131, 157).  OIG Report at 251.  The DOJ attorney responded to Clinesmith, "thanks I think we are good and no need to carry it any further."  *Id.*

As described in detail in his sentencing memorandum, Clinesmith incorrectly believed that Page had been a subsource rather than a source.  Dkt. 21 at 24-26.  While Clinesmith cannot remember precisely how he arrived at that understanding, a number of factors may have contributed, most notably discussions with other members of the Crossfire Hurricane team and confusion arising from differences in FBI and OGA terminology.  *See id.* at 25-26 & n.15.  In particular, members of the Crossfire Hurricane team may have equated the OGA's inability to "task" Page (due to his status as an "operational contact") with Page being a "subsource," as FBI subsources are also not taskable.  *Id.* at 25 n.15.  FBI "sources," in contrast, **are** taskable.  *See, e.g.*, OIG Report at xvi-xvii.

Wherever his misunderstanding came from, the record is clear that Clinesmith held his mistaken belief that Page was a subsource in good faith and believed, at the time, that it was accurate.  For example, the day he received the OGA email, Clinesmith sent a message to his FBI Office of General Counsel supervisor expressing his belief that Page was a "U.S. subsource of a source."  OIG Report at 250.

---

[5] The fact that Clinesmith forwarded the OGA's response but not his underlying email is of no consequence.  Even if the DOJ attorney was not aware of the SSA's request of Clinesmith, it is clear from the text of the OGA email that it was a response to an inquiry about Page's relationship, if any, with the agency (*e.g.*, "My recollection is that Page was or is . . . [digraph] but the [reports] will explain the details.").  Dkt. 9 at ¶ 12.

### III.     The Offense Conduct

On June 19, 2017, the SSA revisited the issue of Page's status with Clinesmith.   OIG Report at 252-53.   They exchanged instant messages in which Clinesmith repeated his good-faith belief that Page was an OGA subsource, and not a source.   *Id.*   The SSA asked Clinesmith if he had it in writing from the OGA that Page was not a source.   *Id.*   Clinesmith thought he had, and indicated he would forward the email to the SSA.   *Id.*

Clinesmith then realized that the OGA email did not specifically state that Page had not been a source.   In an ill-advised attempt to save himself the time and embarrassment of having to backtrack on the assurances he gave to the SSA, Clinesmith forwarded the OGA's response to the SSA (including the list of OGA reports) but added the phrase notated in bold to reflect his understanding of Page's status:

> [The OGA uses] the [digraph] to show that the encrypted individual . . . is a [U.S. person].  We encrypt the [U.S. persons] when they provide reporting to us.  My recollection is that Page was or is . . . [digraph] **and not a 'source'** but the [reports] will explain the details.  If you need a formal definition for the FISA, please let me know and we'll work up some language and get it cleared for use.

OIG Report at 254-55.

Over the next ten days, the DOJ attorney and the case agent worked on and finalized the application, and the SSA signed it.   OIG Report at 220, 224-27.   The final application, as with the previous three applications, did not include information about Page's status as an OGA operational contact between 2008 and 2013.   *Id.* at 8, 248.

## <u>LEGAL STANDARD</u>

As the party asserting rights as a crime victim under the CVRA, Page bears the burden of proving by a preponderance of the evidence that he was "directly and proximately harmed as a

result of the commission of [Clinesmith's] offense."   18 U.S.C. § 3771(e)(2)(A); *see United States v. Giraldo-Serna*, 118 F. Supp. 3d 377, 382 (D.D.C. 2015), *mandamus granted on other grounds*, *In re de Henriquez*, No. 15-3054, 2015 WL 10692637 (D.C. Cir. Oct. 16, 2015) (per curiam), *on remand*, No. 04-cr-114-1, Dkt. 541 (D.D.C. Mar. 14, 2016) (granting CVRA motion).   In conducting this analysis, "[t]he CVRA 'instructs the district court to look at the offense itself only to determine the harmful effects the offense has on parties.' "   *In re McNulty*, 597 F.3d 344, 351 (6th Cir. 2010) (quoting *In re Stewart*, 552 F.3d 1285, 1289 (11th Cir. 2008)).[6]   And, in determining whether the alleged victim was "directly and proximately harmed" by the offense, courts apply the traditional " 'but for' and proximate cause analyses."   *Giraldo-Serna*, 118 F. Supp. 3d at 383.[7]

While the CVRA does not require "a particular type of victim" to be specified "in the elements of the offense or the charging document," courts have recognized "the difficulty presented by a broad society-based statute, such as obstruction or false statements to government officials, when individual victims are proposed to have statutory crime victim status."   *United States v. Atl. States Cast Iron Pipe Co.*, 612 F. Supp. 2d 453, 544 (D.N.J. 2009) (finding alleged

---

[6] In *United States v. Giraldo-Serna*, 118 F. Supp. 3d 377 (D.D.C. 2015), the court, relying on Sixth Circuit precedent, determined that the "Federal offense" committed by the defendant is determined "based solely on facts reflected in the jury verdict or admitted by the defendant."   *Id.* at 382 (quoting *McNulty*, 597 F.3d at 351).   In an unpublished decision, the D.C. Circuit disagreed, reasoning that courts could look beyond "the four corners of . . . [the] plea agreement" to define the offense.   *In re de Henriquez*, 2015 WL 10692637, at *1.   While it makes no difference to the resolution of the motion before the Court, Clinesmith contends that the D.C. Circuit erred in creating a circuit split (albeit through an unpublished opinion) in *In re de Henriquez*.

[7] In response to Page's victim impact statement filed the day before Clinesmith's sentencing memorandum was due, counsel cited *Giraldo-Serna* for the proposition that Page is not a "crime victim" because he was not directly and proximately harmed by Clinesmith's offense.   *See* Dkt. 21 at 17 n.13.   Counsel inadvertently neglected to include the subsequent history in that case, as described above and in footnote 6.   While the district court's observation in its 2015 opinion in *Giraldo-Serna* that § 3663 requires that a victim be directly and proximately harmed by the defendant's offense was not overruled on appeal, counsel apologizes for the oversight.

individual victims were not directly and proximately harmed by obstruction and false statement offenses).  Consistent with that logic, as reflected in the Pre-Sentence Investigation Report, "other than general societal harm," the government indicated that there is "no identifiable victim" in this case.  Dkt. 17 at ¶25.

In the event the Court finds that, contrary to the PSR, Page is a "crime victim," it *may* order restitution for certain losses actually caused by Clinesmith's offense.  18 U.S.C. §§ 3663, 3771(a)(6); *see United States v. Boutros*, No. 20-cr-0082, 2020 WL 6683064, at *1 (D.D.C. Nov. 12, 2020) (interpreting the similar Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A:  "The amount of restitution owed to each victim 'must be based on the amount of loss *actually* caused by the defendant's conduct.'" (emphasis in original) (citation omitted)).  However, before issuing such an order, Page must first prove the amount of loss with "reasonable certainty" and that such loss was the "direct and proximate cause" of Clinesmith's offense.  § 3663(a)(2); *In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012) (applying the MVRA); *see United States v. Sawyer*, 825 F.3d 287, 294 (6th Cir. 2016) ("Whether restitution is mandatory or permissive, [the party seeking an order of restitution] must establish that actual losses to a victim were directly and proximately caused by the offense of conviction.").

## ARGUMENT

## I. Page Is Not a "Crime Victim" Because He Cannot Prove But-For Causation

"An act is a but-for cause of . . . an event if the act is a *sine qua non* of the event—if, in other words, the absence of the act would result in the non-occurrence of the event."  *In re Fisher*, 649 F.3d 401, 403 (5th Cir. 2011) (applying the CVRA).  "Conversely, an act is not a but-for cause of an event if the event would have occurred even in the absence of the act."  *Id.*; *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346-47 (2013); Office of the Gen.

Counsel, U.S. Sentencing Comm'n, *Primer: Crime Victims' Rights* 14 (Jan. 2019), *available at* https://www.ussc.gov/sites/default/files/pdf/training/primers/2019_Primer_Crime_Victims.pdf ("[T]he defendant's criminal conduct will not be 'but-for' cause of the harm if the harm would have occurred even in the absence of the offense.").

Clinesmith's offense is not the but-for cause of Page's claimed harms.  By Page's own admission, any "tangible harm" he suffered stems from "being falsely labeled a Russian spy," Dkt. 19, Victim Impact Statement, at 1; Dkt. 23-2 at 6; *see also* Dkt. 23-2 at 8—something that happened long before, and regardless of, Clinesmith's offense.  By the time of Clinesmith's offense, the initial FISA warrant and two renewals had already issued based on allegations that Page was acting as an agent of the Russian government.  OIG Report at vi, 219.  Moreover, the fact that he was the subject of FISA surveillance had, as Page notes, already been made public in *April 2017*.[8]  Dkt. 23-2 at 3; *see also, e.g.*, Ellen Nakashima et al., *FBI Obtained FISA Warrant to Monitor Former Trump Adviser Carter Page*, Wash. Post (Apr. 11, 2017), https://www.washingtonpost.com/world/national-security/fbi-obtained-fisa-warrant-to-monitor-former-trump-adviser-carter-page/2017/04/11/620192ea-1e0e-11e7-ad74-3a742a6e93a7_story-.html.  And Page had long before been publicly accused of having improper ties with Russian operatives.  *See, e.g.*, Michael Isikoff, *U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin*, Yahoo! News (Sept. 23, 2016), https://www.yahoo.com/news/u-s-intel-officials-probe-ties-between-trump-adviser-and-kremlin-175046002.html.

This point is further illustrated by Page's filings.  He, for example, relies on a March 20, 2017 death threat in an effort to prove the damage that Clinesmith's offense supposedly caused.

---

[8] Without any evidentiary basis, Page claims that "FBI employees and other government officials" leaked to the media that a FISA warrant targeting him had been issued.  Dkt. 23-2 at 3. Page, however, does not identify Clinesmith as one of those FBI employees.  Nor could he, as Clinesmith did not provide that information to the media.

Dkt. 19, Victim Impact Statement, at 1.  But that threat pre-dated Clinesmith's offense by ***three months***.

Likewise, Page points to a January 2018 House of Representatives document as an example of harm.  Dkt. 23-2 at 6-7.  But any possible damage resulting from that document would have occurred regardless of Clinesmith's offense, as the House document notes that Page was the subject of multiple FISA warrants ***before*** the date of Clinesmith's offense.  *Id.*  In other words, Page would have been "paint[ed] . . . as a traitor to his country" regardless of the conduct that led to Clinesmith's guilty plea.  *Id.* at 7.

These examples underscore how, to the extent Page's "reputation was effectively ruined" by "headline controversies" concerning Page's relationship with Russia, the damage was done well before Clinesmith's offense.  Dkt. 19, Victim Impact Statement, at 1.  Ultimately, Page does not even attempt to show—nor could he—that any "tangible harm" as the result of being "labeled a Russian spy" was caused by Clinesmith's offense.

The only harm that could conceivably stem from Clinesmith's offense is the "intangible harm" Page claims he suffered as a result of "being unlawfully spied upon for three months of his life" due to the issuance of the final renewal warrant.  Dkt. 23-2 at 6.  For Page to be a "crime victim" under this theory, he must prove that the final renewal would not have issued but-for Clinesmith's offense.  To make the required showing, Page must prove that (1) the unaltered OGA email would have caused the FBI and DOJ to disclose Page's status as an "operational contact" in the final application, ***and*** (2) such disclosure would have resulted in the FISC declining to issue the warrant.  Page, however, fails to put forth a non-conclusory argument in support of either point.  Nor could he, based on the record.

### A.   Page Fails To Establish that the Unaltered OGA Email Would Have Caused the FBI or DOJ To Disclose Page's Status

One need not guess what the FBI (or DOJ) would have done if it were aware of the unaltered OGA email.  Within hours of receiving it, Clinesmith forwarded the ***unaltered*** OGA email to the FBI case agent, who was intimately involved in preparing the final application, and the case agent's supervisor.  And the next day, Clinesmith also forwarded the ***unaltered*** OGA email to the DOJ attorney responsible for drafting the application.  Yet Page's prior relationship with the OGA was not disclosed in the warrant application.

That is not surprising, given the record here.  It is clear that the FBI's focus was on whether Page had been "***tasked*** by another agency," OIG Report at 249 (emphasis added), not whether he simply provided information to the OGA acquired during the ordinary course of his activities (*i.e.*, as an "operational contact").  That is evident from the fact that the OGA's statement that Page "provide[d] reporting to us"—which was contained even in the altered email forwarded to the SSA—did not trigger disclosure of Page's status.  *Id.* at 250, 254-55.  Nor did the OGA's offer to provide a "formal definition [of Page's status] for the FISA." *Id.*  While both revealed there was ***some*** relationship between Page and the OGA, they didn't trigger disclosure because they didn't show there was a ***taskable*** relationship (which there wasn't).[9]  Indeed, as the SSA acknowledged, the OGA's unaltered email "doesn't really answer the question" ***he*** was focused on: whether Page had been tasked.  *Id.* at 249-50, 254-55.

Clinesmith also forwarded to the case agent, the DOJ attorney, and the SSA the list of OGA reports that "explain[ed] the details" of Page's prior relationship with the OGA, including the August 17 Memorandum.  Unsurprisingly, those reports did not trigger disclosure either, as

---

[9]  Clinesmith's honest but mistaken explanation to the SSA that Page had been an OGA "subsource," *id.* at 252-53, also shows some relationship between Page and the OGA.  Yet, for the same reason, that too did not prompt disclosure in the final application.

the FBI and DOJ had previously considered them.  Prior to the submission of the initial FISA application, the DOJ attorney asked the case agent about Page's status and the agent responded, explicitly referencing the August 17 Memorandum, that "[Page] did meet with [the OGA], however, it's dated and I would argue it was/is outside scope, I don't think we need it in."  OIG Report at 157.  Based on that response, the initial FISA application and the first two renewals did not include information concerning Page's status.  There is no reason to think the FBI or DOJ would have made a different decision based on the same information when it submitted the third and final renewal application.  Indeed, the case agent's supervisor pulled the reports listed in the OGA email for the case agent, but that did not result in disclosure of Page's status.  *See* p. 5, *supra*.

In short, Page has not shown, nor could he based on the record, that but for Clinesmith's alteration of the email, Page's operational-contact relationship with the OGA would have been disclosed to the FISC.

### B. Page Fails To Establish that Disclosure of Page's Status Would Have Resulted in the Warrant Not Issuing

Even if Page's status had been disclosed, Page has failed to prove that such disclosure would have sufficiently undermined the FISC's finding of probable cause.  As a threshold matter, Page's prior relationship with the OGA does not alone negate probable cause.  As an "operational contact," Page provided to the OGA information about contacts he had with Russians "acquired through the ***normal course of [Page's] activities***."  OIG Report at 6 n.8 (emphasis added).  While providing such information to the OGA perhaps could decrease suspicion about those contacts, it is far from inconceivable that an individual engaged in dubious activities would offer up some information to the government in an attempt to curry favor or deflect blame.  In other words, while Page's status as an operational contact may have been

relevant to the FISA application, it was not dispositive as to whether there was probable cause for the warrant.

Additionally, the FISA application—and thus presumably the probable cause finding—was based on evidence and information other than Page's contacts with Russians during the period he "provide[d] reporting to" the OGA. Page was an operational contact between 2008 and 2013, well before the subject of the Crossfire Hurricane investigation: Russia's efforts to interfere with the 2016 U.S. election. OIG Report at i. Thus, Page's relationship with the OGA overlapped with only a subset of the alleged interactions he had with Russians mentioned in the FISA application. *Id.* at vii, 131, 158 & n.295. The FISA applications were driven in large part by information/allegations unrelated to Page's conduct in the 2008-2013 period, including:

- assertions that shortly before the Republican National Convention, Page traveled to Russia and met with Igor Sechin, the Executive Chairman of Rosneft (a Russian energy conglomerate) and a close associate of Vladimir Putin, to discuss lifting Ukraine-related sanctions against Russia, and Igor Divyekin, a high-level Russian official, to discuss sharing with the Trump campaign derogatory information about Secretary of State Clinton, OIG Report at vii;

- assertions that Page acted as an intermediary between Russia and Paul Manafort in a "well-developed conspiracy" of cooperation, which led to Russia's disclosure of hacked Democratic National Committee emails in exchange for the Trump campaign's agreement to sideline Russian intervention in Ukraine as a campaign issue, *id.*;

- an allegation that Page "conceived and promoted" the objective of Russia releasing DNC emails to WikiLeaks, *id.*;

- Page's statements to an FBI confidential human source in 2016 that he has an "open checkbook" from certain Russians to fund a think tank project, *id.*;

- an individual "closely tied" to the president of a school in Russia where Page was selected to give a commencement speech told the FBI that in July 2016, "Page was picked up in a chauffeured car and it was rumored he met with Igor Sechin," *id.* at 221;

- the FBI's assessment that "Page was aware of the pending leak of DNC emails," *id.* at 222;

14

- Page's admission that he met the Russian Deputy Prime Minister in December 2016 "who asked him how to connect for 'future cooperation,' " *id.* at 213;

- the FBI's assessment that Page was "not completely forthcoming" during an interview, *id.*;

- the FBI's assessment that Russian Intelligence Services would continue to use U.S. persons, such as Carter Page, to covertly influence US. foreign policy after the presidential election, *id.* at 200; and

- Page's "continued connections to Russian officials" based on the FBI's assessment of an October 2016 conversation between Page and a confidential human source, *id.* at 201.

Page does nothing to explain how disclosure of the fact that he provided information to the OGA acquired between 2008 and 2013 in the "normal course of [his] activities" would have negated probable cause in light of the other evidence relied upon by the FBI.

Instead, Page argues that Clinesmith's offense combined with "other misstatements and omissions" to cause him harm.  Dkt. 23-2 at 10.  While but-for causation may exist where one act combines with other factors to result in harm, that is only true "***so long as the other factors alone would not have*** [caused the harm]."  *Burrage v. United States*, 571 U.S. 204, 211-12 (2014) (emphasis added).  Under Page's own view of the facts, however, all of the FISA warrants—which in his view caused his claimed harm—were improper based on ***sixteen other errors***, most notably the FBI's reliance on Steele's reporting.  Dkt. 23-2 at 5-6; *see, e.g.*, Compl., *Page v. Comey*, No. 20-cv-3460, at ¶¶7, 12, 39-40, 78-81, 97-99, 105-07 (D.D.C. Nov. 27, 2020).[10]  Because, under Page's own view, those errors by themselves caused his claimed harms, he cannot show but-for causation.

---

[10] Page cites the Department of Justice's after-the-fact concession that there was insufficient evidence to support the issuance of the third or fourth FISA warrants. Dkt. 23-2 at 5-6.  Even so, it proves nothing about the results of Clinesmith's conduct.  The third application pre-dated Clinesmith's offense, and the fourth application "contained the same information used to support probable cause as in" the previous application.  OIG Report at 220.

Page also makes a number of factual assertions that are inaccurate and irrelevant. He argues, for example, that Clinesmith knew that Page had been an OGA operational contact and intentionally sought to conceal that fact. *See* Dkt. 23-2 at 9-10, 14-15. As an initial matter, Clinesmith's intent has no bearing on the question of whether the alteration of the OGA email caused Page's claimed harms. Moreover, as described in Clinesmith's sentencing memorandum, the evidence shows that Clinesmith believed the words he added to the email accurately reflected Page's status and that Clinesmith did not intend to mislead anyone about Page's relationship with the OGA (nor did he have any motive to do so). *See* Dkt. 21 at 24-30.[11]

Additionally, Page recounts a phone conversation his attorney had with Clinesmith and related email correspondence. Dkt. 23-2 at 11-13. The question before the Court, however, is whether Page is a victim of Clinesmith's "Federal offense," § 3771(e)(2)(A), not whether Page was somehow harmed by Clinesmith in other ways (which he was not). *See In re Stewart*, 552 F.3d at 1288-89. In any case, the episode Page recounts is unremarkable. That Clinesmith did not divulge the details of an ongoing, classified FBI counterintelligence investigation to Page or his lawyer—as per the direction of Clinesmith's superiors and the investigative team—is hardly unusual or suspicious. Nor is the fact that Clinesmith told Page's lawyer that he would "prefer"

---

[11] In arguing that Clinesmith intended to deceive others, Page relies on Clinesmith's instant message to the SSA that "we don't have to have a terrible footnote." *See* Dkt. 23-2 at 14. As discussed above, Clinesmith's intent is irrelevant to whether his offense caused Page's claimed harm. In any event, Page's reliance on Clinesmith's passing use of the phrase "terrible footnote"—which was influenced by a recent convoluted 1.5-page long footnote regarding information provided by Steele in the prior FISA applications—is misplaced. As described in his sentencing memorandum, Clinesmith had no motive to conceal, as he faced no personal exposure from the FBI disclosing Page's historical status with the OGA. Dkt. 21 at 28-30. Regardless, it is hardly remarkable that an attorney might be relieved to not have to include an unwieldy footnote regarding a prior factual oversight, even if such a footnote would not "undermine or conflict with the overall narrative presented in the FISA applications." OIG Report at 253; *see* pp. 12-15, *supra* (describing why Page's status as an operational contact between 2008 and 2013 did not alter the FBI's decision to seek a warrant and would not have defeated probable cause).

that Page not comment on another criminal case (notably, Page did not follow Clinesmith's preference and frequently spoke out in the media). Dkt. 23-2 at 12. It is similarly unsurprising that an FBI attorney would not "help remedy" the portrayal in the media of an individual being actively investigated by the FBI. *Id.* at 13. Indeed, such conduct would have been inappropriate.

In short, Page cannot show that, but for Clinesmith's offense, the final FISA renewal would not have issued. Since he cannot establish but-for causation, Page is not a "crime victim" under the CVRA.

## II.    Page Is Not A Crime Victim Because He Cannot Show Proximate Causation

"Proximate cause ensures 'some direct relation between the injury asserted and the injurious conduct alleged.'" *United States v. Monzel*, 641 F.3d 528, 537 (D.C. Cir. 2011) (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010)). "[A]n intervening force breaks the chain of proximate causation when that intervening force is sufficiently unforeseeable as to constitute a superseding cause." *Hundley v. District of Columbia*, 494 F.3d 1097, 1104 (D.C. Cir. 2007).

While Page fails to prove proximate causation for the same reasons he fails to prove but-for causation, the element of proximate cause is unsatisfied for the additional reason that the sixteen *other* errors that the Inspector General found (and that Page cites) constitute intervening acts that "break[ ] the chain of causation." *Bradley v. NCAA*, 464 F. Supp. 3d 273, 298 (D.D.C. 2020); *see generally* Compl., *Page v. Comey*; Dkt. 19; Dkt. 23-2 at 5-6. For example, the FBI failed to disclose exculpatory statements Page made to confidential human sources in 2016, OIG Report at ix, and, in Page's view, probable cause was defeated for all four warrants due to the FBI's heavy reliance on Steele's reporting, *e.g.*, Compl., *Page v. Comey*, ¶¶ 7, 11. Page gives no reason, nor could he, why those intervening events were reasonably foreseeable to Clinesmith.

*See Hundley*, 494 F.3d at 1104.  Indeed, as discussed in his sentencing memorandum, Clinesmith urged members of the investigative team to send all exculpatory statements to the DOJ attorney drafting the application and thus would have had no reason to believe they would not be disclosed.

### III.    Amici Misconstrue the CVRA and the Record

The amicus brief does not help Page establish that he is a "crime victim."  Dkt. 28-1.

***First***, Amici's principal arguments are not presented in Page's brief and are therefore not properly before the Court.  *See, e.g.*, *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 226 n.4 (2013) (declining to consider argument presented by amicus when it was not raised below or presented by the parties); *CSX Transp., Inc. v. Surface Transp. Bd.*, 754 F.3d 1056, 1064 (D.C. Cir. 2014) (declining to consider arguments raised only in an amicus brief).  Page filed the CVRA motion at issue and has the burden to show that he was directly and proximately harmed by Clinesmith's offense.  Page identifies two types of harm: (1) "tangible harm *as a result of the 4th FISA Warrant*" to his pecuniary interests due to damage to his reputation, and (2) "the intangible harm of being unlawfully spied upon for three months of his life."  Dkt. 23-2 at 6 (emphasis in original).  His theory of the case is clear:  He suffered harm "because the 4th FISA warrant ***was issued***."  *Id.* at 9 (emphasis added).  Thus, the question before the Court is whether Page has shown that Clinesmith's offense caused ***the issuance*** of the fourth FISA warrant.

Amici, in contrast, admit that they present other harms not claimed by Page in his opening brief.  *See* Dkt. 28 at 7-8.  Citing a case in which a defendant viewed an image of a child sex-abuse victim—an example entirely unlike this case and an obvious instance of serious emotional harm—Amici claim that "an affront to dignity" is sufficient to confer "crime victim" status (notably, the case Amici cites does not mention an affront to dignity as a cognizable

harm).  Dkt. 28-1 at 8 (citing *United States v. Monzel*, 746 F. Supp. 2d 76, 84 (D.D.C. 2010)).

But Page does not present an "affront-to-dignity" theory of harm.

Similarly, Amici claim that "risk of harm" is itself "harm."  Dkt. 28-1 at 9-11; *see also id.*

at 14 (contending that Page was harmed merely by the "***risk*** that the FISC might improperly

authorize surveillance based on falsified information" (emphasis added)).  Page, however, makes

no such argument.  While Amici are correct that they may further develop arguments properly

presented by the parties, Dkt. 28-1 at 4, they may only do so when those arguments are actually

before the court.  *CSX Transp.*, 754 F.3d at 1064; *Narragansett Indian Tribe v. Nat'l Indian*

*Gaming Comm'n*, 158 F.3d 1335, 1338 (D.C. Cir. 1998) (declining to "entertain arguments not

raised by parties" but addressed in amicus brief).  Amici cannot hijack control of the litigation

and expand the scope of arguments before the Court.  *See, e.g.*, *Resident Council of Allen*

*Parkway Vill. v. U.S. Dep't of Hous. & Urban Dev.*, 980 F.2d 1043, 1049 (5th Cir. 1993)

(acknowledging "the rule that an amicus curiae generally cannot expand the scope of [litigation]

to implicate issues that have not been presented by the parties").  Page, like any litigant, should

be held to the arguments he presented in his opening brief.  *Alon Refin. Krotz Springs, Inc. v.*

*EPA*, 936 F.3d 628, 664 (D.C. Cir. 2019) (argument not raised in opening brief was forfeited).[12]

---

[12] Page's belated attempt to retroactively add new arguments to his opening brief, Dkt. 30, is
unavailing.  Page claims that by simply raising the overarching issue of whether he is a victim
under the CVRA, he has properly presented and preserved any possible theory of victimhood,
including Amici's "risk of harm" theory.  *Id.*  That is wrong.  A movant must develop its
arguments and theories in its opening brief; raising a claim does not preserve every argument
that could theoretically support that claim.  *See, e.g.*, *Coleman v. District of Columbia*, 794 F.3d
49 (D.C. Cir. 2015) (asserting a broad claim does not preserve every theory that could support
it); *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 35-36 (D.C. Cir. 2014) (plaintiff forfeited
arguments that foreign country was not entitled to sovereign immunity where other arguments on
the same legal question were properly presented in the district court); *Am. Wildlands v.
Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) (in Administrative Procedure Act case,
plaintiffs forfeited one argument supporting their claim by failing to adequately raise it in their
opening brief).

Adhering to that well-established principle is particularly appropriate in this case, as Page is not a *pro se* litigant and Amici ask the Court to break new ground in the law based on a theory not presented by a party, *see* Dkt. 28-1 at 9-11 (failing to cite a case in which a court found the "risk of harm" to constitute "harm" under the CVRA).

**Second**, Amici's reading of the CVRA is contrary to the statute's text.  " '[W]hen [a] statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.' "  *Sebelius v. Cloer*, 569 U.S. 369, 381 (2013).  And unless Congress specifically defined statutory terms, courts must "look first to the [terms'] ordinary meaning."  *Wallaesa v. Fed. Aviation Admin.*, 824 F.3d 1071, 1082 (D.C. Cir. 2016) (quoting *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1072, 1076 (2012)).  The CVRA defines "crime victim" as "a person directly and proximately **harmed** as a result of the commission of a Federal offense."  § 3771(e)(2)(A) (emphasis added).  "Harm" as a noun means "physical or mental damage: injury" and as a verb means "to damage or injure physically or mentally: to cause harm."  *Harm*, Merriam-Webster Dictionary (online ed.).  Someone who is "harmed" is therefore physically or emotionally damaged or injured.  Tellingly, Page draws on that plain meaning in his opening brief, claiming harm involving some actual direct impact on him, namely continued government surveillance or pecuniary loss resulting from the issuance of the FISA warrants targeting him.  *See* Dkt. 23-2.

Amici, however, would pencil in text to the CVRA so it defines a crime victim as "a person directly and proximately harmed **or exposed to a risk of harm** as a result of the commission of a Federal offense."  *See* Dkt. 28-1 at 9.  But "harm" and "risk of harm" are not the same.  Just as Amici argue that Congress could have "easily written" a "limitation into the statute" to narrow the CVRA's definition of harm to those who were "physically or economically

injured," so too could Congress have written in that one exposed to a mere "risk" of harm is a "crime victim." *Id.* at 8.   Indeed, Congress has explicitly included "risk" created by a defendant's conduct within statutory definitions where it intends to do so.[13]   Consistent with the plain text of the statute, Amici and their counsel—leading experts on the CVRA and victims' rights issues—are unable to cite any case recognizing a "risk of harm" as "harm" within the meaning of the CVRA. *Id.* at 9-11.

**Third**, Amici's argument that the "Court need not explore the connection between [Clinesmith's] false statement and the ultimate harmful ramifications to [Page] from the FISC's renewal of the warrant" is faulty.  Dkt. 28-1 at 12.  Amici's theory is predicated on the notion that Page is a victim because the false statement "creat[ed] a ***risk*** that the FISC might improperly authorize surveillance based on the falsified information." *Id.* at 14.  But risk of harm is not harm, as discussed above.  There can be no harm without some sort of actual impact on the victim. *See, e.g.*, *United States v. Benns*, 810 F.3d 327, 330 (5th Cir. 2016) (government agency not a victim entitled to mandatory restitution where defendant forged documents in an unsuccessful attempt to avoid foreclosure, where the agency offered no evidence that the false

---

[13] *See, e.g.*, 18 U.S.C. §§ 16(b), 924(c)(3)(B) (defining "crime of violence" as an offense that "involves a ***substantial risk*** that physical force against the person or property of another may be used in the course of committing the offense" (emphasis added)); 18 U.S.C. § 844(f)(2) ("Whoever engages in conduct prohibited by this subsection, and as a result of such conduct, directly or proximately causes personal injury ***or creates a substantial risk of injury*** to any person . . . ." (emphasis added)); 18 U.S.C. § 4243(d) ("[A] person found not guilty only by reason of insanity of an offense involving bodily injury to, or serious damage to the property of, another person, or involving a ***substantial risk*** of such injury or damage, has the burden of proving by clear and convincing evidence that his release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect." (emphasis added)); 21 U.S.C. § 858 ("Whoever, while manufacturing a controlled substance in violation of this subchapter, or attempting to do so, or transporting or causing to be transported materials, including chemicals, to do so, creates a substantial ***risk of harm*** to human life shall be fined in accordance with Title 18 or imprisoned not more than 10 years, or both." (emphasis added)).

statement actually caused it harm); *United States v. Oladimeji*, 463 F.3d 152, 159 (2d Cir. 2006) (explaining that while "mere possession" of credit cards, "even with intent to defraud, was not sufficient to cause a loss" to render someone a "victim" entitled to restitution; "[f]raudulent *use*" of the cards was sufficient (emphasis added)).

The Attorney General Guidelines for Victim and Witness Assistance make clear that actual harm is required to qualify as a "victim." The Guidelines explain, for example, that in identity theft cases, "[i]f no evidence indicates that the information was *misused*, there is likely no direct harm to support victim status." U.S. Dep't of Justice, *Attorney General Guidelines for Victim and Witness Assistance* 10 (rev. May 2012), https://www.justice.gov/sites/default/files/olp/docs/ag_guidelines2012.pdf (emphasis added). Similarly, the Guidelines explain that in a large data breach case, "[i]f there is no indication from the facts known at the time and any reasonable additional investigation that the information *has been misused*, then the direct harm may only be to the entity that legitimately held the [information]," rather than the individuals whose information was exposed to the risk of misuse. *Id.* Together, this guidance indicates that mere exposure to potential harm is not enough; some real impact on the victim must occur.[14]

In any case, even if Amici's theory of harm were correct and had been presented by Page in his opening brief, it would still require Page to show that, but for the offense conduct, the FBI and DOJ would have disclosed Page's status as an operational contact to the FISC. *See* Dkt. 28-

---

[14] The Guidelines also explain that emotional harm "may be presumed in violent crime cases where the individual was actually present during a crime of violence, or, if not present, received information about a violent act attempted against him or her." U.S. Dep't of Justice, *supra*, at 9. Notably, that explains why Amici's fanciful attempted murder hypothetical is inapposite— beyond the drastic difference between attempted murder of a person sleeping in his/her bed and the false-statement offense at issue. *See* Dkt. 28-1 at 9-10.

1 at 13 (arguing that "Defendant deprived Dr. Page of the careful FISC review to which he was
entitled").  Neither Amici nor Page have made or can make that showing.  *See* pp. 12-13, *supra*.

**Fourth**, Amici misconstrue the causation requirement for another reason.  While Amici,
like Page, are correct that "there could be a multiplicity of possible 'but-for' causes," Dkt. 28-1
at 17 (citing *In re de Henriquez*, 2015 WL 10692637, at *1 (citing *Burrage*, 571 U.S. at 211-
12)), that is true only "***so long as the other factors alone would not have*** [caused the harm],"
*Burrage*, 571 U.S. at 211-12 (emphasis added).[15]  As explained in detail above, assuming the
fourth FISA warrant issued without probable cause, "other factors alone" were the cause.  *See*
pp. 13-17, *supra*.

**Fifth**, Amici, who are new to the case, understandably misapprehend the facts.  Amici
argue that Clinesmith sent false information to "his supervisor who prepared the FISA warrant,"
and that he "knew that the substance of the materially false statement he sent to his supervisor
about [Page] would be conveyed 'to the court.'"  Dkt. 28-1 at 12-13.  As described at length in
Clinesmith's sentencing memorandum and this brief, the affiant—who was not Clinesmith's
supervisor—did not prepare the FISA application.  That is the DOJ attorney's role, with the case
agent bearing ultimate responsibility for the factual accuracy of the information in the
application.  *E.g.*, Dkt. 21 at 10-11 & n.3.  Notably, Clinesmith sent both the DOJ Attorney and
the case agent the OGA's response email without the alteration.  Clinesmith also sent the list of
OGA reports—which would "explain the details" of Page's relationship with the OGA—to the
DOJ attorney, the case agent, and the SSA.  Amici also ignore significant portions of the record

---

[15] One possible exception to the general but-for causation requirement discussed, but not
accepted, in *Burrage* is the "rare" circumstance where there are "multiple sufficient causes [that]
independently, but concurrently, produce a result."  *Burrage*, 571 U.S. at 214-15.  Page does not
rely on the multiple-sufficient-causes doctrine, which would not apply here because there is no
showing that the false statement was "sufficient" by itself to result in the fourth FISA warrant's
issuance.

which show that (1) Clinesmith did not believe he was conveying false information about Page's status, and (2) even if Clinesmith had not altered the email, Page's status as an operational contact would still not have been included in the application.  *See* pp. 6-7, 12-13, *supra*.

**Finally**, Amici exaggerate the impact that Page's status as an operational contact from 2008 to 2013 would have had on the FBI and DOJ's preparation of the application.  *See, e.g.*, Dkt. 28-1 at 11, 19-20.  As noted above, the FBI and DOJ simply did not find that information important in light of the three years that had passed since his operational-contact status concluded, the more recent evidence relied upon to support the FISA warrant, and the fact that operational contacts cannot be tasked.  *See* pp. 12-13, *supra*.  While Clinesmith told the Inspector General during an interview that it was a "big, big concern from both [DOJ] and from the FBI" if Page had been a source for the OGA, OIG Report at 249 (quoted in Dkt. 9 at ¶ 10), the concern was rooted primarily in whether Page had been a ***taskable*** source, as evidenced by the SSA's statements to the Inspector General, *id.*, and the FBI's and the DOJ's indifference to the August 17 Memorandum and the unaltered OGA email that Clinesmith forwarded to the case agent, his supervisor, and the DOJ attorney.

In short, Amici's atextual reading of § 3771's definition of "crime victim" is unsupportable.  Harm requires exactly that: harm.  Mere "risk of harm" is not enough.  And to the extent that Amici's arguments are presented in Page's motion and therefore properly before the Court, Amici misunderstand the facts and misapply the law of causation.  Ultimately, Amici cannot salvage Page's failure to carry his burden to establish that he is a "crime victim" under the CVRA.

## IV.     Page Is Not Entitled to Restitution

As Page is not a "crime victim," he is not owed restitution.  18 U.S.C. §§ 3663(a)(2), 3771(a)(6).   And even if he were a victim, Page is not entitled to restitution under the "permissive restitution" provisions of 18 U.S.C. § 3663, which Page acknowledges govern his request here.  Dkt. 23-2 at 15 (recognizing he is not entitled to mandatory restitution under 18 U.S.C. § 3663A).

As an initial matter, Page's motion for restitution is moot.  While his multiple filings are confusing and at times seemingly contradictory, it appears that he does not actually seek restitution.  Rather, he asks the Court for an advisory opinion that he is theoretically entitled to some amount of restitution, but also urges that the Court should not enter an order for restitution because Page has failed to substantiate *his own* damages and because, in his view, this case presents complex questions of causation.  Dkt. 35.[16]  Page invokes 18 U.S.C. § 3663(a)(1)(B)(ii), but that section does not authorize the advisory opinion he seeks.  Instead, § 3663(a)(1)(B)(ii) simply permits the Court to decline to issue an order of restitution where it finds that "the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims." The Court should thus find that there is no live dispute regarding restitution and deny Page's motion for restitution as moot.

To the extent that Page may attempt to resurrect his claim for restitution in his reply brief or in yet another supplemental filing, *see* Dkt. 35, Page is not entitled to restitution on the merits.

---

[16] In his supplemental filing, Page at one point says that he seeks an award of restitution "*to the extent practicable*."  Dkt. 35 at 2 (emphasis in original).  In the final paragraph of the filing, however, Page asks the Court for a determination that he is entitled to some amount of restitution while simultaneously requesting that the Court use its authority under § 3663(a)(1)(B)(ii) to decline to order restitution.  *Id.* at 4-5.  While his filings are confusing, it ultimately appears that Page does not actually seek any restitution in this case.

Page has the burden to prove entitlement to restitution by a preponderance of the evidence. 18 U.S.C. § 3664(e). While § 3664(e) refers to the "Government's" burden of proving restitution, as the Government is normally the party seeking restitution, where the Government does not believe a putative victim is entitled to restitution, the putative victim filing a motion for restitution has the burden of proof. *See United States v. Gamma Tech. Indus., Inc.*, 265 F.3d 917, 924-25 (9th Cir. 2001) (placing burden on the party seeking restitution where government did not seek restitution on the party's behalf); *see also* § 3664(e) ("The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires."); *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177 (2009) (burden is generally on the party seeking relief). In seeking restitution, Page must prove the amount of loss caused by Clinesmith's offense "with some reasonable certainty." *In re Sealed Case*, 702 F.3d at 66.

Page has utterly failed to carry his burden, as he admits. Dkt. 35. In a two paragraph declaration, Page claims to have lost business income and opportunities, but does not describe what his business is or what those opportunities were (Page previously claimed travel expenses to attend the sentencing hearing, but the hearing will be held electronically, so he agrees his claim for travel expenses is moot, Dkt. 35 at 2). Dkt. 19. He does not present any proof of impaired business value, past income, or projected future income. He does not even provide his business's name. Page's failure to provide any evidence whatsoever of his claimed losses to which Clinesmith could respond or that the Court could evaluate requires denial of his request for restitution.

That Page has filed a civil case against Clinesmith and other defendants is of no moment. *See* Dkt. 35 at 3. Evidence of any losses Page suffered is in his possession. The pendency of his civil case did not prevent him from providing any proof regarding his alleged business losses.

Moreover, Page has had ample time to develop his case for restitution, particularly with respect to proving his own losses.  During that time, he has filed multiple lawsuits relating to the same losses, *see Page v. Oath Inc.*, No. 17-CV-6990 (S.D.N.Y.); *Page v. Democratic Nat'l Comm.*, 5:18-cv-1019 (W.D. Okla.); *Page v. Democratic Nat'l Comm.*, 20-cv-671 (N.D. Ill.); *Page v. U.S. Dept. of Justice*, No. 19-cv-3149 (D.D.C.); *Page v. Oath Inc.*, No. S20C-07-030 (Del. Super. Ct.), and published a book dealing with the harm he alleges that he suffered as a result of government surveillance, *see* Carter Page, *Abuse and Power: How an Innocent American Was Framed in an Attempted Coup Against the President* (2020).  Yet nevertheless, in this case, Page failed to provide evidence substantiating his purported losses.  His claim for restitution can be swiftly denied on the merits for that reason alone.

Page's conclusory demand for restitution (assuming he actually demanded restitution) also fails because, as discussed above, his claimed harm was not directly or proximately caused by Clinesmith's offense.  18 U.S.C. § 3663(a)(2) (defining a "victim," who may be entitled to restitution, as "a person directly and proximately harmed as a result of the commission of an offense"); *see* pp. 9-18, *supra*; *Boutros*, 2020 WL 6683064, at *1; *Sawyer*, 825 F.3d at 294.  In any event, much of Page's claimed losses, which amount to speculative future lost income, are not compensable under § 3663.  Section 3663(b)(1) limits restitution to actual losses due to harm to property.  *See, e.g.*, *United States v. Abdelbary*, 746 F.3d 570, 578 (4th Cir. 2014).  It does not include, among other things, consequential damages, *e.g.*, *United States v. Onyiego*, 286 F.3d 249, 256 (5th Cir. 2002); *see also United States v. Papagno*, 639 F.3d 1093, 1100 (D.C. Cir. 2011) (restitution statute was not "a consequential damages statute"), lost income, *Onyiego*, 286 F.3d at 256, "opportunity costs," Catherine M. Goodwin, *Federal Criminal Restitution* § 6:13 (2020), or future losses, § 3663(b)(1)(B) (loss limited to damage to property as of date of damage

or the date of sentencing).  Thus, even if Page had provided evidence to substantiate his alleged

losses, and such losses were directly and proximately caused by Clinesmith's offense, he would

still not be entitled to restitution for his claimed losses under § 3663.[17]

## CONCLUSION

For all the reasons stated herein, the Court should deny Page's Motion for Relief Under

the Crime Victims' Rights Act in its entirety.


Dated:    January 5, 2021                          Respectfully submitted,
          Washington, D.C.

                                                    /s/ Justin V. Shur
                                                   Justin V. Shur
                                                   Emily K. Damrau
                                                   MOLOLAMKEN LLP
                                                   600 New Hampshire Avenue, N.W.
                                                   Washington, D.C.  20037
                                                   Telephone:  (202) 556-2000
                                                   Facsimile:   (202) 556-2001

                                                   Megan Cunniff Church
                                                   Jordan A. Rice
                                                   MOLOLAMKEN LLP
                                                   300 N. LaSalle Street, Suite 5350
                                                   Chicago, IL  60654
                                                   Telephone: (312) 450-6700
                                                   Facsimile:  (312) 450-6701

                                                   *Attorneys for Defendant*

---

[17] Even if Page were entitled to restitution, the Court should decline to order it as Clinesmith lacks the ability to pay.  In determining whether to order restitution, the Court should consider "the financial resources" and "earning ability" of the defendant.  18 U.S.C. § 3663(a)(1)(B)(i). Clinesmith is jobless, his family has a negative monthly cash-flow, and his expenses are only expected to increase when he and his wife welcome their first child in March.  Dkt. 17 at ¶ 80.

## <u>CERTIFICATE OF SERVICE</u>

I certify that today, January 5, 2021, I electronically filed the foregoing Opposition to Carter Page's Motion for Relief Under the Crime Victims' Rights Act with the Clerk of the Court for the U.S. District Court for the District of Columbia using the CM/ECF system. All participants in this case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Justin V. Shur